UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

              Plaintiff,

        - against -                                    04 Civ. 4971 (NG) (MDG)

OLYMPIA MORTGAGE CORPORATION, *et al.*,

              Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
TO PIERCE THE CORPORATE VEIL AGAINST DEFENDANT SAMUEL PINTER**

**REED SMITH LLP**
599 Lexington Avenue
New York, NY  10022

Attorneys for Plaintiff
Federal National Mortgage Association

Of Counsel:

Wendy Schwartz
Emily Kirsch
Luanne Chu

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................1

FACTS ....................................................................................................3

    A.     Sam Pinter .........................................................................3

    B.     Olympia ............................................................................5

    C.     Sam Pinter Conceived of, Formed and Controlled Olympia. ...............7

          1.     Olympia's Formation ............................................7

          2.     Corporate Structure .............................................8

               a)    Ownership of Shares .................................8

               b)    Director and Officer Designations .................9

          3.     Absence of Corporate Formalities ..........................10

          4.     Sam Pinter's Control Over Olympia .........................12

          5.     Inadequate Capitalization .....................................14

          6.     Use of Midwood Federal Credit Union To Prop Up Books and Disguise Outgoing Cash ......................................17

    D.     Sam Pinter Routinely Used Olympia To Further His Own Personal and Business Interests .........................................................19

          1.     Payments Made Directly to Sam Pinter's Family and Friends ..............20

          2.     Sam Pinter's Personal Real Estate Portfolio ...............21

          3.     Payments to KSH ...............................................25

          4.     Cash From Olympia's Office Building .......................27

    E.     Olympia's Business Creditors ...................................29

          1.     Fannie Mae ......................................................29

          2.     Warehouse Lenders .............................................31

F.     Sam Pinter's Post Shut-Down Collection and Use of Assets That Should Go To Olympia's Legitimate Creditors ................................................................32

     1.     Use of Olympia's Assets To Avoid Personal Liability.............................32

     2.     Sam Pinter Collected For Himself Olympia-Funded Assets Held By Other Principals.........................................................33

          a)     1716 ........................................................................33

          b)     P&G/Flatbush Avenue Properties ......................................34

          c)     Leib/Shaindy Pinter's Interest in S&F Realty .....................34

          d)     Jasmine Lakes ............................................................35

ARGUMENT .......................................................................................................36

I.     Legal Standards ...........................................................................................36

     A.     Summary Judgment ............................................................36

     B.     Alter Ego Liability ..............................................................37

II.     Sam Pinter Should Be Held Liable For All of Fannie Mae's Damages ...........................39

     A.     Sam Pinter Exercised Complete Dominion Over Olympia ...................39

          1.     Absence of Corporate Formalities. ...........................................40

          2.     Inadequate Capitalization.......................................................41

          3.     Funds Were Routinely Taken Out for Personal Use.................42

          4.     Overlap in Ownership, Space and Personnel of Related Entities .............44

          5.     Olympia's Business Was Operated For The Benefit of Sam Pinter .........45

     B.     Sam Pinter Abused His Domination to Perpetrate a Wrong..................46

CONCLUSION.......................................................................................................52

## Cases

*Atari, Inc. v. Games, Inc.*,
  04 Civ. 3723 (JSR), 2005 WL 1294403 *2-3 (S.D.N.Y.  May 31, 2005) ......................... 38, 46

*Austin Powder Co. v. McCullough*,
  216 A.D.2d 825, 826-28, 628 N.Y.S.2d 855, 856-57 (3d Dep't 1995) ....................... 39, 42, 47

*Bridgestone/Firestone Inc. v. Recovery Credit  Services, Inc.*,
  98 F.3d 13 (2d Cir. 1996)............................................................................................ 43, 45

*Capital Distribution Services, Limited v. Ducor Express Airlines, Inc.*,
  04 CV 5303 (NG) (VVP), 2007 WL 1288046 *2 (E.D.N.Y. May 1, 2007)..................... passim

*Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998)....................................................................................... 36

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................. 36, 37

*Godwin Realty v. CATV Enterprises, Inc.*,
  275 A.D.2d 269, 270, 712 N.Y.S.2d 39, 41 (1st Dep't 2000) ................................... 47

*Hewlett Packard Co. v. The Computer Specialists, Inc.*
  06 Civ. 0390 (RPP), 2007 WL 1434989 *6 (S.D.N.Y. May 15, 2007)...................... 38, 45, 47

*In re Blackwood Assocs., L.P.*,
  153 F.3d 61 (2d Cir. 1998).......................................................................................... 36

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*,
  85 F. Supp.2d 174 (E.D.N.Y. 2000) ............................................................................ 36, 37

*JSC Foreign  Economic Ass'n Technostroyexport v. Int'l Development and Trade Services, Inc.*,
  386 F. Supp.2d 461 (S.D.N.Y. 2005)........................................................................ passim

*MAG Portfolio Consult., Gmbh v. Merlin Biomed Group LLC*,
  268 F.3d 58 (2d Cir. 2001)......................................................................................... 37, 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................................. 36

*Morris v. New York State Dep't of Taxation and Finance*,
  82 N.Y.2d 135, 141-42, 623
  N.E.2d 1157, 1161, 603 N.Y.S.2d 807, 811 (NY 1993)............................................. 39

*Shanghai Join Buy Co., Ltd. v. PSTEX Group, Inc.*,
  05 Civ. 3766 (NRB), 2006 WL 2322648, at *3 (S.D.N.Y. Aug. 10, 2006) ..................... passim

*Smoothline Ltd. v. North Am. Foreign Trading Corp.,*
  00 Civ. 2798 (DLC), 2002 WL 31885795, at *10 (S.D.N.Y. Dec. 27, 2002) .................... 45, 47

*Thrift Drug v. Prescription Plan Serv. Corp ("Thrift Drug III"),*
  1 F. Supp.2d 387 (S.D.N.Y. 1998) ...................................................................... passim

*Thrift Drug v. Prescription Plan Service Corp. ("Thrift Drug I"),*
  890 F. Supp. 319 (S.D.N.Y. 1995) .................................................................... passim

*Thrift Drug, Inc. v. Universal Prescription Adm'rs ("Thrift Drug II")*
  1 F.3d 95 (2d Cir. 1997)......................................................................... 37, 46, 48, 49

*WM Passalacqua Builders, Inc. v. Resnick Developers South,*
  933 F.2d 131, 139 (2d Cir. 1991) ...................................................................... passim

## Statutes

Fed. R. Civ. P. 56(c) ........................................................................................... 36

N.Y. BUS. CORP. LAW § 602 ............................................................................ 10

N.Y. BUS. CORP. LAW § 614 ............................................................................ 10

N.Y. BUS. CORP. LAW § 624 ............................................................................ 10

N.Y. BUS. CORP. LAW § 708 ............................................................................ 10

N.Y. BUS. CORP. LAW § 715 ............................................................................ 10

## PRELIMINARY STATEMENT

In late 2004, plaintiff Federal National Mortgage Association ("Fannie Mae") learned that defendant Olympia Mortgage Corporation ("Olympia"), a New York-based mortgage banker and a servicer of mortgage loans for Fannie Mae, was in default of its loan servicing contractual obligations to Fannie Mae as the result of a well-concealed multi-year servicing fraud in which Fannie Mae lost more than $44 million. Specifically, in its capacity as a servicer of loans for Fannie Mae, Olympia had failed to report and remit payoff monies due to Fannie Mae for 257 mortgage loans that Olympia had been servicing on Fannie Mae's behalf. On August 27, 2007, the Court entered a consent judgment against Olympia in the amount of $44.8 million for its breach of its servicing contractual obligations to Fannie Mae related to its failures to timely and accurately report the status of, and remit payoff amounts for the 257 loans at issue. As stated in Fannie Mae's Memorandum of Law in Support of Motion for Partial Summary Judgment Against Leib Pinter, Defendant Leib Pinter (who oversaw Olympia's servicing functions) is at the heart of these wrongdoings.

Defendant Samuel Pinter ("Sam Pinter") is equally culpable. While Olympia was committing servicing fraud against Fannie Mae, Sam Pinter, using Olympia's assets for his own purposes, siphoned off millions of dollars. Sam Pinter created Olympia and controlled its finances. He divided up the ownership among his family and friends, and appointed himself and them as the sole directors and officers of Olympia. He then proceeded to use the corporate entity as an extension of himself, using its name and assets to further his own and his family's interests, to the detriment of Fannie Mae as well as Olympia's other creditors. Under his control, Olympia was undercapitalized, shareholder and Board meetings were rarely, if ever, held, and the shareholders have no recollection of receiving stock certificates. Rather, Sam Pinter and his

designees shuttled stolen and other funds in and out of the company to provide unearned salaries and benefits for family and to provide capital and funding for personal real estate ventures and other entities affiliated with himself and his family and friends, for which there was no legitimate business purpose.

In late 2004, Olympia ceased operating after Fannie Mae uncovered Olympia's failure to remit loan payoff amounts to Fannie Mae, for which Olympia has since confessed to judgment. Shortly after these acts were uncovered, Sam Pinter gathered up from the other Principals (as hereinafter defined) various Olympia-funded assets, attempting to put them beyond Fannie's Mae's reach.

Olympia was placed in receivership and is now insolvent. Because of the manner in which Sam Pinter allowed Olympia to be run, routinely swapping money among himself, his family, Olympia, and a number of other closely-held companies used to shield his activities, it is impossible at this point to know or detail all of the asset diversion that took place over its two-decade life. For present purposes, we simply detail a number of examples, based on compelling and undisputed evidence, which alone account for millions diverted by Sam Pinter out of Olympia to himself and his family, for their own benefit and to the direct detriment of legitimate creditors, including Fannie Mae.

As there is no genuine issue of material fact on these points, the Court should hold as a matter of equity that the corporate form should be disregarded and that judgment should be entered in favor of Fannie Mae and against Sam Pinter for the entire amount for which Olympia is liable.

## FACTS

### A.     Sam Pinter[1]

Sam Pinter describes himself as a buyer and seller of real estate.  *S. Pinter 10/17/06 Dep.*
at 31:25-32:5; *see also S. Pinter 5/25/05 Dep. ((Chinatrust Bank (USA) v. Samuel Pinter, et al.)*
*("Chinatrust v. Pinter"))* at 7:8-13.  He is an expert at using the corporate form to hold his
money and his properties, owning and controlling a large number of closely held entities, often
in conjunction with his wife Fagie Pinter, or other family members.  In interrogatory responses,
Sam Pinter provided a list of many entities in which he has an interest, *see, e.g., Chu Decl., Exh.*
*1* (Sam Pinter's Response to Interrogatories, dated September 27, 2006 ("2006 Interr. Resp.")) at
4 & Exh. 4 thereto.[2]  He also provided a list of real estate currently or previously owned by those
entities, which he described as "assets   . . . associated with Sam Pinter." *Id.* at 2 & Exh. 3
thereto.  He claims to own, or previously have owned, a 100% interest in the vast majority of
assets held by these entities.  *Id.* at 2 & Exh. 3 thereto.  The lists presented in the interrogatory
responses are edited versions of previous lists maintained internally at Olympia, reflecting his
view of his assets as of 2003 and 2001.[3]  *Balmer Decl., Exh. 34* (Shmuel and Fagie Pinter List of

---

[1] Sam Pinter uses a number of different names, including Sidney V. Pinter, Shmuel, Shmelke, Sam and Samuel. *See S. Pinter 10/17/06 Dep.* at 10:5-10; *S. Pinter 12/15/05 Dep.(Independence Cmty. Bank v. Olympia Mortgage Corp., et al.) ("ICB v. OMC"))* at 7:5-11.  For consistency, all references herein will be "Sam Pinter."  Sam's brother, Leib Pinter, is also known as Samuel Leon Pinter, and sometimes used the name Sam Pinter.  *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 7:13-18; *S. Pinter 10/17/06 Dep.* at 10:11-16.  For clarity, all references to Sam's brother will be to "Leib Pinter."  All deposition testimony is annexed to the Declaration of Luanne Chu, dated May 30, 2008 ("Chu Decl."), and will be referenced by the name of the deponent and the date of the deposition, along with page and line citations.

[2] This list is undisputedly incomplete, as it does not include Olympia itself, and does not include certain other entities in which Sam by his own admission (and discussed herein) held interests.

[3] Since the shut-down of Olympia in 2004, Sam Pinter has transferred or exchanged many of his closely-held entities and real estate properties.  For purposes of this motion, unless otherwise stated, ownership will be described as of 2004.  Fannie Mae has claims for numerous fraudulent transfers, and reserves the right to pursue recovery of all properties associated with Sam Pinter, regardless of the names of the current alleged owners of record.

Closely Held Assets as of 12/31/03 ("2003 Pinter Asset List")) & *Exh. 35* (Shmuel and Fagie

Pinter List of Closely Held Assets as of 10/15/01 ("2001 Pinter Asset List")).

The entities identified fall into three main categories.  Category (1) is comprised of the

long-standing entities through which Sam Pinter held his first properties, all in Brooklyn, New

York – 1340 E. 9th Street Realty Corp. ("1340 Realty"), Z&S Realty Co. ("Z&S Realty") and

S&F Ocean Realty Co. ("S&F Realty").  These all date back to the 1970s or early 1980s.  *S.*

*Pinter 12/15/05 Dep. (ICB v. OMC)* at 15:24-16:21, 17:24-18:2, 35:21-25; 36:10-12.  Category

(2) consists of the entities started during Sam Pinter's tenure at Olympia, associated with specific

investment properties outside of New York.  Category (3) consists of alleged

trust/charitable/religious entities.[4]

Sam Pinter also owns and controls an important entity that he did not list in his

interrogatory responses as being associated with or having an interest in:  Kahal Shomrei Hadath

("KSH").  KSH is a New York (allegedly) non-profit organization formed in 1971 that purports

to be a religious organization.  *S. Pinter 10/17/06 Dep.* at 106:9-14, 108:3-15.  Sam Pinter has

been the Rabbi of KSH since 1978 and has directed the activities of KSH from the time it was

registered through the present.  *S. Pinter 10/17/06 Dep.* at 107:23-25; 108:2; 109:24-25; 110:2-8.

He sometimes references a "KSH Trust," but that is the same entity as KSH.  *S. Pinter 11/14/06*

*Dep.* at 363:18-364:4.  KSH operates out of 1340 E. 9th Street, a property that was owned by

1340 Realty.  *S. Pinter 10/17/06 Dep.* at 308:17-25, 309:2-18.  KSH also occasionally shows the

---

[4] A few entities on Sam Pinter's lists are suggestive of other related businesses.  See, e.g., *Chu Decl., Exh 1* (2006 Interr. Resp.) at 2 & Exh. 4 (Sam Pinter entities include Hardware by Kramer Inc., Kassorla Real Estate Ltd and CMO Title Services.)  As detailed below, some of these also served as a pass through for real estate properties.

same office address as Olympia's latest address, 1716 Coney Island Avenue. *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 581:17-25, 582:2-17.

In practice, Sam Pinter treats all of his entities as interchangeable with himself. In his own words: "when I say *me*, it meant I was in charge of KSH. I was in charge of 1340. I was in charge of Z&S Realty. I mean, when I say myself, it's not me, but incorporated in different entities." *S. Pinter 11/14/06 Dep.* at 365:9-14. Sam Pinter also considers all interests held in the name of his wife to be "his" interests. *S. Pinter 10/17/06 Dep.* at 305:4-7 (describing "his" interests in various assets as 100% regardless of whether technically held by his wife, himself, or both).

From 1986 through 2004, Sam Pinter also formed, built and controlled the financial flow of Olympia. As demonstrated below, he used Olympia as an extension of himself to build his real estate empire and his personal and family fortune. By the end of 2003 – the last full year of Olympia's operation – Sam Pinter had accumulated a net worth exceeding $30 million. *Balmer Decl., Exh. 34* (2003 Pinter Asset List) at 1.

**B. Olympia**

Olympia was an independent mortgage banker, with its headquarters in Brooklyn, New York, licensed to operate in numerous states. *Balmer Decl.* ¶ 5. Olympia's stated business was originating loans to homeowners, secured by a mortgage on the property. *Balmer Decl.* ¶ 6. Olympia also sold loans into the secondary mortgage market, and in many instances, for an additional fee, retained the servicing responsibility for those loans. *Balmer Decl.* ¶ 7.

At times Olympia borrowed money to fund its origination of loans through, among other sources, revolving lines of credit known as "warehouse" lines obtained from China Trust Bank ("China Trust") and Independence Community Bank ("ICB"). *See Chu Decl., Exh. 2*

(Memorandum and Order, dated March 23, 2007, in *Chinatrust Bank (U.S.A.) v. Samuel Pinter, Fagie Pinter and Avruhum M. Donner*, 04 CV 5331 (SLT) (KAM) (E.D.N.Y.) ("China Trust Decision")) at 2 & *Exh. 3* (Decision, dated August 14, 2007, in *Independence Community Bank v. Olympia Mortgage Corp., et al.*, Index No. 36722/04 (N.Y. Sup. Ct.) ("ICB Decision")) at 2. The credit limit on the China Trust warehouse line of credit was at times as high as $15 million. *Chu Decl., Exh. 4* (Affidavit of Anthony Oliva, dated October 27, 2005 ("Oliva Aff.")) ¶ 7. The ICB warehouse line of credit was at times as high as $35 million. *J. Liccardo 12/01/05 Dep. (ICB v. OMC)* at 62:3-6, 64:13-25, 65:2-4.

Beginning in 1988, Olympia contracted with Fannie Mae to sell loans to Fannie Mae and then to provide servicing for those loans. *Chu Decl., Exh.* 5 (Contract); *Chu Decl., Exh.* 6 (Consent Judgment) ¶ 2. Fannie Mae is a private, shareholder-owned company that has been chartered by the federal government to channel its efforts into increasing the availability and affordability of homeownership for low, moderate, and middle income Americans. *Chu Decl., Exh. 7* (Affidavit of Joseph Sakole, dated November 16, 2004 ("Sakole Aff.")) ¶ 3. Fannie Mae operates in the secondary mortgage market, *i.e.*, it does not originate mortgages; rather it purchases them from others. *Chu Decl., Exh. 7* (Sakole Aff.) ¶¶ 2, 3. Fannie Mae does not service mortgages directly but instead generally retains the loan seller (or another third party) to act as loan servicer. *Chu Decl., Exh. 7* (Sakole Aff.) ¶ 4.

Olympia contracted with Fannie Mae until October 2004. On October 19, 2004, shortly after receiving an anonymous tip, Fannie Mae visited Olympia, confronted several of the Principals, confirmed that servicing fraud (the failure to report and remit loan payoffs) had occurred, and terminated the contract. *Chu Decl., Exh. 7* (Sakole Aff.) ¶¶ 16-20. Shortly

thereafter, on November 4, 2004, Olympia surrendered its New York State license to act as a

mortgage lender. *Chu Decl.*, *Exh. 6* (Consent Judgment) at 2.

### C.    Sam Pinter Conceived of, Formed and Controlled Olympia.

#### 1.    Olympia's Formation

In 1986, having at that time 14 years of experience in real estate, Sam Pinter decided to

form a company "giving out mortgages," *S. Pinter 5/25/05 Dep. (Chinatrust v. Pinter)* at 7:20-

8:2, which he could use to support his other business interests. In his own words: "I always went

for mortgages to a third-party. And I had to pay them a fee for retaining the mortgage. And, at

one time, I had one of the mortgage companies that didn't treat me the right way. And I felt that

it was time to form my own mortgage company and – for my own purpose and to the community

to try to solicit other businesses." *S. Pinter 10/17/06 Dep.* at 32:6-13.

Sam Pinter had no interest in actually running the company, so long as he retained overall

control. He planned to "invest, have other people run it." *S. Pinter 5/25/05 Dep. (Chinatrust v.*

*Pinter)* at 8:3-7. But the "other people" who were to run the company were Leib Pinter, Barry

Goldstein and Abe Donner, *S. Pinter 10/17/06 Dep.* at 31:8-24, comprising, with him, a "close

knit" group of "two brothers with two friends." *Id.* at 101:16-18 (Sam Pinter, Leib Pinter, Barry

Goldstein and Abe Donner are referenced herein as the "Principals.")

Leib Pinter (actually known to Fannie Mae as Sam Pinter) is Sam Pinter's brother, and,

as was learned after the fraud against Fannie Mae was discovered, was also a convicted criminal

with no mortgage banking experience.[5] *S. Pinter 10/17/06 Dep.* at 34:22-35:8. Abe Donner,

---

5 Sam Pinter excluded Leib Pinter from holding a title, so as to not raise any issue on account of
Leib Pinter's criminal record. *S. Pinter 10/17/06 Dep.* at 67:16-68:15. However, this fiction was
not consistently maintained. *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 221:22-23, 222:14-223:2; *P.*
*Trinidad 8/31/06 Dep. (ICB v. OMC)* at 78:16-24 (Leib Pinter was, at times, the Vice President,
Senior Vice President, Secretary, Assistant Secretary at Olympia); *P. Trinidad 9/27/06 Dep.* at

who had previously managed three SBICs (Small Business Investment Companies), two of them in partnership with Sam Pinter, had some knowledge of lending but no mortgage banking experience. *Id.* at 33:22-34:21, 37:2-7; *K. Balmer 10/23/06 Dep.* at 170:21-25.  His main qualification was that he and Sam had been friends since 1974. *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 28:15-18, 29:21-25, 30:2-5.  Barry Goldstein was possibly a mortgage broker, and had "connections with banks" but he also had no experience in mortgage banking. *S. Pinter 10/17/06 Dep.* at 32:14-20, 33:6-19; *B. Goldstein 2/2/06 Dep. (ICB v. OMC)* at 15:13-22.

### 2.   *Corporate Structure*

Over time, the Principals and their wives were allocated varying levels of shares, Board positions and officer positions of Olympia.  The wives were merely representatives; each Principal handled his wife's Olympia affairs. *S. Pinter 10/17/06 Dep.* at 137:7-20. *See generally S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 193:8-195:4 (Sam Pinter handled all matters relating to Fagie Pinter's business and real estate interests).  Sam Pinter made Leib Pinter his primary representative, and placed responsibility for the day-to-day operations on Leib, along with Barry Goldstein. *S. Pinter 10/17/06 Dep.* at 124:19-126:6; *S. Pinter 5/25/05 Dep. (Chinatrust v. Pinter))* at 10:16-22. *See also B. Goldstein 2/2/06 Dep. (ICB v. OMC)* at 69:11-14 (Leib Pinter represented the owners, Sam Pinter and Abe Donner).

### a)   Ownership of Shares

The percentage of ownership was frequently shuffled around, making it impossible to discern precise ownership at any given time (by itself a flag showing domination and control).  The general breakdown of claimed equity ownership prior to 2004 seemed to be Fagie Pinter and

---

95:11-24 (Leib Pinter signed documents as Secretary, Assistant Secretary, or Vice President of Olympia); *K. Balmer 10/23/06 Dep.* at 104:11-24; *Balmer Decl., Exh. 1* (Olympia's 2002 tax return listing Leib Pinter as an officer of Olympia) p. 3.

Abe Donner owning the largest percentages, with various combinations of Sam Pinter, Leib

Pinter, Barry Goldstein, some of their children and BL Associates (an entity owned by Barry

Goldstein and Leib Pinter) owning the rest. *Balmer Decl., Exh. 2* (Receiver's chart of changing

ownership).

        b)        <u>Director and Officer Designations</u>

Olympia's director and officer allocations were slightly more stable, with Sam Pinter,

Fagie Pinter, Abe Donner, and Barry Goldstein generally holding the main positions.  Fagie

Pinter's position was held in name only, as there is no evidence she ever had an active role. *F.

Pinter 12/15/05 Dep.* at 62:23-63:3.  Sam Pinter was generally identified as some form of the

"Vice-President." *See, e.g., S. Pinter 10/17/06 Dep.* at 91:2-5 (Sam Pinter was Vice President of

Olympia during its entire existence); *id.* at 67:2-10, 68:3-21 (Sam Pinter was Vice President,

Fagie Pinter was Secretary, Abe Donner was Managing Director and Barry Goldstein was

Managing Director; not sure about the other wives); *P. Trinidad 9/27/06 Dep.* at 70:3-16 (Sam

Pinter was referenced as the Vice President, the Executive Vice President or the Senior Vice

President); *Balmer Exh. 3* (undated document with Olympia's early address Abe Donner as

President, Sam Pinter as Executive Vice President, Joan Bibla as Senior Vice President); *Exh. 4*

(undated document showing officers as Abe Donner President, Sam Pinter Executive Vice

President, Elaine Petrone Vice President, Fagie Pinter Secretary, Barry Goldstein Managing

Director); *Exh. 5* (undated document showing officers as Abe Donner President, Sam Pinter

Senior Vice President, Fagie Pinter Secretary, Barry Goldstein Managing Director and Shaindy

Pinter Shareholder); *Exh. 6* (undated document labeled "Olympia Mortgage Corp. as of January

1, 1998" shows Barry Goldstein as CEO/COO, Abe Donner as President, Sam Pinter as

CFO/Senior VP, Fagie Pinter as Secretary).  As of August 10, 2004 – just before Olympia was

shut down – the Principals of Olympia were identified as Abe Donner President, Fagie Pinter

Secretary, Barry Goldstein Sr. Vice President/Managing Director and Sam Pinter Sr. Vice

President. *Balmer Decl., Exh. 7.*

### 3.    *Absence of Corporate Formalities*

As a corporation formed under New York law, Olympia was required to comply with

New York's Business Corporation law, which requires annual shareholders' meetings to elect the

directors and transact other business on a date fixed by or under the by-laws, *N.Y. BUS. CORP.

LAW* § 602 (McKinney 2008), the issuance of notices of shareholders' meetings, *id.* § 605,

electing directors at shareholders' meetings by a plurality of votes, *id.* § 614, maintaining correct

and complete books and records of account and minutes of all meetings of shareholders, the

Board and any executive committee, *id.* § 624, acting only if upon written consent and

authorization of all members of the Board, *id.* § 708, and election of all officers by the Board or

shareholders, *id.* § 715.

The by-laws of Olympia Funding, the predecessor name to Olympia, tracking New York

law, required annual meetings of shareholders for the election of directors to be held on the first

Monday of each year, *Chu Decl., Exh. 8* (By-laws) § 2 Art. II),[6] notice of such annual meeting to

be given to each shareholder, *id.* § 4 Art. II, election of the directors at each annual meeting by a

plurality of votes (shares) cast, any other action was authorized by a majority of votes cast, or on

written consent of the shareholders of all outstanding shares entitled to vote, *id.* §§ 7, 11 Art. II,

Board action only by the vote of a majority of the directors present at a meeting at which a

---

[6] Articles of Incorporation for Olympia itself have not been produced in this litigation, or
otherwise located. *Balmer Decl.* ¶ 8.

majority of the entire Board of Directors is present, or upon written consent by all members of the Board of Directors filed with the Board minutes. *Id.* §§ 6, 8 Art. III.

As learned after the servicing fraud committed against Fannie Mae was discovered, Olympia followed none of New York's statutory rules, and failed to comply with standard by-laws.

First, no Principal recalls receiving a stock certificate for their Olympia ownership interest and no complete corporate book was kept. *See, e.g., F. Pinter 12/15/05 Dep. (ICB v. OMC)* at 78:7-25, 79:2-11 (Olympia's Secretary never had charge of the books and records of Olympia); *B. Goldstein 2/2/06 Dep. (ICB v. OMC)* at 61:7-12, 140:16-20 (Barry Goldstein never had a stock certificate); *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 38:10-12 (Sam Pinter does not recall getting a stock certificate for his and Fagie Pinter's 40-41% share in Olympia); *S. Pinter 3/22/05 Dep. (ICB v. OMC)* at 546:25-547:7 (Sam Pinter never ever saw a corporate book).[7]

Second, shareholder meetings were at best sporadic and most likely non-existent. Sam Pinter admits that he never received a notice of a shareholders' meeting for Olympia, never attended any formal shareholders' meeting, never formally voted as a shareholder of Olympia, and never participated in an annual shareholders' meeting to appoint directors. *S. Pinter 10/17/06 Dep.* at 96:22-25; *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 218:9-11, 15-25, 219:2-9, 220:25, 221:2-9; 224:3-6. His wife, who was Olympia's Secretary, likewise admits that she never saw any minutes of meetings of shareholders and never maintained any books of minutes.

---

[7] Leib Pinter invoked his Fifth Amendment right against self-incrimination when asked about the existence of any books of minutes of meetings of Olympia's board of directors, and took the Fifth when asked about the absence of any stock certificates evidencing ownership interests at Olympia. *L. Pinter 9/18/06 Dep.* at 64:19-24, 65:11-21. Abe Donner similarly invoked the Fifth Amendment when asked about the location of Olympia's corporate books and records. *A. Donner 20:10-16, 20:24-21:6.*

*F. Pinter 12/15/05 Dep. (ICB v. OMC)* at 78:23-25; 79:2-5. The other shareholders say nothing

different. *B. Goldstein 2/2/06 Dep. (ICB v. OMC)* at 100:14-16.[8]

Board of Director meetings were likewise dispensed with. Sam Pinter testified that

"maybe in the beginning" there was a formal meeting, but "later on, no." *S. Pinter 2/7/06 Dep.*

*(ICB v. OMC)* at 219:2-9. He was unaware of any formal Board of Directors' meetings where

minutes were taken or a Chairman called the Board to order. *S. Pinter 10/17/06 Dep.* at 96:9-17.

Fagie Pinter, the designated Secretary, never gave notice of meetings of the Board of Directors

for Olympia, never saw or prepared minutes of any meetings of the Board of Directors of

Olympia, never participated in any meetings of the directors of Olympia, didn't recall taking

other actions as Secretary and didn't recall delegating those responsibilities to anyone else. *F.*

*Pinter 12/15/05 Dep. (ICB v. OMC)* at 78:10-22; 79:6-15; *F. Pinter 1/24/06 Dep. (ICB v. OMC)*

at 136:24-25; 137:2-3. Barry Goldstein did not know who was on the Board of Directors, does

not recall attending one Board meeting of Olympia during his entire tenure at Olympia, and does

not recall seeing any written minutes of the Board.[9] *B. Goldstein 6/15/06 Dep. (ICB v. OMC)* at

374:21-23; *B. Goldstein 2/2/06 Dep.(ICB v. OMC)* at 101:19-21; *B. Goldstein 2/23/06 Dep. (ICB*

*v. OMC).* at 250:23-25, 251:2-14.

### 4.    *Sam Pinter's Control Over Olympia*

Regardless of share, officer and director allocations on paper, Sam Pinter was the

acknowledged owner and person with overall control. With no corporate financial procedures in

_____

[8] Leib Pinter invoked the Fifth Amendment when asked about the absence of any shareholder
meetings at Olympia, and the non-occurrence of any shareholder votes by Olympia shareholders.
*L. Pinter 9/18/06 Dep.* at 63:23-64:3, 65:22-66:3.

[9] Leib Pinter and Abe Donner asserted their Fifth Amendment rights when asked if any formal
Board of Directors' meetings took place at Olympia and whether minutes of Board meetings
were ever taken. *L. Pinter 9/18/06 Dep.* at 56:8-18, 64:14-24; *A. Donner 7/6/06 Dep.* at 20:20-
25, 21:2-6.

place, Sam Pinter simply laid down the rules, and the others obeyed, no questions asked.  *See,*

*e.g., B. Goldstein 9/26/06 Dep.* at 406:9-407:4 (when Sam Pinter gave directions, they were

followed because Sam controlled Olympia); *S. Pinter 10/17/06 Dep.* at 112:10-20; 114:22-115:4

(when Sam Pinter told Olympia to give him money, Leib Pinter and Barry Goldstein complied;

incredulous to think that any authorization would be needed); *S. Pinter 11/14/06 Dep.* at 366:22-

367:13 (no one at Olympia challenged Sam Pinter's right to receive the regular payments that he

claimed as interest, even if not reflected in Olympia's books); *B. Goldstein 2/23/06 Dep. (ICB v.*

*OMC)* at 273:5-24 (Sam Pinter could obtain any information about Olympia by asking the

owners and employees; anything relating to Olympia that Sam Pinter ever asked Barry Goldstein

about, Barry told him); *J. Goldstein 3/2/06 Dep. (ICB v. OMC)* at 35:16-36:14 ("[Sam] would

start yelling that he is the boss and I should remember that. . . . It was my understanding that . . .

he was in charge of everything.").

Significantly, Sam Pinter maintained a constant physical presence at Olympia.  When

Olympia was first formed, in 1986, it was run out of Sam Pinter's office at 805 Avenue L

(owned by his entity, 1340 Realty).  *S. Pinter 10/17/06 Dep.* at 85:12-15; 86:6-10.  At that time,

he shared the space – one physical office – with his brother, Leib Pinter.  After a short period of

time, part of Olympia's operation moved to a "satellite office" at 18th Avenue.  *Id.* at 85:19-

86:5; 86:22-87:5.  After that, Olympia moved to 1413 Avenue J, and Sam Pinter, at the same

time, moved his office to that location.  *Id.* at 87:6-88:2.  And after that, both Olympia and Sam

Pinter, again at the same time, moved offices to 1716 Coney Island Avenue.  *Id.* at 93:20-94:19.

As part of that last move, Sam Pinter worked for the first several months out of a conference

room at Olympia while construction on his office at 1716 was being completed.  *Id.* And Sam's

presence was more than a formality – he and those running the company for him prayed together

and talked business every single day.  *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 219:3-9, 222:2-4

("I told you I was there every single day").

Sam Pinter also maintained control over Olympia's finances as a signatory on every

Olympia account.  *S. Pinter 10/17/06 Dep.* at 143:3-16.  He authorized those running the day-to-

day business to use a rubber stamp of his name, *id.* at 144:9-145:15, and also would sign checks

"live" if Barry Goldstein or Abe Donner weren't available to sign.  *Id.* at 143:21-144:8.  Every

month or two, he would sign "hundreds" of checks issued by Olympia.  *S. Pinter 2/7/06 Dep.*

*(ICB v. OMC)* at 157:5-18.  *See also S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 466:9-25.

### 5.     *Inadequate Capitalization*

Olympia's most recent audited financial statements before it was shut down, and for

many years prior to that, showed shareholders' equity of $1.5 million.  *Balmer Decl., Exh. 8*

(Olympia's Financial Statement Summary 1991-2005) and *Exh. 9* (Olympia's Shareholder

Equity G/L Entries 1991-2003).  As has been learned since Fannie Mae uncovered Olympia's

servicing fraud, there is, however, neither documentation from Olympia nor testimony from any

of the Principals that supports this figure.  *Balmer Decl.* ¶ 9.  There is an initial amount of

$488,361 in the General Ledger shareholders' equity column between 1991 and 1993, for which

there are no records.  *Id.* ¶ 10.  In 1997, there is a General Ledger entry that purports to increase

shareholders' equity by $600,000.  However, there is a corresponding entry made at the same

time that increases a receivable amount from Shaindy Pinter (Leib's wife) for $300,000 and one

from Miriam Goldstein (Barry's wife) for $300,000 – no cash went into Olympia in connection

with this entry.  *Id.* ¶ 11.  The remaining shareholders' equity that brings the shareholders' equity

number to $1.5 million comes from the reclassification of amounts recorded in Olympia's books

as payable to Sam Pinter ($308,000), Leib Pinter ($74,000) and Abe Donner ($37,100). *Id.* ¶ 12. These were also non-cash events. *Id.* ¶ 12.[10]

Sam Pinter's testimony is consistent with undercapitalization. Sam Pinter repeatedly describes his role in Olympia as the person responsible for its funding. *S. Pinter 10/17/06 Dep.* at 42:24-43:2 ("Olympia was funded by me"); 79:18-24 ("I was the person that they always counted on when they needed – when they needed money"). However, he specifically declined to put any capital into Olympia as equity. *S. Pinter 11/14/06 Dep.* at 367:23-368:4. So did everyone else. *See, e.g., B. Goldstein 8/10/06 Dep.* at 49:20-25; 50:2-4; 51:3-23 (no capital investment from Barry Goldstein); *L. Pinter 9/18/06 Dep.* at 72:14-19 (Leib Pinter invoked the Fifth Amendment when asked about capital contributions to Olympia); *A. Donner 7/06/06 Dep.* at 21:9-16) (Abe Donner invoked the Fifth Amendment when asked about capital contributions to Olympia).

Instead of making actual capital contributions, when Olympia needed funds, Sam Pinter would either "loan" the money to Olympia, at a handsome interest rate, obtain similar "loans" from family or friends, or craft some other financial transaction involving related entities that made funds available or appear to be available, depending on the immediate need. According to Sam Pinter's testimony, he initially loaned Olympia "start up funds . . . small moneys that were needed in the beginning. . . ." *S. Pinter 10/17/06 Dep.* at 42:24-43:16. He doesn't know how much, maybe $50,000 to $100,000. *Id.* at 44:4-20. However, these monies were a loan, not a capital contribution. *Id.* at 45:11-12. As the years passed, there were loans up to a total of

_____

[10] At the time Olympia was shut down in 2004, and for many years prior, Fannie Mae's capitalization requirements were a net worth of at least $250,000 and be otherwise financially acceptable to Fannie Mae. *Chu Decl., Exh. 9* (Servicing Guide § I:101, p. 103). As noted above, compliance with this amount appeared to be satisfied by Olympia's audited financial statements. Only after the shut-down did it become apparent that financial statements must have been falsified.

$1.679 million.  *Id.* at 44:24-45:12, 47:10-14.  These loans did not go from Sam Pinter directly, but are claimed by Sam Pinter to have been made through KSH and other entities controlled by him.  *Id.* at 106:5-23; *S. Pinter 11/14/06 Dep.* at 380:2-10.  Moreover, they were not consistently reflected in Olympia's books.  *S. Pinter 10/17/06 Dep.* at 45:13-17; 46:8-47:9; *S. Pinter 11/14/06 Dep.* at 366:22-367:22; *Balmer Decl.* ¶ 13.

Sam Pinter claims to have provided capital in an uncertain amount, in the form of a second mortgage Sam Pinter took on one of his investment properties, to show liquidity needed for licensing purposes.  *S. Pinter 10/17/06 Dep.* at 47:15-48:21; *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 33:6-35:3.[11]  He admits, however, that this amount was never actually delivered to Olympia, *S. Pinter 10/17/06 Dep.* at 48:14-21, and its availability was quickly withdrawn.  *S. Pinter 11/14/06 Dep.* at 373:8-374:18.

Sam Pinter arranged for Olympia to pay regular "interest" to his related entities KSH, 1340 Realty and Z&S Realty on account of the claimed off-the-books loans, at rates ranging between 12% and 20%.  *S. Pinter 10/17/06 Dep.* at 45:18-46:7; *S. Pinter 11/14/06 Dep.* at 380:11-381:9.  Even though the loans were off-the-books, no one at Olympia ever challenged Sam Pinter's right to receive regular payments.  *S. Pinter 11/14/06 Dep.* at 366:22-367:13.  And absent that certainty, he would not have participated in Olympia, even through loans.  In his own words: "I only invest in brick and mortar, ***what I know and what I control***."  *Id.* at 381:10-20 (emphasis added).

Funds from various family members and friends of Sam Pinter and the other Olympia principals bolstered Olympia's coffers from time to time, in amounts that add up to about $6

---

11 The properties he claims to have mortgaged were owned by 1340 Realty and S&F Realty. *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 35:4-35:10.  But, further demonstrating the lack of separation among his and his family interests, he claims that he did not actually own S&F Realty, but that this belonged to his wife and his sister-in-law.  *Id.* 35:15-36:9.

million, going back to the early-1990s.  Sam Pinter admits that these were all loans as well, not

capital contributions.  *S. Pinter 10/17/06 Dep.* at 49:19-59:23.  These were, for the most part,

reflected in promissory notes, but in at least one instance not, and were not consistently reflected

in Olympia's books, *Balmer Decl.* ¶ 14, but they all generated high interest payments back to

Sam Pinter's family and friends, in amounts that started at 10% and in some cases reached as

much as 25%.  *Balmer Decl., Exh. 10* (listing payments to related-entities, family and friends as

noteholders, and specifying those with notes and interest rates, and those that are without

documentation).  Olympia paid approximately $300,000 per year in interest to these noteholders.

*Id.* Between 1997 and 2004, these payments total almost $2.6 million.  *Id.*

### 6.      Use of Midwood Federal Credit Union To Prop Up Books and Disguise Outgoing Cash

Sam Pinter and the other Principals frequently pumped up Olympia's ledgers with money

illegally obtained from Midwood Federal Credit Union ("MFCU"), and also used MFCU to hide

the destination of monies going out of Olympia.

MFCU was a federally-regulated credit union, chartered sometime on or before the

1980s.  *Balmer Decl.* ¶ 15.  Abe Donner, also an Olympia Principal, was the Chief Executive

Officer of MFCU.  *Balmer Decl., Exh. 11*.  From mid-2003 through 2004, MFCU was located in

the same office building as Olympia at 1716 Coney Island Avenue, *B. Goldstein 2/2/06 Dep.*

*(ICB v. OMC)* at 66:20-25, 67:2-19, on the same floor as Sam Pinter.  *Id.* at 67:16-19.  MFCU

was seized and shut down by its regulator, the federal National Credit Union Administration

("NCUA") on November 4, 2004, within a week after Olympia itself was shut down.  *Balmer*

*Decl.* ¶ 16.

Olympia had over 100 accounts with MFCU between 1994 and 2004, many of which

were not on Olympia's general ledger system.  *Balmer Decl.* ¶ 17.  To bolster Olympia's cash,

Donner permitted Sam Pinter to borrow monies from MFCU in his own name but for Olympia's use, with principal and interest thereafter paid by Olympia. *Balmer Decl.* ¶ 18. *See also S. Pinter 10/17/06 Dep.* at 210:24-218:12; *B. Goldstein 8/10/06 Dep.* at 174:25-175:25, 180:25-181:7, 182:10-24. Leib Pinter or Donner would come to Sam Pinter and ask for a loan for a few weeks. *S. Pinter 10/17/06 Dep.* at 213:8-16, 216:4-22. Sam Pinter would then take out a loan from MFCU, and would give the money to Olympia, and Olympia would pay the interest and principal on the loan back to MFCU. *See S. Pinter 10/17/06 Dep.* at 210:24-218:12. Barry Goldstein and Leib Pinter engaged in similar transactions. *B. Goldstein 8/10/06 Dep.* at 175:4-25;181:3-184:24; 189:8-20; *L. Pinter 9/18/06 Dep.* at 79:6-84:6 (invoking the Fifth Amendment).

Sam Pinter and his family and friends would also take loans from MFCU in their own names for their own purposes, secured by accounts held by Olympia. *Balmer Decl., Exh. 12.* For example, Sam Pinter took out a $175,000 loan from MFCU in July 1997, the proceeds of which were wired to a Texas Title company, that was secured by an Olympia account. *Balmer Decl., Exh. 12.* Similarly, Sam Pinter took out a $75,000 loan from MFCU in December 1997 secured by an Olympia account, but the loan proceeds went to Z&S Realty and S&F Ocean Realty. *Balmer Decl., Exh. 12.* He also took out a $175,000 loan in May 1999 for payment to himself, but the loan was secured by Olympia accounts. *Balmer Decl., Exh. 12.* All the principal and interest on these loans were paid by Olympia. *Balmer Decl., Exh. 12.*

The number of MFCU loans taken by Sam Pinter and his family members escalated significantly over time and totaled approximately $5 million by 1995. *Balmer Decl., Exh. 12.*[12]

_____

[12] While the schedule of loans in this exhibit shows the majority of loans as occurring during the early-1990s, the schedule was prepared on the basis of new loan dates. Most of those loans were extended for years or loan numbers were revised. *Id.*

Sam Pinter's loans totaled $1,273,750. *Balmer Decl., Exh. 12.* Olympia paid the principal and interest on all of these loans except a few. *Balmer Decl., Exh. 12.* A schedule prepared by the Olympia Receiver showing the amount of interest income paid back to MFCU by Olympia by year for the Principals' and related party loans demonstrates that Olympia paid approximately $2.1 million in interest to MFCU for such loans for the years 1995-2004. *Balmer Decl., Exh. 13.*

At the same time, MFCU was used as a way-station to disguise the destination of funds flowing out of Olympia. As a credit union, MFCU did not maintain separate checking or savings accounts for each designated account. Instead, it maintained a handful of accounts in its own name (MFCU), and distinguished among deposits and debits solely on a "book" basis. Thus, all checks out from Olympia's MFCU accounts are written from "MFCU" and not the entity named on the account. This makes tracing of funds from Olympia but sent from MFCU extremely difficult. *Balmer Decl.* ¶ 19.

### D.    Sam Pinter Routinely Used Olympia To Further His Own Personal and Business Interests

From the start and throughout its existence, Sam Pinter disregarded Olympia's independence as a corporation and used its name, address, balance sheet, and money indiscriminately as his own. During this time, he siphoned out from Olympia large amounts of cash unconnected with services actually provided, and beyond the level of financial resources actually available at Olympia. He generally allowed the other Principals to do the same. Moreover, as the founder and mastermind of the Olympia corporate financial set-up, Sam Pinter also used Olympia's name, balance sheet and assets to build for himself a substantial personal real estate portfolio, which by the end of Olympia's life exceeded $30 million.