### 1.     *Payments Made Directly to Sam Pinter's Family and Friends*

Although he claims that he had no involvement with Olympia's business, as of 1998, Sam Pinter was allocating to himself a "salary" of $150,000 from Olympia. *S. Pinter 10/17/06 Dep.* at 133:17-134:13. Salaries were also allocated to the other Principals. *Id.* at 133:17-134:3; 138:5-20.

Sam Pinter and the other Principals purported to take their "salary," as well as additional amounts, in the form of payments to members of their family, even though the family members failed to render any services or provided at most a *de minimis* service. These payments were made as payroll checks, health insurance, and for car payments, mortgage payments and various other benefits, all paid directly to or on behalf of the family members. *S. Pinter 10/17/06 Dep.* at 118:15-20; 138:21-139:14; *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 106:15-25, 107:2-25, 108:2-25, 109:2-24. *See also B. Goldstein 9/26/06 Dep.* at 306:20-308:5, 19-23, 309:17-314:4, 316:17-22, 317:19-318:9; *B. Goldstein 2/2/06 Dep. (ICB v. OMC)* at 110:24-122:7; *Balmer 10/23/06 Dep.* at 143:6-25, 144:2-17, 145:12-25, 146:2-14. Yet the Principals did not report such compensation as income on their own tax returns; instead, W-2s were given to, and tax returns were filed by, the family members who did not perform any services. *S. Pinter 10/17/06 Dep.* at 139:9-17; *B. Goldstein 9/26/06 Dep.* at 307:19-25, 308:1-5, 19-23, 309:17-25, 310:1-8, 311:9-25, 312:1-25, 316:17-22, 317:19-318:9; *Balmer 10/23/06 Dep.* at 145:12-25, 146:2-14.

Using these methods, Sam Pinter and the other Principals took millions of dollars out of Olympia just in the period 1998–2004. At least $1,944,585 in payroll and other benefits went to family members of the Principals who provided no services, and additional millions were provided to Principals' family members where insufficient services were provided to Olympia

for the compensation paid. *Balmer 10/23/06 Dep.* at 143:6-25, 144:2-17, 145:12-25, 146:2-14;

*Balmer Decl., Exhs. 14 & 15.*

### 2.     *Sam Pinter's Personal Real Estate Portfolio*

As noted above (at 3-5) Sam Pinter owns a number of wholly-owned entities that

collectively own real estate worth tens of millions of dollars.  Throughout Olympia's existence,

these entities (like Sam Pinter himself), shared some combination of office space, common

address and telephone numbers and overlapping principals with Olympia, primarily himself and

Fagie Pinter.  Sam Pinter used Olympia to build these personal real estate interests into the

substantial personal fortune that he holds today.  Early on, he caused Olympia to make the initial

real estate purchases.  Later, he simply took out funds for a down-payment, often through KSH

or another entity.  Often, he used Olympia's name, office address and/or balance sheet, to lend

himself additional credibility.  In all instances, his actions demonstrate that he made no

distinction between Olympia's corporate existence and his own, and that he treated Olympia's

assets as his own, reaping a substantial personal gain.

Before he started Olympia in 1986, Sam Pinter's real estate holdings were located in

three entities, and confined to properties in Brooklyn, New York.  The first was Z&S Realty,

which was formed in 1971, and held a building at 4712 12th Avenue. *S. Pinter 12/15/05 Dep.*

*(ICB v. OMC)* at 15:24-17:19; *S. Pinter 10/17/06 Dep.* at 306:12-18.  It was initially a

partnership between Sam and his father-in-law, Zev, *id.*, and Fagie Pinter took over her father's

interest when he passed away. *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 19:20-20:8.  The next

was 1340 Realty, formed in 1978. *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 17:20-18:13.  That

entity held 1340 E. 9th Street (KSH),[13] 1199 E. 8th Street (Sam and Fagie's Brooklyn

residence), and 805 Avenue L (Olympia's first office).[14] *S. Pinter 10/17/06 Dep.* at 29:24-

30:20; 308:17-309:16; *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 583:11-21. *See also Balmer*

*Decl., Exh. 34* (2003 Pinter Asset List). The third entity, formed around 1980, was S&F Realty,

in which Sam Pinter had a 50% interest through his wife that he exclusively managed. *S. Pinter*

*10/17/06 Dep.* at 302:21-303:16; *S. Pinter 12/15/05 Dep. (ICB v. OMC)* at 35:21-25; 36:10-12;

36:21-37:8. That entity held 2502 E. 19th Street and 1806 Ocean Avenue. *S. Pinter 10/17/06*

*Dep.* at 298:15-17. *See also Balmer Decl., Exh. 34* (2003 Pinter Asset List).

In the late 1980s/early 1990s, Sam Pinter began purchasing real estate in Texas. He used

Olympia to support these purchases in several different ways. For several properties, he made

Olympia the purchaser. For example, in 1991, he had Olympia purchase the Hidden Lake

Village Apartments in Baytown, Texas, claiming that funds for purchase would be "infused" into

Olympia by Olympia's officers (*i.e.,* the Principals). *Balmer Decl., Exh. 16* (Hidden Lakes

correspondence). Also in 1991, he had Olympia purchase the Elite Apartments in Arlington,

Texas, noting that the source of funds would include Olympia. *Balmer Decl., Exh. 17* (Elite

correspondence). Notably, Sam Pinter lists several Olympia accounts that would fund the down

payment for Elite. One of those – account # 1579C at Chesed Federal Credit Union (MFCU's

---

13 Sam Pinter claims to have sold 1340 E. 9th Street in 2004, in an IRS § 1031 tax-exempt
exchange for a shopping center *S. Pinter 10/17/06 Dep.* at 310:13-311:5. However, KSH
continues to inhabit the main portion of the synagogue at 1340 E. 9th Street rent-free, and pays
only a small fee for the upstairs women's section. *S. Pinter 10/17/06 Dep.* at 308:24-310:2.

14 While this document has 1716 Coney Island inserted in the middle of the 1340 Realty entry,
that is a typographical error, as 1716 Realty did not hold anything other than 1716 Coney Island
Avenue. Sam Pinter admits that 1340 Realty held 1340 East 9th Street through October 2004,
and 1199 E. 8th Street and 805 Avenue L through March 2006. *S. Pinter 3/22/06 Dep. (ICB v.
OMC)* at 581:17-582:17, 583:11-21.

predecessor) – was a custodial account maintained for the benefit of Fannie Mae.  *Balmer Decl.,*
*Exhs. 17 & 18* (Elite correspondence).

By December 31, 1991, Olympia (not Sam Pinter) was the owner of four apartment
complexes in Texas, including Hidden Lakes Village, The Woods, Woodhollow Apartments, and
the Elite Apartment complex.  *Balmer Decl., Exh. 19* (Olympia  Deeds).  Shortly thereafter, steps
were taken to move those properties out of Olympia and into the hands of Sam Pinter, his
relatives and associates.  For example, in December 1992, inquiries were made about assigning
Olympia's mortgage on Elite Apartments (*i.e.*, transferring the property) to Kassorla Real Estate
Ltd., to "allow Olympia to get this REO off its' [sic] book," *Balmer Decl., Exh. 20*.  Kassorla is
one of the entities associated with Sam Pinter, per his interrogatory answers.  *Chu Decl., Exh* 1
(2006 Interr. Resp.) at 4 & Exh. 4.

Also during 1992, Hidden Lakes Village was conveyed to a company called Olympia-
Schapin Realty and Woodhollow was conveyed to Hardware by Kramer, Inc., in each case at a
loss and for no consideration or inadequate consideration.  *Balmer Decl., Exh. 21* (Olympia
contracts of sale and deeds).  Sam Pinter had an ownership interest in each of Olympia-Schapin
Realty and Hardware by Kramer, Inc.  *Chu Decl., Exh. 1* (2006 Interr. Resp.) at 2 & Exh. 4; *S.
Pinter 10/17/06 Dep.* at 220:25-221:22.  These properties were subsequently sold to third parties
for significant profits.  *Balmer Decl., Exhs.* 21, 23.

Indeed, in July 1994, Hardware by Kramer "authorized" Olympia to make disbursements
to Pinter relatives on account of "monies owed to us [Hardware by Kramer] due to the sale of
Woodhollow Apartments."  *Balmer Decl., Exh. 22.*  Thus, despite the "paper" transfer of this
complex to Hardware by Kramer in 1992, Olympia collected (and remitted to Sam Pinter's
order) the proceeds from the sale of this complex.  On October 26, 1995, Hidden Lakes Village

was sold, generating net proceeds of $1,445,000 to Olympia-Schapin Realty, Ltd.  *Balmer Decl.,*

*Exh. 23*.  Some of the $1,445,000 was used to pay off amounts owing to Olympia as a result of

the transfer; however, several hundred thousand dollars of these proceeds were used to pay off

loans to MFCU, and some $445,000 laundered through MFCU and conveyed to various other

Pinter accounts and entities.  *See Balmer Decl., Exh. 24*.

By 2001, Sam Pinter had amassed a lengthy list of properties in Texas that he considered

"his," in addition to the properties in Brooklyn that he had owned before starting Olympia.

*Balmer Decl., Exh. 35* (2001 Pinter Asset List).  These include the Carters Grove Apartments in

Houston, Texas and the Timbercreek Shopping Center in Houston, Texas, along with many

others.  *Id.*  These also include the Southern Gardens apartment complex in West Columbia, TX,

which Sam Pinter put into Z&S Realty.  *S. Pinter 10/17/06 Dep.* at 305:11-23.  *See also Balmer*

*Decl., Exh. 34* (2003 Pinter Asset List) at 2.  By December 31, 2003, even more were added,

including the Middlesteadt Shopping Center.  *Balmer Decl., Exh. 34* (2003 Pinter Asset List).[15]

Sam Pinter was still using Olympia's name and balance sheet to purchase and manage

these Texas properties.  For example, in a written offer to purchase Middlesteadt, he references

himself as "Samuel Pinter & Associates of Olympia Mortgage Corp."  *Balmer Decl., Exh. 25*.

Moreover, according to a record found on Olympia's computer network, referencing insurance

quotes, the Carters Grove Apartments and the Timbercreek Shopping Center were portrayed as

Olympia-owned properties, and a number of other properties were portrayed as run out of

_____

[15] Various Sam Pinter entities and properties have in recent years been transferred to trusts
and/or non-profits.  *See, e.g., Chu Decl., Exh 1* (2006 Interr. Resp.) at 1-2 (claiming to have
transferred, *inter alia*, 1340 Realty and Carters Grove Apartments LLC to the Fagie Pinter
Irrevocable Trust and the Sam Pinter Irrevocable Trust); *S. Pinter 10/17/06 Dep.* at 23:10-16;
26:3-29:21; *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 593:20-594:2 (Pinter residence in Lakewood
New Jersey has been transferred to Bais Pinchos, Inc., an alleged religious entity, although the
Pinters maintain exclusive use of the property).

Olympia offices (addresses c/o Olympia.)  *Balmer Decl., Exh. 26.*  Yet there is no record of Olympia purchasing or selling any such real estate to or from Sam Pinter, his spouse or his other entities, nor of Olympia managing such real estate, and Olympia did not own any such real estate in 2004 when it ceased operating.  *Balmer Decl.* ¶ 20.

In sum, Sam Pinter used the name, address, balance sheet and the assets of Olympia, to move his real estate holdings beyond Brooklyn, New York, and into the Texas market.  He treated himself as functionally interchangeable with Olympia for these purposes.  Yet none of the benefit of these transactions remains with Olympia (or indeed, with the other Principals); rather, it all resides in Sam Pinter's personal pockets.

### 3.   *Payments to KSH*

KSH pays many of the expenses of Sam Pinter and his family and friends.  *Balmer Decl., Exh. 27* (copies of checks from KSH to, *inter alia*, Samuel Pinter, Charles Pinter (his son), Shaindy Pinter, S&F Realty, 1340 Realty, Abe Donner, Basi Nierenberg (daughter), Samson Pinter (nephew), Township of Lakewood, Bota Sefer (another Sam Pinter religious organization)).  Sam Pinter also runs a significant amount of cash flow to and from his investment properties through KSH.  *Balmer Decl., Exh. 28.*  KSH also holds or has held some of Sam Pinter's investment properties.  *See Chu Decl., Exh. 1* (2006 Interr. Resp.) at 2 & Exh. 3 (Sam Pinter's properties include the Carriage House apartment complex in Odessa, Texas and the Garden Court Apartments complex in Midland, TX, held by "KSH Trust").  Notably, a substantial amount of the funds in KSH originated with Olympia.

At Sam Pinter's direction, Olympia made monthly payments of $12,000 or more to KSH for a period dating prior to 1996 through October 1, 2004.  *See Balmer Decl., Exh. 29* (list of payments made to KSH reflected in Olympia's systems).  On one occasion, Sam Pinter

specifically withdrew $300,000 from Olympia for KSH to use as a down payment for one of the Texas properties. *See S. Pinter 10/17/06 Dep.* at 111:4-112:20. Sam Pinter claims that these payments were interest (and the $300,000 was principal) on loans that he had caused KSH, together with 1340 Realty and Z&S Realty Corporation, to make to Olympia in lieu of an equity infusion. *See S. Pinter 10/17/06 Dep.* at 106:5-23; *S. Pinter 11/14/06 Dep.* at 364:5-17, 365:5-19. No such loans are documented in Olympia's books and records, *S. Pinter 11/14/06 Dep.* at 366:22-367:17; *J. Goldstein 7/19/05 Dep.* at 193:15-25, 194:2-15, 195:11-196:2. But Olympia staff paid these amounts, and more, to Sam Pinter upon his oral request. *S. Pinter 10/17/06 Dep.* at 112:10-115:9.

Olympia's checking accounts also reflect several one-time large payments from Olympia to KSH, in the amounts of $450,000, $217,000, and $100,000. *Balmer Decl., Exh. 29* (list of payments to KSH). In addition, the Receiver has documented transactions from Olympia to MFCU with corresponding subsequent transfers from MFCU to KSH. *Balmer Decl., Exhs.* 30 & 31.

For example, on November 2, 1998, Olympia gave MFCU a check post-dated November 30, 1998 for $152,500 payable to MFCU, a seemingly innocuous transaction standing alone. *Balmer Decl., Exh. 31*. But coupled with MFCU's records – which show a journal entry for November 2nd indicating that $152,500 was to be paid to KSH as directed by Sam Pinter, and a notation of 11/30/98, the date of the post-dated check from Olympia – it was clear that Sam funneled Olympia's money through MFCU to hide the real beneficiary of the transfer, KSH. MFCU carried out the transaction as recorded in its journal on that same day, November 2, 1998, and transferred the $152,500 to KSH. *Id.* KSH's bank records confirm KSH's receipt of the

wire transfer for $152,500.  *Id.*  On November 30, 1998, MFCU cashed Olympia's check for $152,500.  *Id.*

Olympia staff ultimately had to falsify their bookkeeping to show obligations from Olympia to KSH, despite the absence of any supporting documentation.  For instance, in 2001, upon questioning from Olympia's outside accountant, Alan Braun, as to why Olympia was paying interest on an undocumented liability, the payments to KSH were reclassified in Olympia's books as "rent."  *Braun 8/17/06 Dep.* at 131:17-133:7; *Braun 5/11/06 Dep. (ICB v. OMC)* at 287:15-289:20.  This classification, however, was equally unsupported, so a lease was created between Olympia and KSH.  *Braun 5/11/06 Dep.  (ICB v. OMC)* at  328:3-329:3, 433:10-23; *Balmer 10/23/06 Dep.* at 196:2-197:4.  But the transaction remained obviously fictitious, as pursuant to that lease, Olympia was paying KSH for space in a building that Olympia did not use.  *J. Goldstein 7/27/05 Dep.* at 490:19-25, 491:2-13; *Balmer 10/23/06 Dep.* at 197:15-24.

### 4. *Cash From Olympia's Office Building*

A portion of the fictitious obligations to KSH described above were paid with funds obtained from GE Capital in exchange for a mortgage lien taken out on Olympia's office building at 1716 Coney Island Avenue.  The building at that address was owned by 1716 Realty Corp. n/k/a 1716 Realty LLC ("1716 Realty"), an entity owned and controlled by Sam Pinter and the other Olympia Principals.  In an Opinion and Order, dated May 9, 2008, this Court found that 1716 Realty was in fact the alter ego of Olympia, and that its assets belonged to Olympia.  *Balmer v. 1716 Realty LLC, et al.,* 05 CV 839 (NG) (MDG), Slip Op. at 6 (E.D.N.Y. May 9, 2008) (*"Balmer Slip Opinion"*) (attached as Exh. *10* to the *Chu Decl.*)  This holding is grounded in many of the same facts presented on this motion, namely the common ownership, disregard of

- 27 -

corporate formalities, and disregard of separation by Sam Pinter and the other Olympia

Principals, and their use of Olympia's assets to buy and fund the 1716 building. *Balmer Slip*

*Opinion* at 7-12.

As discussed below (at 33), upon Olympia's closure in November 2004, Sam Pinter took

over the day-to-day control of 1716 Realty. *Balmer Slip Opinion* at 6. Prior to 2004, Sam Pinter

had allowed Barry Goldstein to run the operations of 1716 (just as he allowed Barry Goldstein to

run the operations of Olympia). *Balmer Slip Opinion* at 9. However – and again just as with

Olympia – Sam Pinter still retained control of the finances for purposes of taking money out on

command. In December 2002, 1716 Realty obtained a $1,550,000 mortgage loan from GE

Capital, guaranteed by Olympia and 1716 Corporation's principals (Abe Donner, Fagie Pinter,

Barry Goldstein, Shaindy Pinter). *Balmer Decl., Exh. 32. See also Balmer Slip Opinion* at 4.

Proceeds of this loan, net of closing costs and final payment of the first mortgage loan,

amounting to $1,323,245, was transferred to Olympia, and immediately disbursed to make

personal payments on behalf of KSH, Sam Pinter, and Sam Pinter's family. *Balmer Decl., Exh.*

*33. See also Balmer Slip Opinion* at 5. One of the KSH payments – $450,000 – was paid from

these funds. *Balmer Decl., Exh. 33* (summary of payments from GECC funds) & *29* (list of

payments to KSH). $200,000 was immediately transferred to MFCU and used to pay off two

personal loans to Sam Pinter and Leib Pinter for $100,000 each. *Balmer Decl., Exh. 33*

(summary of payments from GECC funds). *See also Balmer Slip Opinion* at 5. $205,000 was

immediately transferred to an account at MFCU held by Yeshiva Yaakov Moshe and was later

distributed in $15,000 or $20,000 amounts to Sam Pinter and Leib Pinter's children and spouses.

*Id.* Additional payments were made to related parties, for benefits for the Principals and related

parties, for personal credit card expenses, and for car payments. *Balmer Decl., Exh. 33*

(summary of payments from GECC funds). *See also Balmer Slip Opinion* at 5. Absent the GE Capital loan proceeds, Olympia would not have had sufficient funds to make any of those payments. *Balmer 10/23/06 Dep.* at 150:5-151:6.

### E.    Olympia's Business Creditors

#### 1.    Fannie Mae

While Sam Pinter was siphoning money from Olympia, Olympia was being operated by Sam Pinter's designees as a mortgage banker and loan servicer, presenting itself to the outside world as a legitimate operation. As part of that operation, it contracted with Fannie Mae, one of the companies that purchased its mortgage loans in the secondary market. Fannie Mae retained Olympia to service thousands of mortgage loans on its behalf. *Chu Decl., Exh. 6* (Consent Judgment) at ¶¶ 2b, 2c.

As a servicer, Olympia was required to report and remit to Fannie Mae monthly principal and interest ("P&I") payments, along with any real estate tax, homeowner's insurance, and other escrow payments made by the borrower. *R. Silecchia 7/26/05 Dep.* at 119:14-23; *Chu Decl., Exh. 9* (Servicing Guide) § I:202, pp. 127-128; § III:101, p. 303. Accordingly, for loans serviced on behalf of Fannie Mae, Olympia, as a servicer, was required to place P&I payments into a Fannie Mae custodial account, and report on a monthly basis the status of each loan serviced, informing Fannie Mae whether the loan was current or not and of the monies Fannie Mae should expect to find in the custodial account. *R. Silecchia 7/26/05 Dep.* at 230:12-231:22; *Chu Decl., Exh. 5* (Contract) § V(A)(1); *Chu Decl., Exh. 9* (Servicing Guide) § IX:101, pp. 903-905; § X:101, p. 1003.

When a loan that Olympia was servicing for Fannie Mae was refinanced or modified, Olympia, as servicer, had to notify Fannie Mae that the loan was a "payoff," and to remit the

appropriate payoff amount to a custodial account from which Fannie Mae could then withdraw the funds. *Chu Decl., Exh. 9* (Servicing Guide) § VI:106, pp. 608-610; § X:103.01, p. 1005; *Chu Decl., Exh. 6* (Consent Judgment) ¶ 2(f); *R. Silecchia 4/26/07 Dep. (FNMA v. NU)* at 73:21-74:3; 75:9-22. Olympia expressly warranted to Fannie Mae that Olympia would comply with its loan servicing obligations. *Chu Decl., Exh. 5* (Contract) § IV.

Despite, and in breach of, Olympia's contractual and fiduciary obligations to Fannie Mae, Olympia dishonestly failed to remit payoff funds for 257 loans Olympia was servicing as part of the Contract. *Chu Decl., Exh. 6* (Consent Judgment) at ¶¶ 2(g), 2(h), 2(n), 2(o). It is undisputed that Olympia not only stole payoff amounts, but used its loan servicing functions to fraudulently conceal the theft of these payoff funds. *Chu Decl., Exh. 6* (Consent Judgment) at ¶ 2(k). The servicing fraud worked as follows. When mortgage loans were refinanced/modified, Olympia failed both to report the status of such loans as payoffs to Fannie Mae and to place the funds into the custodial account for Fannie Mae. *Chu Decl., Exh. 6* at (Consent Judgment) ¶ 2. Instead, Olympia falsely continued to represent to Fannie Mae that these paid-off mortgages were "active" by falsely reporting monthly loan payments as if they were being made by the borrowers and then placing checks with the amounts equaling the expected monthly P&I payments into the custodial account, while simultaneously failing to remit payoff funds. *Chu Decl., Exh. 6* (Consent Judgment) at ¶¶ 2(i)-2(l); *R. Silecchia 7/26/05 Dep.* at 256:8-21; 264:9-25; 302:8-22. Olympia used its servicing functions to conceal this fraud from the borrowers too.

Sam Pinter's stamped signature – required because he was a signatory on all of Olympia's accounts – was on these checks. *S. Pinter 10/17/06 Dep.* at 142:21-25, 143:8-13, 145:21-146:4. On occasion, he signed these checks "live" as well. *S. Pinter 10/17/06 Dep.* at 142:4-14, 144:7-8. He claims he took no steps to stay informed of what he was signing, nor

what was signed on his behalf. *S. Pinter 10/17/06 Dep.* at 144:15-22, 151:13-16.  Indeed, he put

no financial controls whatsoever into place. *S. Pinter 10/17/06 Dep.* at 144:15-145:15, 146:5-

147:20.  This was because his relationship with his designees running the company was such that

he could readily receive whatever information he wanted at any time. *B. Goldstein 2/23/06 Dep.*

*(ICB v. OMC)* at 273:5-24.  Indeed, without fail, he met with his designees running the company

every single day. *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 219:3-9, 222:2-4.

As a direct result of Olympia's servicing scheme, Fannie Mae lost a total of $44,800,000.

*Chu Decl., Exh. 6* (Consent Judgment) at ¶¶ 4, 5.  Olympia has consented to judgment in that

amount. *Id.*

### 2.    *Warehouse Lenders*

Olympia had contractual obligations to other creditors as well, including the two banks

that provided its warehouse lines of credit, China Trust and ICB.  As noted above (at 6), Olympia

had lines of credit with China Trust at times up to $15 million and with ICB at times up to $35

million.  Beginning as early as 1991, Sam Pinter and Abe Donner each granted unlimited,

unconditional guarantees of Olympia's debts to China Trust. *Chu Decl., Exh. 11.*[16]  As of May

18, 2001, Sam Pinter and Abe Donner also each personally guaranteed Olympia's debt to ICB

with individual unconditional guarantees. *Chu Decl., Exh. 12.*  As Sam Pinter was well aware,

his guarantee was needed in conjunction with Abe Donner's guaranty to obtain the China Trust

and ICB warehouse lines of credit because they were, according to Sam Pinter, the only "people

of means." *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at 316:25-317:23.  And as Sam Pinter was also

---

16 There is also a purported guarantee by Fagie Pinter, but she has claimed it was a forgery. *F.*
*Pinter 5/25/05 Dep. (Chinatrust v. Pinter)* at 25:5-26:25; *S. Pinter 2/7/06 Dep. (ICB v. OMC)* at
305:19-306:8.

well aware, Olympia used those lines of credit continually.  *S. Pinter 2/7/06 Dep. (ICB v. OMC)*
at 235:8-17, 318:2-7, 323:3-6.

### F.   Sam Pinter's Post Shut-Down Collection and Use of Assets That Should Go To Olympia's Legitimate Creditors

As noted above (at 6-7), Fannie Mae uncovered the fraud, confronted Olympia on
October 19, 2004, and shortly thereafter, Olympia ceased to operate.  At that time, it was
discovered that the amount of the payoffs Olympia, as servicer, had failed to remit totaled
approximately $44 million.  It was also apparent that Sam Pinter would have personal liability on
his guarantees to ICB and China Trust.  *S. Pinter 10/17/06 Dep.* at 255:3-12; *S. Pinter 2/7/06
Dep. (ICB v. OMC)* at 316:25-317:5, 318:20-24, 340:13-23.

In response, Sam Pinter took steps to obtain for himself assets funded by Olympia that
were in the hands of other Principals.  He attempted to use these assets to negotiate a resolution
with ICB of his personal liability.  When that failed, he simply took all that was readily available.
He used his control of Olympia to transfer assets of Olympia's San Jose office to a third-party
for an unknown consideration, for the stated purpose of relieving himself of potential personal
liability, and he arranged for other Principals to transfer to him their real estate interests
purchased with Olympia funds.  These efforts further demonstrate his ultimate control over
Olympia and the other Principals, and also his complete lack of regard for Olympia as a
corporation separate from his own personal interests.

### 1.   *Use of Olympia's Assets To Avoid Personal Liability*

On or about October 31, 2004, Sam Pinter wrote to ICB in an aborted attempt to
negotiate a resolution with ICB that would avoid liability on his personal guarantee.  *Chu Decl.,
Exh. 13* (October 31, 2004 letter).  He offered to ICB a number of assets that he characterized as
belonging to Olympia, including real estate held by the other Principals.  *Id.*

One of the Olympia assets on Sam Pinter's list for ICB was Olympia's San Jose office. *See Chu Decl., Exh. 13.* On the list, Sam Pinter valued the business in this office at $1 million. *Id.* When the discussion with ICB was not fruitful, Sam Pinter gave the San Jose office to a third-party company, First Financial. However, he claims he did not collect any money for Olympia in this transaction. Instead, he gave away the San Jose business for free to protect himself from what he believed would be personal liability for the office lease, and "responsible person" withholding tax liability. *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 552:2-556:13; 667:19-669:12; *S. Pinter 10/17/06 Dep.* at 273:3-18. No one at Olympia challenged or questioned his ability to single-handedly give away an entire business unit of Olympia.

### 2. Sam Pinter Collected For Himself Olympia-Funded Assets Held By Other Principals

#### a) 1716

Prior to November 2004, 1716 Realty was purportedly owned by all of the Principals – Sam Pinter, Abe Donner, Barry Goldstein, and Leib Pinter (through themselves and their wives). *Chu Decl., Exh. 14* (Sam Pinter's Aff. in *Balmer v. 1716,* herein, "S. Pinter Aff.") ¶ 2.

However, in his letter to ICB, Sam Pinter "compiled a thorough list of assets that [Olympia] feel[s] can be liquidated in the next six to twelve months" and included "1716 Coney Island Avenue" as an asset on that list. *See Chu Decl., Exh. 13* (October 31, 2004 letter). Shortly after Olympia was placed under receivership in November 2004, Sam Pinter took over control of the 1716 entities from Barry Goldstein, *Chu Decl., Exh. 10* (Balmer Slip Opinion) at 6, who, before November 2004, was President of 1716 Corp. and Managing Director of 1716 LLC. *Id.* at 9. Around the same time, Barry Goldstein transferred his interest in 1716 Corp. to Sam Pinter. *S. Pinter 3/22/06 Dep.* at 558:10-25.

b)       P&G/Flatbush Avenue Properties

Prior to Olympia's closure, Leib Pinter and Barry Goldstein owned an entity called P&G

Realty.  *B. Goldstein 7/17/06 Dep.* at 738:2-8.  P&G Realty bought a 3-lot property on Flatbush

Avenue, 1766, 1768 and 1770 Flatbush, in Brooklyn, New York, using $295,000 of Olympia

money that should have been used for a mortgage payoff.  *B. Goldstein 7/17/06 Dep.* at 738:9-

14.  The mortgage was not in P&G's name, but the money was used by P&G.  *B. Goldstein*

*7/17/06 Dep.* at 738:15-739:12.  P&G "borrowed" the $295,000 in payoff money, and left the

mortgage loan outstanding.  *B. Goldstein 7/17/06 Dep.* at 798:14-17, 799:6-22, 801:24-802:16,

803:15-804:10.  In Sam Pinter's letter to ICB, he listed the Flatbush property as an asset of

Olympia.  *Chu Decl., Exh. 13* (October 31, 2004 letter).

As with 1716, shortly after Olympia's closure, Barry Goldstein transferred his interest in

P&G Realty to Sam Pinter, for no consideration.  *B. Goldstein 7/17/06 Dep.* at 740:18-24; *S.*

*Pinter 3/22/06 Dep. (ICB v. OMC)* at 559:2-13; 618:21-24; *S. Pinter 10/17/06 Dep.* at 290:12-24.

Leib Pinter also conveyed his P&G interest to Sam Pinter for no consideration.  *S. Pinter 3/22/06*

*Dep. (ICB v. OMC)* at 615:22-616:5; 618:5-17.  P&G Realty then sold the Flatbush Avenue

property to another related party for $550,000, providing the proceeds to Sam Pinter.  *B.*

*Goldstein 7/17/06 Dep.* at 744:9-17; *S. Pinter 10/17/06 Dep.* at 290:25-293:12.  Sam Pinter

leaves no doubt that the proceeds of that sale belonged to him.  *S. Pinter 10/17/06 Dep.* at 295:5-

11 ("Q: Who was in control of that cash? A: I was.").

c)       Leib/Shaindy Pinter's Interest In S&F Realty

After Olympia's closure, Sam Pinter required Leib Pinter and his wife to transfer

additional assets over to him.  First, Sam Pinter took 100% control of S&F Realty (owned 50%

by his wife and 50% by Leib's wife), and stopped making any payments to Leib and his wife on

behalf of their 50% interest. *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 566:5-567:12.  In addition,

right after Olympia's closure, Sam Pinter "made" Shaindy Pinter sign over a personal guarantee

to Sam for $5 million. *S. Pinter 10/17/06 Dep.* at 297:8-19.  This guarantee was initially secured

by Shaindy Pinter's interest (through S&F Realty) in 2502 E. 19th Street and 1806 Ocean

Avenue, and is now secured by replacement property for those buildings that S&F Realty

purchased in a recent tax exempt "1031" exchange for the prior properties. *S. Pinter 10/17/06*

*Dep.* at 298:5-301:25.

d)      <u>Jasmine Lakes</u>

Jasmine Lakes Apartments is a real estate venture originally owned 15% by Barry

Goldstein, 15% by Leib Pinter, and 30% by each of Howard Bochner and Isaac Tennenbaum,

additional business associates of the Principals. *B. Goldstein 9/26/06 Dep.* at 331:6-332:9.

Olympia paid  approximately $500,000 in connection with the Jasmine Lakes investment.

*Balmer 10/23/06 Dep. at 190:23-191:25; B. Goldstein 9/26/06 Dep.* at 334:3-20; *see also S.*

*Pinter 10/17/06 Dep.* at 246:10-13 ("few hundred thousand").  Barry Goldstein characterizes

monies paid by Olympia for the benefit of Jasmine Lakes as "loans," *B. Goldstein 9/26/06 Dep.*

at 333:8-17; 337:16-23, but no loan documentation nor evidence of any repayment has been

produced, and Olympia never received any equity interest in Jasmine Lakes. *B. Goldstein*

*9/26/06 Dep.* at 334:3-20; *Balmer 10/23/06 Dep.* at 192:6-13.

In his letter to ICB, Sam Pinter also characterized Jasmine Lakes as an asset of Olympia.

*See Chu Decl., Exh. 13* (October 31, 2004 letter); *S. Pinter 10/17/06 Dep.* at 231:4-232:11.  Sam

Pinter confirmed this understanding at his deposition. *S. Pinter 10/17/06 Dep.* at 250:2-9.

Nonetheless, Jasmine Lakes has not been turned over to the Receiver. *Balmer Decl.,* ¶ 21.

Instead, Barry Goldstein and Leib Pinter took steps to transfer their interests in Jasmine Lakes to

- 35 -

Sam Pinter. *S. Pinter 3/22/06 Dep. (ICB v. OMC)* at 646:9-647:16. *See also Balmer 10/23/06 Dep.* at 193:2-17.

## ARGUMENT

## I.   LEGAL STANDARDS

### A.   Summary Judgment

"Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Balmer Slip Opinion* at 6. *See also Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp.2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)). *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a summary judgment motion, a district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *Balmer Slip Opinion* at 6-7. *See also Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). However, when there is no more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Even if parties dispute material facts, summary judgment must be granted unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Shanghai Join Buy Co., Ltd. v. PSTEX Group, Inc.,* 05 Civ. 3766 (NRB), 2006 WL 2322648, at *3 (S.D.N.Y. Aug. 10, 2006) (internal quotations omitted). Once the moving party has demonstrated that there is no material fact dispute, the burden shifts to the non-moving party, which "may not 'rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment,' but 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Balmer Slip Opinion* at 7 (quotations omitted). *See also Shanghai Join Buy*, 2006 WL 2322648, at *3 (quotations omitted; citing Fed. R. Civ. P. 56(e)); *Jamaica Ash*, 85 F. Supp. 2d at 180 (quoting *Celotex*, 477 U.S. at 322)).

### B.   Alter Ego Liability

In New York, alter ego liability will be imposed where (1) the owner exercised complete domination and control over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a "fraud or wrong" against the plaintiff, which resulted in plaintiff's injury. *Balmer Slip Opinion* at 7; *Capital Distribution Services, Limited v. Ducor Express Airlines, Inc.,* 04 CV 5303 (NG) (VVP), 2007 WL 1288046 *2 (E.D.N.Y. May 1, 2007) (citing *Thrift Drug, Inc. v. Universal Prescription Adm'rs ("Thrift Drug II")*, 131 F.3d 95, 97 (2d Cir. 1997)). *See also MAG Portfolio Consult., Gmbh v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001); *WM Passalacqua Builders, Inc. v. Resnick Developers South*, 933 F.2d 131, 139 (2d Cir. 1991). "[W]hen the corporation has been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego," New York courts will disregard the corporate form. *Balmer Slip Opinion* at 7 (quotations omitted); *Capital Distribution*, 2007 WL 1288046 at *2 (quoting *Passalacqua*, 933 F.2d at 131).

Piercing is a fact-specific inquiry that requires consideration of numerous factors. *Capital Distribution*, 2007 WL 1288046 at *2 (citing *MAG Portfolio*, 268 F.3d at 63). For this reason, the decision to disregard corporate independence will differ depending on the "attendant facts and equities" of each case. *Balmer Slip Opinion* at 7 (quotation omitted). *See also Shanghai Join Buy*, 2006 WL 2322648 at *3. But the overriding principal remains constant:

New York courts will pierce the corporate veil where necessary to prevent fraud or achieve

equity. *Balmer Slip Opinion* at 7; *JSC Foreign Economic Ass'n Technostroyexport v. Int'l*

*Development and Trade Services, Inc.*, 386 F. Supp.2d 461, 464 (S.D.N.Y. 2005); *Hewlett*

*Packard Co. v. The Computer Specialists, Inc.,* 06 Civ. 0390 (RPP), 2007 WL 1434989 *6

(S.D.N.Y. May 15, 2007) ("Because disregarding corporate separateness as an equitable remedy

is one that differs with the circumstances of each case, no single factor or even combination of

factors is dispositive. The general principle followed by the courts has been that liability is

imposed when doing so would achieve an equitable result." (internal quotations omitted)).

This Court, along with other New York courts, has not hesitated to grant summary

judgment based on alter ego liability where such relief is warranted and necessary to achieve

equity, and indeed, this Court has just done so in a related case brought by Olympia's receiver to

pierce the corporate veil of the 1716 Realty entities. *See Balmer Slip Opinion. See also Capital*

*Distribution*, 2007 WL 1288046 at *2-4 (granting summary judgment against President of

company in full amount of judgment against company where President ran "family" company for

his own benefit and stripped company of assets, rendering it judgment-proof); *Shanghai Join*

*Buy,* 2006 WL 2322648 at *3-5 (granting summary judgment against individual who was sole

owner, officer, director and shareholder of defendant company and two related companies and

who over several years drained company of assets so it could not fulfill its contractual

obligations); *JSC v. IDTS*, 386 F. Supp.2d at 471-476 (granting summary judgment against two

principals of company as alter egos for using domination of company to divert its assets such that

company could not fulfill its contractual obligations); *Atari, Inc. v. Games, Inc.*, 04 Civ. 3723

(JSR), 2005 WL 1294403 *2-3 (S.D.N.Y. May 31, 2005) (denying reconsideration of summary

judgment against individual who controlled corporation that breached contract, and its guarantor

because "there is a realistic risk of [corporation] being used now simply as a device to defraud creditors"); *Austin Powder Co. v. McCullough,* 216 A.D.2d 825, 826-28, 628 N.Y.S.2d 855, 856-57 (3d Dep't 1995) (affirming grant of summary judgment against President of company based on undercapitalization and personal use of funds that resulted in company's inability to pay judgment). The same should occur here.

## II. SAM PINTER SHOULD BE HELD LIABLE FOR ALL OF FANNIE MAE'S DAMAGES

### A. Sam Pinter Exercised Complete Dominion Over Olympia

"[C]omplete domination [of the corporation] is 'the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business.'" *Balmer Slip Opinion* at 8 (quotations omitted). *See also Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 141-42, 623 N.E.2d 1157, 1161, 603 N.Y.S.2d 807, 811 (NY 1993). In determining whether domination and control exist, a number of factors should be examined, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, the issuance of stock, election of directors, keeping of corporate records, and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors and personnel, (5) common office space, address and telephone numbers of the corporate entity and its alleged dominators, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by the alleged dominators as their own.

*Balmer Slip Opinion* at 8. *See also W.M. Passalacqua*, 933 F.2d at 139; *Capital Distribution*, 2007 WL 1288046 at *3.

###### 1.    *Absence of Corporate Formalities.*

With respect to the first factor, the record is replete with admissions of Sam Pinter and the other Principals that corporate formalities were completely disregarded. *See Facts* at 10-12. No Principal was able to testify that directors were elected or met or even that the shareholders ever held a meeting at which directors could have been elected. *Id.* at 11.  None of the Principals – each of whom held significant ownership interests in Olympia – were able to testify that any stock certificates were ever issued to them. *Id.*  No complete minute book has been produced or found and Olympia's designated Secretary, Sam Pinter's wife, never saw or prepared minutes, never participated in any directors' or shareholders' meetings and never delegated her duties to anyone else. *Id.* at 11-12.  This is more than enough to support a finding of absence of corporate formalities for summary judgment purposes. *Balmer Slip Opinion* at 8-9 (no evidence to indicate that corporate formalities were abided by at Olympia where there is only a single record of a corporate meeting, no records indicating that its directors were ever formally elected, and no evidence that Olympia even attempted to place a value on, or keep records of, the various administrative and personnel services provided to defendants). *See also W.M. Passalacqua*, 933 F.2d at 139-140 (the absence of any corporate indicia, timely issuance of shares, and any regular meetings supports a finding of domination); *Shanghai Join Buy*, 2006 WL 2322648, at *4 (incomplete corporate records fraught with inconsistencies and the absence of any minutes of corporate meetings show that the principal completely disregarded any corporate formalities); *Capital Distribution,* 2007 WL 1288046, at *3 (company had no functioning board of directors, no minutes of corporate meetings, and no bylaws or resolutions); *JSC v. IDTS*, 386 F. Supp.2d at 473 (evidence showing that corporation did not hold any annual shareholder meetings or regular directors' meetings, did not keep corporate records such as corporate minutes, that company's

bookkeeping was inadequate as at least $303 million in revenues was not reflected in its books,
supported a finding that the company failed to comply with basic corporate formalities).

### 2.    *Inadequate Capitalization*

As has been learned since the fraud upon Fannie Mae was discovered, Olympia was
undercapitalized. *See Facts* at 14-17. Sam Pinter describes himself as the person who provided
"funding." *S. Pinter 10/17/06 Dep.* at 89:6-90:5. But he didn't actually invest, and admits that
no one else did either. *Id*. at 45:11-12, 49:19-59:23; *S. Pinter 11/14/06 Dep.* at 367:23-368:4.
This is confirmed by available Olympia records, which do not reflect any capital investments in
exchange for equity ownerships, and by the testimony of the other Principals. *B. Goldstein
8/10/06 Dep.* at 49:20-25, 50:2-4, 51:3-23; *S. Pinter 11/14/06 Dep.* at 381:10-20. Olympia
stayed in operation as a result of an ever-revolving stream of loans from Sam Pinter and his
relatives, friends, and related entities, all returning to the friends and family a high rate of
monthly interest, but only sporadically recorded in Olympia's books and records. *S. Pinter
10/17/06 Dep.* at 45:13-46:14, 49:19-59:23; *S. Pinter 11/14/06 Dep.* at 366:22-367:22. In
addition to direct loans, Sam Pinter and other Principals took out loans from related entity
MFCU for the benefit of Olympia (in violation of the regulation governing MFCU) and such
loans were serviced and repaid by Olympia. *S. Pinter 10/17/06 Dep.* at 210:24-218:12; *B.
Goldstein 8/10/06 Dep.* at 175:4-25, 181:3-184:24, 189:8-20. Olympia was further kept afloat by
accounting techniques that fraudulently recorded incoming funds as for the benefit of Olympia
when in fact, the funds were funneled to Sam Pinter, his personal entities, and his family and
friends. *Id.* This factor weighs in favor of finding alter ego liability. *Balmer Slip Opinion* at 9
(concluding with respect to this same company that "Olympia was an inadequately capitalized
company" where the record established that from "1998 until 2004, when it was placed under

receivership, Olympia was insolvent and possessed a growing liability to its creditors that exceeded its cash, shareholders' equity, and net income.  Yet despite its insolvency, Olympia funds were taken out of the corporation for the owners' personal purposes."). *See also Capital Distribution*, 2007 WL 1288046 at *3 (insufficient funds to meet obligations supports funding of alter ego liability); *Shanghai Join Buy*, 2006 WL 2322648, at *4 (constant movement of funds out of PSTEX's account led to inadequate capitalization); *JSC v. IDTS*, 386 F. Supp. 2d at 473 (company capitalized with only $10,000 was considered undercapitalized, despite transacting hundreds of millions of dollars in purchases and sales); *Austin Powder*, 216 A.D.2d at 827-28 (undercapitalization of the corporation supported piercing the corporate veil); *W.M. Passalacqua*, 933 F.2d at 139 (corporation undercapitalized where only $10 capital had been paid into corporation by a related entity in exchange for all outstanding equity of corporation and remaining working capital was derived from related entity loans).

### 3.      *Funds Were Routinely Taken Out for Personal Use*

Part and parcel of the undercapitalization was Sam Pinter's complete discretion to put money in and take money out of Olympia on his personal whim.  Sam Pinter may have parked some money in Olympia to get it started and keep it going, but he thereafter continued to treat that money as his own, taking regular monthly payments from Olympia, and larger amounts whenever he wanted.

Sam Pinter generally did not take money directly but instead used other corporate entities that he considered indistinguishable from him, or he directed that money be paid to his family. *Facts* at 19-29.  He allowed the other Principals to do the same, although at the end of the day collected back from the others many of the Olympia-funded assets.  *Id.* at 33-35.

The monies taken out included millions of dollars in purported "compensation" to Sam

Pinter's family members in the form of payroll checks, health insurance, car payments, mortgage

payments and various other benefits where the family members failed to render any services or

purely *de minimis* services to Olympia. *Facts* at 20. Similar payments were made to the family

of the other Principals. *Facts* at 20-21. Monies were paid to KSH, also owned by Sam Pinter

and his wife, *see Facts* at 25-27, and were also used to purchase real estate that ended up in Sam

Pinter's possession. *Facts* at 21-25. As this Court has recently recognized in the related action,

this is a classic demonstration of alter ego. *Balmer Slip Opinion* at 10 (by stripping Olympia of

any business discretion and causing it to enter into transactions that were neither arms-length nor

profitable for Olympia, defendants dominated Olympia). *See also Bridgestone/Firestone Inc. v.

Recovery Credit  Services, Inc.,* 98 F.3d 13 (2d Cir. 1996) (shuttling funds among related

companies controlled by same principal supports finding of alter ego liability); *Capital

Distribution*, 2007 WL 1288046 at *3-4 (principal's testimony that he regarded company's funds

as his own, took out funds on an "as needed" basis for personal use, but took no defined salary,

supported alter ego finding); *Shanghai Join Buy,* 2006 WL 2322648 at *4 (payments for the

principal's car, to the principal's wife and to the principal's temple are funds taken out of the

corporation for personal rather than corporate purposes that support alter ego finding); *Thrift

Drug v. Prescription Plan Serv. Corp. ("Thrift Drug III"),* 1 F. Supp.2d 387, 388 (S.D.N.Y.

1998) (principal's use of corporate assets for personal use, readily withdrawing funds for his own

use without intending to repay those funds, authorization of the corporation to loan money to the

principal's other wholly owned entities where the loans were never repaid, and allowing family

members to live rent-free in a corporate owned house, justified piercing the corporate veil);

*Capital Distribution*, 2007 WL 1288046, at *3 (testimony of company's principal that he viewed

the company's funds as his own, taking the company's funds at will, paying his personal

expenses, such as his home mortgage, directly from the company's account supported a finding

of alter ego); *JSC v. IDTS*, 386 F. Supp.2d at 474 (evidence showing corporate funds were paid

to the principals and their family for phantom services, were paid to a personal investment fund

for one of the principals, were classified as loans to the principals which were then partially used

to fund the purchase and renovation of the principals' personal residences, and were used to pay

professional services rendered to the principals which were unrelated to the company,

established that the principals diverted funds from the company for their personal purposes and

supports a finding of alter ego liability).

### 4.    *Overlap in Ownership, Space and Personnel of Related Entities*

Sam Pinter started running Olympia out of his personal office, and throughout almost all

of Olympia's existence, his office was in the same place as Olympia. *Facts* at 13.  Sam Pinter

owned and controlled numerous entities that routinely exchanged funds with Olympia, and

which had nearly complete overlap and identity of ownership, officers and directors and places

of business with Olympia, *e.g.*, 1716 Realty, KSH, S&F Realty, and 1340 Realty. *Id.* at 17-19,

21-22, 25-28.  Sam Pinter also owned and controlled a number of real estate ventures that at

various points have claimed Olympia (not Pinter) as owner for insurance purposes and/or have

listed Olympia's office address and phone number as their own. *Id.* at 21-25.  Moreover, where

expedient, Sam Pinter used Olympia's name and balance sheet to further the business of various

of those entities, which redounded solely to his and his wife's personal benefit. *Id.*  Sam Pinter

basically made no distinction between himself, his other entities, and Olympia.  As this Court has

again already recognized, this further demonstrates that Olympia was Sam Pinter's alter ego.

*Balmer Slip Opinion* at 9 (evidence showing that Olympia and 1716 Realty shared office spaces,

addresses, telephone numbers, and were owned and directed by nearly the same group of people is a factor establishing alter ego). *See also Bridgestone/Firestone,* 98 F.3d 13 (piercing the veil to reach common owner of related companies that share "same place, same people, same phone, same stationery"); *Smoothline Ltd. v. North Am. Foreign Trading Corp.,* 00 Civ. 2798 (DLC), 2002 WL 31885795, at *10 (S.D.N.Y. Dec. 27, 2002) (substantial overlap in directors and personnel, shared office space, use of letterhead of one company on behalf of its subsidiary evidences domination); *Hewlett Packard Co.,* 2007 WL 1434989 at *7-8 (there was sufficient evidence to establish domination over one company by the other two companies where there was a high overlap in ownership and officers among the three companies, funds were commingled among all three entities, the finances of one company was controlled by another company).

### 5.   *Olympia's Business Was Operated For The Benefit of Sam Pinter*

The entirety of the undisputed evidence shows that Olympia was part of a constant flow of money among the commonly owned companies controlled largely by Sam Pinter.  Sam Pinter delegated the day-to-day functioning of the mortgage banking business to others.  And, in fact, Olympia did conduct a mortgage banking and loan servicing business.  However, at the end of the day, that business was operated for Sam Pinter's personal benefit, and he controlled and used its assets for his own personal purposes.  Significantly, for an alter ego finding it is irrelevant whether or not Olympia conducted some legitimate business.  *JSC v. IDTS*, 386 F. Supp.2d at 472.  The only question is whether the business that Olympia conducted was carried out by individuals who failed to respect the separate identity of the corporation and used it as an agent to pursue their own ends.  *Id.*  This is exactly what Sam Pinter did, through his own actions and those that he delegated to the other Principals.  Olympia did the bidding of Sam Pinter, for the benefit of Sam Pinter, in a classic alter ego sense, and Sam Pinter should thus be responsible for

satisfying its debts. *Balmer Slip Opinion* at 12 ("Defendants cannot now, after using the corporate form to further their personal ends, seek to use the same corporate form to avoid their obligations and protect their assets from Olympia's creditors."). *See also JSC v. IDTS*, 386 F. Supp.2d at 472; *Capital Distrib. Servs., Ltd., v. Ducor Express Airlines, Inc.* , No. 04 CV 5303 (NG)(VVP), 2007 WL 1288046, at *3 (E.D.N.Y. May 1, 2007) (company was completely dominated by its founder where evidence showed that the officers of the family business company were appointed merely to follow the founder's instructions, the founder viewed corporate funds as his own and took corporate funds at will for his personal use, the founder used the company to achieve his own ends); *Atari*, 2005 WL 1294403, at *3 (evidence that limited liability company was owned by defendant and his family members, company's purpose as per defendant was to provide "a structure in which I can manage-through which I can manage invested capital," company had no investment focus beyond defendant's whims, established complete domination); *Thrift Drug III*, 1 F. Supp.2d at 388 (that principal used "whatever money he needed" from "whatever corporation was there at the time" compelled the court to rule that principal's sole reason for creating and maintaining the corporations was "to enable him to conduct his personal business").

### B.   Sam Pinter Abused His Domination to Perpetrate a Wrong

In addition to showing complete domination, "[t]he party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Thrift Drug II*, 131 F.3d at 97. "Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced." *Capital Distribution*, 2007 WL

1288046 at *3 (quoting *JSC v. IDTS*, 386 F. Supp. 2d at 476). Equity requires the disregard of corporate form in circumstances where domination of a corporation was used to transfer assets for personal gain, leaving legitimate creditors unpaid. *Hewlett Packard Co*, 2007 WL 1434989 at *7.

For alter ego purposes, it does not matter whether the diversion occurred before or after suit was filed or a judgment was obtained. *Capital Distribution*, 2007 WL 1288046 at *3-4; *Shanghai Join Buy*, 2006 WL 2322648 at *5; *JSC v. IDTS*, 386 F. Supp. 2d at 476; *Godwin Realty v. CATV Enterprises, Inc.*, 275 A.D.2d 269, 270, 712 N.Y.S.2d 39, 41 (1st Dep't 2000). Nor does the wrong have to be directed specifically at the plaintiff – it is sufficient to show that assets were diverted for personal rather than business purposes at a time when the dominator knew there would be a class of legitimate creditors that might go unpaid, of which the plaintiff is a part. *Thrift Drug III*, 1 F. Supp.2d at 388. *See also Hewlett Packard Co*, 2007 WL 1434989 *9; *Smoothline Ltd. v. North Am. Foreign Trading Corp.*, 00 Civ. 2798 (DLC), 2002 WL 31885795, *9-10 (S.D.N.Y. Dec. 27, 2002); *Austin Powder*, 216 A.D.2d at 857, 628 N.Y.S.2d at 827-28; .

There is no question that both before and after Olympia was shut down, Sam Pinter directed and controlled the diversion of corporate assets, knowing of outstanding contractual obligations that would thus necessarily go unpaid. His constant asset shifting in and out of Olympia was done with his full knowledge that Olympia was undercapitalized, and with full knowledge that Olympia was conducting a mortgage banking and loan servicing business that involved significant and ongoing contractual obligations, including servicing obligations to Fannie Mae that required the remittance of payoff amounts to Fannie Mae. Yet with reckless disregard for Olympia's obligations to its creditors, or to purposely avoid meeting those

obligations, Sam Pinter continued to use the assets of Olympia as he pleased, to the ultimate

detriment of Fannie Mae and other creditors. As to Fannie Mae, it is undisputed that Olympia

owes Fannie Mae $44,800,000 in unremitted loan payoff amounts, *see Chu Exh. 6* (Consent

Judgment) ¶¶ 4, 5, and that Fannie Mae is unable to collect, as Olympia does not have any assets

even approaching that amount.

This case is very similar to the situation in the *Thrift Drug* case. *Thrift Drug* involved a

breach of contract by a company called Universal Prescription Administrators ("UPA"), a

prescription benefit plan. *Thrift Drug II*, 131 F. 3d at 96. UPA administered prescription benefit

plans, and as part of that administration, worked with a number of pharmacies, including Thrift

Drug. *Id.* Beneficiaries would fill their prescriptions at Thrift, which would charge only a

minimal co-pay and then submit a claim and be reimbursed by UPA. *Id.* This system worked

without incident for 11 years. However, UPA then claimed to be experiencing cash flow

problems, and over a period of one year failed to reimburse Thrift for a number of prescriptions.

*Id.* Thrift brought suit and obtained a judgment against UPA. *Id.* It also brought suit against

UPA's owner and sole shareholder ("the Owner"), claiming alter ego liability for the debts of

UPA. *Id.*

In *Thrift Drug,* the District Court initially found alter ego based primarily on complete

domination by the Owner. *Thrift Drug II*, 131 F.3d at 97-98.[17] In a subsequent opinion,

---

[17] Strangely, the District Court had initially denied summary judgment on the alter ego question, mistakenly concluding that *W.M. Passalacqua*, 933 F.2d at 139, 140, required that alter ego always be put to a jury. *Thrift Drug v. Prescription Plan Service Corp. ("Thrift Drug I")*, 890 F. Supp. 319, 320-21 (S.D.N.Y. 1995). But this is not what *Passalacqua* held – in that case, the Second Circuit had simply reversed a directed verdict absolving individuals of potential alter ego liability where there was, in fact, evidence in the record that could support a finding that the corporate veil should be pierced. *W.M. Passalacqua*, 933 F.2d at 137-140. It does not prevent a court from determining in advance of trial that the undisputed material facts are sufficient to find alter ego, in the absence of evidence raising any actual dispute about those facts. And in *Thrift*

specifically considering whether the Owner abused the corporate form to perpetuate a wrong or injustice against the plaintiff, the District Court found "no question" that the Owner abused the privilege of doing business in the corporate form and that alter ego liability was warranted.  The basis for that finding was very similar to the circumstances here.  In *Thrift Drug*, as here, the Owner considered the company's assets, and those of several other "phantom" companies, to be available for any non-corporate purposes, and he used such assets whenever he deemed it convenient.  *Id.* at 388.  Among other things, again similar to here, the Owner authorized loans to his other corporations that were never repaid, he withdrew funds for his own use and he allowed his family members to live rent-free in a house paid for by the company.  *Id.*  Ultimately, again as here, this "carefree conduct" with respect to company assets resulted in UPA being unable to meet its commercial debts, resulting in the judgment obtained by Thrift Drug.

In reaching that conclusion, the *Thrift Drug* court made clear it was irrelevant whether the Owner had any animus or intent to harm the particular plaintiff.  However, the plaintiff "was clearly a part of the class of potential creditors against whom [the Owner's] use of UPA (and the other "phantom" corporations) was directed."  *Thrift Drug III,* 1 F. Supp.2d at 388.  The test for alter ego liability was satisfied because the Owner created and maintained his corporations in a manner that enabled him to prevent assets in the businesses from being reachable by creditors. *Id.*

The same situation is presented here.  Sam Pinter created Olympia for his own purposes. He staffed Olympia with friends and family, and set it up and funded it through a network of

---

*Drug,* the District Court ended up having a bench trial in any event. *Thrift Drug III*, 1 F. Supp.2d at 388.

corporate structures designed both to make Olympia's name and assets available to him and his

family and friends as needed, while protecting it and him from the claims of business creditors.

 *Shanghai Join Buy* and *JSC v. IDTS* – both finding alter ego on summary judgment – are

also very closely on point.  In *Shanghai Join Buy*, the owner-officer-director-shareholder (the

"Shanghai Owner") of a women's knitwear company was held liable as alter ego for the

company's breach of contract to pay a trade creditor.  *Id.* at 2006 WL 2322648 at *1, 5.  As

discussed in the previous section (at 42, 45 and 46-47), the Shanghai Owner engaged in many of

the same activities engaged in by Sam Pinter, using the corporations assets as his own and

diverting money that could have or should have been used to pay the plaintiff.  The wrong

justifying alter ego liability was undisputed evidence that large amounts of money exited the

company for a long period of time during which the Shanghai Owner was clearly aware of a

financial obligation under the contract with Shanghai.  *Id.* at 2006 WL 2322648 at *5.  Likewise,

in *JSC v. IDTS*, the two principals of IDTS (the "IDTS Principals"), a metal-seller, were held

liable as alter ego for the company's debt to its supplier, based upon substantial undisputed

evidence – again similar to here – that the IDTS Principals had over a number of years diverted a

large portion of corporate assets to their own personal and family uses, even though they knew

the company had concomitant commercial obligations to pay its supplier.  386 F. Supp.2d at 475-

76.  In *JSC v. IDTS*, as with Olympia, IDTS was conducting an actual business, and was paying

its supplier a large amount of money.  However, it was diverting just as much, ultimately

rendering itself unable to satisfy the arbitration judgment its supplier obtained.  *Id.* at 472; 476.

 As in the above cases, Sam Pinter dominated Olympia, setting it in motion and keeping

control over its finances in a way that would personally benefit him and his family and friends,

instead of Olympia's business.  *See Facts* at 13.  He kept his office at Olympia, went there every

day, met every day with his designees running the company, retained control as signatory on Olympia's accounts, and allowed his signature to authorize hundreds of checks. *Id.* at 30-31. Moreover, when Olympia was shut down, Sam Pinter sprang into action, making efforts to tie down as many Olympia assets as possible and use them to cover his personal liabilities and losses. *Id.* at 32. His control vis-à-vis the other Principals is demonstrated by their undisputed actions in response to his demands. The other Principals took advantage of his largesse when times were good, but as it all fell apart, they simply handed to Sam Pinter whatever they had. *Id.* at 33. This has further prevented Fannie Mae from recovering even a portion of what is owed.

As Olympia's alter ego, Sam Pinter should be held liable, and should be required to pay Fannie Mae's judgment against Olympia.

## CONCLUSION

For the reasons stated above, Plaintiff Federal National Mortgage Association

respectfully requests that this Honorable Court grant its Motion for Summary Judgment against

Defendant Samuel Pinter for liability under the Eighth Cause of Action in its Amended

Complaint (Alter Ego).

Dated: May 30, 2008
       New York, New York

                              Respectfully submitted,

                              REED SMITH LLP

                              By: _____

                                  Wendy Schwartz (WS 1862)
                                  Emily Kirsch (EB 4216)
                                  Luanne Chu (LC 4637)

                                  599 Lexington Avenue
                                  New York, NY  10022-7650
                                  Telephone:212.521.5400
                                  Facsimile: 212.521.5450

                                  *Counsel for Plaintiff*
                                  *Federal National Mortgage Association*