UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

                                            Plaintiff,

        - against -

OLYMPIA MORTGAGE CORPORATION,
et al.,

                                            Defendants.

-------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★  JUL 8 - 2010  ★
BROOKLYN OFFICE

OPINION AND ORDER

04 CV 4971 (NG) (MDG)

**GERSHON, United States District Judge:**

Plaintiff Federal National Mortgage Association ("Fannie Mae") brought this action against defendant Samuel Pinter ("Samuel"[1]), among others, in connection with a fraud and breach of contract carried out by Olympia Mortgage Corporation ("Olympia"). Olympia has been put into receivership by this court and has entered into a consent judgment with Fannie Mae concerning the breach of contract claim. In the one of many motions pursuant to Rule 56 of the Federal Rules of Civil Procedure that is addressed in this opinion, Fannie Mae seeks to pierce the corporate veil and hold defendant, who, along with his wife, was one of the largest shareholders of Olympia, personally responsible for Olympia's liabilities.[2]

## FACTS

The following facts are undisputed unless otherwise noted.

**I.      Defendant's relationship to Olympia**

---

[1] This case involves two brothers, both of whom used the name "Samuel Pinter" at various times. For clarity, this opinion will refer to the founder of Olympia as "Samuel" and his brother as "Leib."

[2] Fannie Mae has other legal claims arising out of the same facts outstanding against defendant, on which they have not moved for summary judgment.

### A.      *Defendant's other corporations*

Defendant, who deals in real estate, presides over a congeries of related entities primarily owned by himself and his wife, Fagie Pinter.[3]  Among the corporations in which defendant (or his wife) have an interest are 1340 East 9th Street Realty Corp. ("1340 Realty"), S&F Ocean Realty Co. ("S&F Realty"), and Z&S Realty Co. ("Z&S Realty").  Defendant is also associated with Kahal Shomrei Hadath ("KSH"), which he describes as a New York non-profit religious organization.  Defendant has been "in charge" of KSH (11/14/06 S. Pinter Dep. 365: 10-11) since its inception and has been its rabbi since 1978.  KSH operates out of 1340 E. 9th St., a building which was previously owned by 1340 Realty and which KSH continues to occupy largely rent-free.[4]  KSH pays many of the expenses of defendant and his family and friends.

### B.      *Olympia's corporate structure*

Olympia (originally called Olympia Funding) was an independent mortgage lender founded in 1986 by defendant.  It was headquartered in Brooklyn, New York, and initially located at 805 Avenue L, a building owned by 1340 Realty.  Defendant characterizes Olympia as "a close-knit corporation that involved two brothers [Samuel and Leib Pinter] with two friends [Abraham Donner and Barry Goldstein]."  10/17/06 S. Pinter Dep. 101:11-15.  Defendant served as vice president of Olympia, and Fagie Pinter held the title of secretary.  Few, if any, corporate formalities appear to have been observed at Olympia.  There were no formal meetings of the shareholders, even to appoint directors, and no books of minutes of shareholders' meetings were

---

[3] Defendant appears to have regarded his wife's holdings as effectively his own, testifying: "Fagie, just like anything that involved myself...all my business interests are myself and Fagie, myself and Fagie.  All my holdings are either myself or Fagie.  So, all together."  11/14/06 S. Pinter Dep. 110:9-16.  Defendant does not contest that "[he] handled all matters relating to Fagie Pinter's Olympia affairs, and her real estate interests."  Plaintiff's Local Civil Rule 56.1 Statement ¶ 40.

[4] 1340 Realty also owns defendant's Brooklyn home.

ever kept by Fagie Pinter. There were few or no formal meetings of the board of directors, nor were any minutes taken at any such meeting. However, defendant and other major shareholders met informally on a daily basis. No complete and correct corporate books were ever kept.

Defendant claims that he provided start-up funds and then working capital for Olympia in the form of a number of loans ultimately totalling $1.679 million, loans for which defendant has been unable to provide documentation. (Defendant claims that the bulk of these funds actually came through KSH.) Because of the lack of documentation, it is unclear how much, if any, cash defendant actually provided to Olympia over the years. Defendant personally guaranteed Olympia's warehouse lines of credit to two of its lenders.[5]   Other relatives and friends of defendant are also said to have made loans to Olympia at various times. Samuel Pinter made no capital contributions to Olympia in the form of equity, as opposed to loans.

Although the percentages of ownership shifted over the years, before 2004, Fagie Pinter, defendant's wife, and Abe Donner, a friend of defendant and president of the Midwood Federal Credit Union ("MFCU"), were the two largest shareholders, with the remaining shares held by defendant, his brother Leib[6], another friend of defendant named Barry Goldstein, and some other individuals and entities related to defendant, Donner, or Barry Goldstein. However, no one recalls that Olympia ever issued any stock certificates.

The degree of defendant's operational control of Olympia is disputed. Defendant characterizes himself as a passive investor and argues that he did not have knowledge of Olympia's day-to-day business or free access to its assets. Defendant did, in fact, give responsibility for running Olympia's operations to Leib Pinter and Barry Goldstein. However,

---

[5] Fagie Pinter's signature is also on these guarantees, but she claims that it was forged.
[6] Leib Pinter was not initially a shareholder because of his criminal record; he had previously pled guilty to charges of bribing a Congressman. However, over the years he acquired a stake in Olympia.

defendant and Olympia operated out of the same office or different offices in the same building for all of Olympia's history, and defendant claims to have met with Leib Pinter and Barry Goldstein daily, to pray, but also to talk business. Defendant was a signatory on at least some Olympia accounts and signed "hundreds" of checks issued by Olympia.

Defendant has offered some testimony to support his claim that Leib Pinter and Barry Goldstein were careful to control the flow of information concerning Olympia's affairs to him and deliberately misinformed him about its financial situation. For instance, Joan Goldstein (no relation to Barry), who kept the books at Olympia, recalled that "everyone was told—not just me, everyone in the company, from the moment you come on board…that he is the silent partner and he gets no information from anyone about anything." 7/19/05 J. Goldstein Dep. 285:4-15. According to the report of Olympia's receiver, Olympia was insolvent at least from 1997 onwards and possibly for its entire existence. But defendant denies awareness of Olympia's insolvency, testifying that he thought the company was doing well. It should also be noted that plaintiff does *not* claim for the purposes of this motion that defendant was actually aware of the massive fraud perpetrated at Olympia over several years by Leib Pinter and Barry Goldstein, which supports defendant's claim that he was not kept fully apprised of the situation at the company.[7]

However, as will be discussed below, it is clear that defendant was able to extract money from Olympia for himself and his relatives essentially at will; he does not identify any systematic controls on Olympia's finances or even a single instance in which he was denied funds he sought from the company.

C.    *Funds received from Olympia by defendant before discovery of the fraud*

---

[7] Both Leib Pinter and Barry Goldstein have pled guilty to fraud charges in connection with the Olympia scheme. Defendant was never charged.

4

Defendant drew substantial funds from Olympia throughout its existence. Defendant received a "salary" of approximately $150,000 a year (plus life insurance) from Olympia, though he claims to have performed no substantial services for Olympia. Defendant arranged to have Olympia provide payments to various members of his family, even though he knew that many of them performed no or *de minimis* services for the company. These relatives received paychecks, health insurance, car payments, and mortgage payments. Defendant regarded these payments as "part of [his] salary" (10/17/06 S. Pinter Dep. 138:21-139:14), even though this compensation was reported on his relatives' tax returns, rather than his own.[8] Olympia also made multiple large payments to KSH, in the amounts of $450,000, $217,000, and $100,000; at least one other payment to KSH from Olympia, for $152,000, was funneled through MFCU. Defendant offers no business basis for these payments.

Defendant and his related entities also received large "interest payments" from Olympia every year. Olympia paid interest at generous rates ranging from 12 to 15 percent on alleged loans from defendant, KSH, 1340 Realty, and Z&S Realty. These loans are not documented in Olympia's books. In fact, when Olympia's outside accountant examined the "interest" payments to KSH, he determined that there was no record of an underlying liability justifying the payments. As a result, a fictitious lease between KSH and Olympia was created for a building which Olympia did not actually use, and the payments were reclassified as "rent." There is no evidence of any check on defendant's ability to dictate the terms and repayment of his supposed loans to Olympia (except Olympia's ability to provide the funds). For instance, at one point in approximately 2001, Olympia paid $300,000 to cover the purchase of a Texas property in

---

[8] The other major shareholders of Olympia enjoyed similar privileges. Through September 2004, payments to relatives of the major shareholders, including defendant, who did not work for the company amounted to at least $1.94 million.

defendant's name, allegedly as repayment of a loan. Defendant's description of this transaction in his deposition testimony is telling: "Q. Was there any vote of the shareholders authorizing you to take that money? A. It was my money. Vote of the shareholders? It was my....Barry or Leib or Donner didn't say it wasn't my money...." 10/17/06 S. Pinter Dep. 114:22-115:5.

It is clear that defendant regarded all loans to Olympia from him or from related entities as his personally. Notably, defendant characterized the loan allegedly made by KSH to Olympia as "*my* loan" for which "*I* received anywhere from 12 to 15 percent interest...*I* was paid each month." 11/14/06 S. Pinter Dep. 364:11-17 (emphasis added). Similarly, defendant, when asked whether "any of the money was from you personally that was loaned to Olympia," responded, "Z&S is an entity that's mine, because it's together with my wife. 1340 is an entity that's a corporation together with my wife. If you're saying me, yes, it's me and my wife." 11/14/06 S. Pinter Dep. 380:2-7.

In addition, other friends and family members of defendant (and the other major shareholders) received interest payments on their own supposed loans to Olympia at rates ranging from 10 to 14 percent. "Interest" payments to related noteholders up to 2004 totalled almost $2.6 million. Finally, defendant would take personal loans from MFCU. He claims, with no record support, that he provided the funds to Olympia, and then had Olympia repay the principal and interest to MFCU. The loans were structured in this manner because MFCU was not permitted to loan more than ten percent of its funds to any one shareholder, a limit that Olympia appears to have hit with some frequency.[9] Defendant claims that he had Olympia repay the principal and interest directly because he did not wish to be bothered with bookkeeping issues.

---

[9] MFCU was seized and shut down by its regulator on November 4, 2004.

6

Defendant also borrowed money from MFCU for his own purposes; at least some of these loans were secured by Olympia accounts.  In July 1997, defendant borrowed $175,000, secured by an Olympia account, and wired the proceeds to a Texas title company.  In December 1997, defendant borrowed $75,000, again from MFCU and again secured by an Olympia account, and distributed the money to Z&S Realty and S&F Realty.  Principal and interest on these two loans was paid by Olympia.  Altogether, defendant's loans from MFCU totaled $1.27 million.

Olympia also engaged in a series of real estate transactions over the course of its existence that redounded to the benefit of defendant personally or of one of his related entities. This court has already determined that 1716 Realty LLC ("1716 Realty") was an alter ego of Olympia. *Balmer v. 1716 Realty LLC*, 2008 WL 2047888, at *7 (E.D.N.Y. May 9, 2008).  1716 Realty was run by Barry Goldstein until November 2004 (when defendant took over day-to-day control).  In December 2002, 1716 Realty obtained a $1.5 million mortgage from GE Capital. This loan was guaranteed by Olympia and some of Olympia's major shareholders.  The net loan proceeds of $1.32 million were then transferred, with no apparent business justification, to Olympia.  At that point, the funds were distributed to KSH; to the MFCU (repaying loans to defendant and Leib Pinter); to MFCU accounts which were shortly thereafter used to pay various amounts to the children and spouses of defendant and Leib Pinter; and to replenish a custodial account held for Fannie Mae.  Although defendant argues that he believed that the payments to his and his brother's spouses and children represented an "inheritance" from his father, the letter that he submits in support of this statement indicates that all his late father's funds were withdrawn in February 2002, and the funds in question were not disbursed until at least

7

December 2002. Thus, defendant siphoned off the proceeds of a loan to a corporation dominated by Olympia for the benefit of himself and his family.

By December 31, 1991, Olympia was the record owner of four apartment complexes in Texas: the Hidden Lakes Village, The Woods, Woodhollow, and the Elite Apartments. During 1992, Olympia sold Hidden Lakes Village to Olympia-Schapin Realty and Woodhollow to Hardware by Kramer, Ltd., both companies in which defendant had an ownership interest. In both cases, the properties were conveyed at a loss and for no or inadequate consideration. In 1995, Hidden Lakes Village was sold for $1.45 million. Some of the proceeds were used to pay off loans to MFCU, and $445,000 was conveyed through MFCU to various other accounts and entities related to defendant. It appears that Woodhollow Apartments was also sold and disbursements of the proceeds were made to relatives of defendant.

Defendant used the name and address of Olympia during some of his real estate transactions. In a written offer to purchase a Texas property called Middlesteadt Shopping Center, defendant referred to himself as "Samuel Pinter & Associates of Olympia Mortgage Corp." Defendant also portrayed two other Texas properties, Carters Grove Apartments and Timbercreek Shopping Center, as owned by Olympia for purposes of obtaining insurance quotations. Other properties were described as having addresses in care of Olympia. There is no evidence that Olympia ever owned or managed these properties. Thus, defendant often did not distinguish between his personal business activities and those of Olympia, but rather used Olympia for his own business purposes when it was convenient.

II.    *The "Code 59" fraud*

Fannie Mae is a "government-sponsored entity" which supports the United States residential mortgage market by purchasing such mortgages in the secondary market. It does not

itself originate mortgages, but rather buys the m from lenders, such as Olympia.  In 1988, Olympia began selling some of its mortgage loans to Fannie Mae.  Under the terms of their contract, Olympia sold Fannie Mae thousands of mortgages which Olympia had originated, but retained the valuable rights to service the loans—that is, to handle (for a fee) the collection of payments and other administrative matters.  After a mortgagor submitted a monthly payment to Olympia, Olympia, as the servicer, was responsible for depositing the payment into various bank accounts (corresponding to each component of the monthly payment, including 1) principal and interest and 2) taxes) and notifying Fannie Mae through a computer system called LASER that the payment had been made.  Fannie Mae would then withdraw the money from the appropriate accounts.  If a mortgagor paid off a loan entirely (usually as the result of a refinancing), Olympia was supposed to deposit all the funds into a custodial account and inform Fannie Mae that the loan was being closed out.  Such loans were known at Olympia as "Code 59"[10] loans.

However, for a substantial number of Code 59 loans (a group called "Leib's list"), Olympia did not inform Fannie Mae that the loan was paid off, nor did it deposit the funds into the custodial account for withdrawal by Fannie Mae.  Instead, at the direction of Leib Pinter and Barry Goldstein, it continued to report the loan as active and diverted the funds to other uses.  In some cases, it appears that, in violation of the contract with Fannie Mae, Olympia applied the funds to the repayment of other mortgages.  In other cases, the funds were simply appropriated for Olympia.  Olympia went to great lengths to ensure that the diversion of these funds was not detected.  Not only did it continue to report the loan as active to Fannie Mae on LASER, it made monthly deposits into the bank accounts corresponding to the loan to make it appear that the mortgagor was continuing to make the mortgagor's monthly payments.  It ceased sending

---

[10] The code used in LASER to identify a refinanced loan to Fannie Mae was 60.

monthly bills to the mortgagor and also adjusted tax forms so that the mortgagor was credited only for the interest the mortgagor had actually paid in a year, as opposed to any interest that Olympia had paid "for" the mortgagor.

Fannie Mae discovered this fraud in 2004 after receiving an anonymous tip that an unidentified lender was diverting payoff funds. Its examination of its records revealed that Olympia had sold it over a hundred mortgages in which there were two first liens outstanding against the same property, a situation explicable only by either gross incompetence in recordkeeping or outright fraud. As a result, Fannie Mae visited the offices of both Olympia and MFCU on October 19, 2004, to investigate. Fannie Mae terminated its contract with Olympia shortly thereafter. On October 28, 2004, the New York State Department of Banking summarily suspended Olympia's license to act as a mortgage lender; on November 4, 2004, Olympia surrendered its license permanently. On November 16, 2004, Fannie Mae sued Olympia, as well as defendant and a number of others, for, among other things, breach of contract and fraud. Olympia, which went into receivership by the order of this court, has consented to judgment in the amount of $44.8 million to settle the breach of contract claim—the corporate obligation for which plaintiff seeks to hold defendant liable.

## III.   Defendant's actions after the fraud was revealed

After the discovery of the fraud in 2004, the financial situation at Olympia was grim. It was in the process of losing both its important contract with Fannie Mae and its very license to operate in its line of business. It was facing a lawsuit for tens of millions of dollars from Fannie Mae. It also had multi-million-dollar debts to Independence Community Bank ("ICB") and Chinatrust Bank which were guaranteed by defendant personally.

At this point, the record establishes, defendant began to assert considerably more hands-on, day-to-day control over Olympia's operations in order to avoid personal liability for Olympia's debts and to diminish the assets which would be available to satisfy a judgment against Olympia.  Defendant wrote a letter to ICB dated October 31, 2004 ("the ICB letter"), attempting to negotiate a resolution of Olympia's debts.  In that letter, he listed a number of assets supposedly available to satisfy Olympia's debts.  Defendant disputes plaintiff's description of this letter as listing assets "characterized as belonging to Olympia."  However, the ICB letter was on Olympia letterhead, characterizes itself as "a thorough list of assets that we feel can be liquidated" in order "to repay the monies that are outstanding on the secured lines of credit [to Olympia]" and lists assets, such as servicing rights for loans to Ginnie Mae and Freddie Mac and Olympia's California office, which could pertain only to Olympia.  Nowhere does the ICB letter make any reference to the possibility that some of the assets listed might belong to some other entity or individual.   Therefore, no reasonable jury could conclude that defendant was not representing that the items listed in the ICB letter were assets of Olympia.

Defendant acknowledged in the ICB letter that Olympia's San Jose office had a face value of $1 million and that Olympia had been in contact with "numerous" brokers who were interested in purchasing it.  He also acknowledged that he believed that he had personal liability under California law for the lease belonging to this office and for certain withholding taxes.  In an attempt to escape that personal liability, he transferred the office to a third party for no known consideration.

Defendant argues in his brief that plaintiff is mischaracterizing the evidence on two points—he argues that, in fact, the "sale" of the San Jose office was made to shield *Olympia* from liability and that there was consideration for the "sale."  However,  defendant did not

controvert paragraph 158 in plaintiff's Local Rule 56.1 statement, which states that "Sam Pinter transferred the San Jose business to a third[] party for no known consideration to protect himself from what he believed would be personal liability." Plaintiff's claim concerning defendant's motive is supported by defendant's deposition testimony that "I didn't want to have further exposure against me personally….the decision [to give away the San Jose office] was based on that." 10/17/06 S. Pinter Dep. 273:3-18. Plaintiff's claim concerning the consideration involved is similarly supported by defendant's own testimony: "Q. Did any money change hands [in the transfer of the San Jose office]? A. No. Q. No consideration was given? A. No." 3/22/06 S. Pinter Dep. 566:10-13. Defendant cannot contradict his own sworn testimony through arguments in his brief, especially when he also has failed to controvert the same facts in plaintiff's Local Rule 56.1 statement.   Furthermore, even assuming that defendant's claims were true, that Olympia might have shared defendant's liability hardly justifies the dissipation of this asset (or demonstrates Olympia's independence from defendant). Plaintiff has therefore established that defendant simply gave away the property of Olympia to try to insulate himself from a perceived personal liability.

Another property identified in the ICB letter as an Olympia property is a property on Flatbush Avenue that was actually owned by an entity called P&G Realty, which in turn was owned by Leib Pinter and Barry Goldstein. The property was purchased with $295,000 diverted from the funds that an apparently unrelated individual had transferred to Olympia to pay off his own mortgage.[11] Shortly after Olympia's closure, both Leib Pinter and Barry Goldstein conveyed their interest in P&G Realty to defendant for no consideration. Plaintiff claims that P&G Realty,

---

[11] In other words, the mortgagor tried to pay off his mortgage, which was originated and serviced by Olympia, but Olympia misappropriated those funds to purchase the Flatbush Avenue property and left the original mortgage outstanding.

under the direction of defendant, then sold the property to Barry Goldstein's father-in-law for $550,000 and provided the proceeds to defendant. Defendant disputes this claim, arguing that, while the property was indeed sold for $550,000, "those funds were first used to pay off the liens on the property and the remainder was used to renovate Olympia's property at 1716 Coney Island Avenue." More specifically, defendant testified that he received approximately $300,000 in notes from the sale of the property (and thus, by implication, an additional $250,000 in cash). Defendant also testified that he—along with Donner, who contributed some amount which the defendant did not identify—paid $70,000 in tax liens on the property, and that "about $150,000 in cash" was spent on renovating the 1716 Coney Island Avenue property. 10/17/06 S. Pinter Dep. 293:6-21. Even allowing for reasonable imprecision of figures recited from memory, defendant's own account leaves approximately $20,000 in cash and another $300,000 in notes unaccounted for.

Thus, even accepting defendant's version of the facts, he has not actually contested the significant claim made by plaintiff as to the stripping of this asset from Olympia—that is, that defendant personally sold this property, which had been purchased with Olympia funds, and then effectively diverted the funds in part to another entity and in part (apparently) to himself. When asked "Who was in control of that cash?" defendant responded, "I was." (S. Pinter 10/17/06 Dept. 295:5-11) Therefore, he, and not Olympia, controlled the proceeds of the sale. Although 1716 Realty was ultimately held by this court to be an alter ego of Olympia, this finding had not yet been made. The 1716 Coney Island Ave. property is owned by 1716 Realty, *not* Olympia, and defendant had no right to choose to spend Olympia's money on 1716 Realty.

In sum, although there is no evidence that defendant was directly involved in the original fraud at Olympia that secured the funding for the purchase of the Flatbush Avenue property,

13

once the fraud was revealed, he arranged to shift the funds involved out of Olympia—funds that might otherwise have been used to satisfy the claims against Olympia.

## DISCUSSION[12]

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(c).[13] A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 586-88 (emphasis removed).

Plaintiff argues that defendant so dominated the affairs of Olympia that the court should pierce the corporate veil and hold him responsible for Olympia's liabilities. Defendant denies

---

[12] After oral argument, defendant sent a letter to this court purporting to discharge his counsel and making further arguments with respect to this motion. Even if his submission were not untimely, it does not raise any material issues of fact.

[13] On December 1, 2009, amendments to the language of Rule 56(c) which are not material to the disposition of this motion went into effect.

that he dominated Olympia and argues that, even if he did, he did not commit any wrongs against plaintiff.

Plaintiff asserts, and defendant has not disputed, that New York law governs this diversity action. Under New York law, "[t]he doctrine of piercing the corporate veil is typically employed by a third party seeking to go behind the corporate existence in order to…hold [the owners] liable for some underlying corporate obligation." *Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 140-41 (1993). Ordinarily, the shareholders of a corporation are not personally liable for obligations incurred by that corporation. However, where "the owners, through their domination [of the corporation] abuse[] the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [a] party…a court in equity will intervene." *Id.* at 142. An attempt to pierce the corporate veil does not provide an independent cause of action against an owner; it is an attempt to impose an established obligation of the corporation—in this case, the $44.8 million consent judgment to which Olympia has consented—on an owner. *Id.* at 141.

"In order to pierce the corporate veil under New York law, it must be established (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Capital Distribution Servs., Ltd. v. Ducor Express Airlines, Inc.*, 2007 WL 1288046, at *2 (E.D.N.Y. May 1, 2007), *citing Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997). In determining whether the owner exercised complete domination, courts look to a number of factors, such as:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the

15

> corporation for personal rather than corporate purposes, (4) overlap
> in ownership, officers, directors, and personnel, (5) common office
> space, address and telephone numbers of corporate entities, (6) the
> amount of business discretion displayed by the allegedly dominated
> corporation, (7) whether the related corporations deal with the dominated
> corporation at arms length, (8) whether the corporations are
> treated as independent profit centers, (9) the payment or guarantee of debts
> of the dominated corporation by the corporation, and (10) whether the
> corporation in question had property that was used by the corporation as
> if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.

1991).  In this case, the relevant factors strongly support a finding that Olympia was dominated

by defendant.  As discussed in detail above, Olympia lacked many of the formalities of corporate

existence, including formal meetings of directors and shareholders and the keeping of complete

and accurate official corporate records.  Though his precise holdings and title varied over time,

defendant was both a significant shareholder and an important officer in the corporation, as was

his wife, whose business interests defendant concedes that he handled.  Defendant operated out

of either the same office or the same building as Olympia for almost all of Olympia's existence.

Defendant characterizes himself as a mere "minority shareholder," but cites no authority for the

proposition that majority ownership is required for piercing the corporate veil.  Domination is

established not by such a bright-line test, but by examination of the way a corporation

functions—whether "the owners use the corporation as a mere device to further their personal

rather than the corporate business." *Morris*, 82 N.Y.2d at 141.

Defendant took funds out of the corporation for personal use on a regular basis.  He used

the corporation to support a remarkable number of relatives who did little or no work for the

corporation and to provide extraordinarily high "interest payments" to himself and his friends

and family.  It is impossible to believe that the loans allegedly made by defendant and his related

16

entities to Olympia would be the result of arms-length transactions, especially with an insolvent corporation.  Defendant guaranteed the debts of Olympia personally.  Finally, the defendant used the name of Olympia repeatedly in setting up his own real estate deals.

Plaintiff also contends that Olympia was at all times undercapitalized, another of the *Passalacqua* factors.  It is not clear that plaintiff has established this for the purposes of summary judgment.[14]  However, plaintiff is not required to demonstrate that all of the *Passalacqua* factors apply to support a finding that defendant dominated the corporation. "[T]here is no set rule as to how many…factors must be present in order to pierce the corporate veil." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989).  Even without a definitive demonstration of undercapitalization, plaintiff has still overwhelmingly shown that defendant abused the corporate form for his own personal benefit throughout Olympia's existence.  I therefore find that defendant dominated Olympia.

Finally, I note that the disputes as to how much "operational control" defendant had over the mortgage business of Olympia and whether he knew Olympia was insolvent—before the "Code 59" fraud was revealed—are immaterial.  Under the facts of this case, these disputes do not affect the determination as to whether the defendant dominated Olympia.  As defendant showed no regard for Olympia's independent corporate existence, but rather exploited the company as a means of channeling funds to himself, his entities, his relatives, and his associates, I find that defendant exercised complete domination over Olympia.

In order to pierce the corporate veil, plaintiff must also establish that defendant's domination of Olympia was used to commit "a fraud or wrong" against plaintiff, a position that defendant disputes.  "A plaintiff is not required to plead or prove actual fraud in order to pierce

---

[14] In *Balmer v. 1716 Realty*, this court found, relying primarily on Olympia's own assertions through its receiver, that Olympia was undercapitalized.  Olympia is not a party to this motion.

the corporate defendant's corporate veil," but merely "a wrongful or unjust act." *Rotella v. Derner*, 283 A.D.2d 1026, 1027 (4th Dep't 2001). Plaintiff does not claim for the purposes of this motion that defendant was aware of Leib Pinter and Barry Goldstein's fraud against plaintiff and consciously shifted the proceeds of that fraud out of the corporation and into his own hands. Defendant thus argues that, as he was not responsible for—nor even aware of—the "Code 59" mortgage fraud that led to the judgment against Olympia, he cannot have used his alleged domination of the corporation to commit a fraud or wrong against Fannie Mae. However, "[u]nder New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced." *Capital Distribution Servs.*, 2007 WL 1288046, at *3; *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development and Trade Servs., Inc.*, 386 F. Supp. 2d 461, 476 (S.D.N.Y. 2005). Throughout Olympia's existence, defendant raided the assets of the company for his own purposes, indifferent to whether his steady drain of funds from its coffers would impair its ability to meet its substantial contractual obligations to Fannie Mae (and other parties). There is no doubt that he appropriated significant monies which would otherwise have been available to satisfy Fannie Mae's current judgment against Olympia, thus committing a wrong against Fannie Mae. Even more importantly, once defendant became aware of the allegations against Leib Pinter and Barry Goldstein, and thus that claims against Olympia would almost certainly be brought, he continued to withdraw assets—in particular, the San Jose office and the Flatbush Avenue property—from Olympia. There can be no question that defendant's dissipation of Olympia's assets served to remove them from the reach of Olympia's creditors, which constitutes a wrong against plaintiff. *See Godwin Realty Assoc. v. CATV Enter., Inc.*, 275 A.D.2d 269, 270 (1st Dep't 2000).

In a conclusory footnote, defendant challenges the basis for calculating the $44.8 million loss to Fannie Mae which Olympia agreed to in the consent judgment. However, the $44.8 million loss is supported by both facts stipulated to in that judgment and by the receiver's report addressing Olympia's solvency, which established Olympia's liabilities in detail. As plaintiff noted at oral argument, and as defendant then acknowledged, defendant did not contest the amount of the loss in his Local Civil Rule 56.1 statement; if he had done so, plaintiff would have offered its expert report on its loss, which has been submitted to the court as part of another summary judgment motion. Defendant had access to the receiver's report (and, later, plaintiff's expert report) and full opportunity for discovery on the subject of Fannie Mae's damages. The court therefore rejects defendant's perfunctory challenge to the $44.8 million figure.

Defendant also argues that it would be inequitable to hold him liable for the entire $44.8 million judgment since plaintiff has not shown that he took that amount for Olympia. Piercing the corporate veil is an equitable remedy, with some flexibility in its application, and it is true that, on occasion, courts have chosen not to hold a defendant liable for a corporation's full liabilities even after piercing the veil. *See Mars Electronics of New York, Inc., v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91, 99-100 (E.D.N.Y. 1998) (citing New Jersey law). However, I find that here, as is more common in such cases, *see, e.g., Capital Distribution Servs.*, 2007 WL 1288046, at *4, it is more equitable to hold defendant liable for all of Olympia's liabilities in question. Defendant abused the corporate form from the very beginning of Olympia's existence, exploiting all the advantages of incorporation to the greatest possible extent while flouting requirements designed to protect other shareholders and creditors.[15] The undisputed facts concerning his

---

[15] It also appears that many of Olympia's records were stolen or destroyed between the time that Fannie Mae began to investigate the fraud and the time that the receiver took possession; thus, the true extent of defendant's withdrawals of assets from Olympia may never be known.

19

conduct of Olympia's financial affairs are consistent with only one conclusion: that defendant did not care whether Olympia ever fulfilled any of the obligations it entered into, as long as he could continue to extract money and other benefits from the company.  Although New York courts are careful to respect the corporate form, individuals nonetheless may not abuse the privilege of incorporation to shield themselves from the consequences of wronging others.

## CONCLUSION

For the reasons given above, plaintiff's motion for summary judgment to pierce the corporate veil against defendant is granted, and plaintiff will be granted judgment against Samuel Pinter in the sum of $44.8 million.

**SO ORDERED.**

NINA GERSHON
**United States District Judge**

Dated: Brooklyn, New York
    July 7, 2010

20