UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT
★ JUN - 8 2011 ★
BROOKLYN OFFICE

-------------------------------------------------------x

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

                Plaintiff,

- against -

OLYMPIA MORTGAGE CORPORATION,
et al.,

                Defendants.

OPINION & ORDER
04-CV-4971 (NG)(MDG)

-------------------------------------------------------x

OLYMPIA MORTGAGE CORPORATION,
et al.,

                Crossclaim Plaintiff,

- against -

Leib Pinter, et al.,

                Crossclaim Defendants.

-------------------------------------------------------x

GERSHON, United States District Judge:

      Federal National Mortgage Association ("Fannie Mae") initiated this action on November 16, 2004. On October 18, 2005, Olympia Mortgage Corporation ("Olympia") filed an Amended Answer and Crossclaims asserting crossclaims against, among others, Samuel Pinter ("Pinter") and various corporate or religious entities, including Kahal Shomrei Hadath ("KSH"), 6401 Bingle Corporation ("6401 Bingle"), Jasmine Lakes Properties Corporation ("Jasmine Lakes"), S&F Ocean Realty ("S&F") and Z&S Realty ("Z&S") (collectively, the "Entity Defendants"). Olympia has been put into receivership by this court and has entered into a consent judgment with Fannie Mae concerning its breach of contract claims. On May 11, 2011, by Stipulation and Order, the remaining six claims against Olympia were dismissed without prejudice.

Olympia now seeks to pierce the corporate veil and hold Samuel Pinter, who, along with his wife, was one of the largest shareholders of Olympia, personally responsible for Olympia's liabilities under Rule 56 of the Federal Rules of Civil Procedure.[1] In addition, Olympia seeks partial summary judgment against the Entity Defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure on its crossclaims of constructive fraud for fraudulent transfers to the Entity Defendants under New York Debtor and Creditor Law § 273 ("§ 273"). For the reasons set forth below, Olympia's motions are granted.

## I. Piercing the Corporate Veil as to Samuel Pinter

In a previous opinion, the court, after a lengthy and detailed discussion, granted Fannie Mae's motion to pierce Olympia's corporate veil and hold Samuel Pinter personally responsible for Olympia's liabilities to Fannie Mae. *See Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F.Supp.2d 308 (E.D.N.Y. 2010). No new facts or arguments were presented in the instant motion in which Olympia seeks the same relief. In fact, Olympia relies entirely on the arguments set forth by Fannie Mae in its motion to pierce Olympia's corporate veil as to Samuel Pinter, and Pinter did not submit any additional papers opposing this motion. Therefore, I rely on the facts and analysis from my earlier opinion and, again, pierce Olympia's corporate veil as to Samuel Pinter and award Olympia $44.8 million in damages against Samuel Pinter.

---

[1] Samuel Pinter was represented by counsel at the time he responded to the summary judgment motions filed by both Fannie Mae and Olympia. In fact, on August 21, 2008, the court granted Pinter an extension of time to respond to the summary judgment motions so that his newly hired counsel, Jacob Zelmanovitz, Esq., would have sufficient time to prepare responses to the motions. Pinter's affidavit in opposition to summary judgment against the Entity Defendants in this opinion was filed during the period in which he was represented by counsel and Pinter was represented by counsel at oral argument. Thereafter, Pinter filed a letter with the court, dated June 15, 2010, stating that he had discharged his counsel because of his counsel's inability to adequately represent his interests. Pinter's counsel, however, has not sought to be relieved by the court, and new counsel, Jonathan S. Gould, has now filed a notice of appearance.

## II. Motion for Partial Summary Judgment Against the Entity Defendants

### A. Background and Facts

The following facts are undisputed unless otherwise noted. The background of this case has been set forth in recent opinions, *see, e.g., Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d 308. Facts relevant to the instant summary judgment motion are set forth below.

Olympia moves for summary judgment on its claim of constructive fraud against the Entity Defendants on the basis that there was no consideration for the transfers which Olympia made on their behalf. The Entity Defendants argue that Samuel Pinter loaned money to Olympia from its inception and that the transfers at issue are interest payments and principle repayments of those loans, which constitute fair consideration. The Entity Defendants also question Olympia's insolvency at the time of the transfers and argue that insolvency should be addressed at a trial.

#### 1. Samuel Pinter's Role at Olympia

Samuel Pinter's role at Olympia is discussed in detail in *Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d 308, and will not be repeated here. Additional facts relating to his role with the Entity Defendants are set forth below.

#### 2. Olympia's Insolvency

According to the receiver's "Analysis of Solvency – Report of Findings" (the "Report"), Olympia was insolvent at least from December 31, 1997, and possibly for its entire existence. Karen Kincaid Balmer Decl. Ex. 40, May 23, 2008. Defendants argue that they are entitled to cross-examine the receiver at trial as to Olympia's insolvency. The defendants have had ample opportunities to review the discovery in this case and to question the receiver under oath about her conclusions on the issue of Olympia's insolvency. That the defendants have chosen not to avail

themselves of those opportunities does not entitle the defendants to a trial on the issue of insolvency. Defendants have not offered even one piece of evidence in support of their position that Olympia was solvent during the period in which they received the money transfers in question. Therefore, the insolvency of Olympia during that period is treated as undisputed.

### 3. Pinter's Initial Infusion of Capital to Olympia

Pinter provided Olympia's initial operating capital of $250,000. Pinter asserts that this infusion was a loan, while the receiver argues that it was an equity capitalization contribution, which was what the New York State Banking Department regulations required.

There is no dispute that Pinter gave Olympia $250,000 in 1986. However, the Agreement to form Olympia Funding (the "Agreement"), upon which Pinter relies, and which describes the $250,000 infusion, is an agreement between three men, Samuel Pinter, Abe Donner and Leib Pinter. There is no signature on the Agreement from anyone acting on behalf of Olympia. Therefore, Olympia was not a party to the Agreement, and there is no evidence that Olympia ever adopted the Agreement or agreed to its terms. In addition, the Agreement itself calls Pinter's contribution a "capitalization" for which he was to receive a 12½% yearly return on his "investment." Pinter has offered no documentation which could prove that Pinter's initial contribution was a loan to Olympia which Olympia agreed to pay back. On the contrary, the evidence relied upon by Pinter, just described, shows that Pinter made a capital contribution to Olympia, evidenced by a document on which Olympia was not a signatory, and expected a yearly return on his investment, but not a repayment of the principal.[2]

---

[2] The Receiver's Report, contrary to the receiver's position here, states that Olympia was at all times undercapitalized because its initial operating capital was a loan from Samuel Pinter, and, at her deposition, the receiver referred to Pinter's initial contribution to Olympia as a loan.

### 4. Samuel Pinter's Other Purported Loans to Olympia[3]

#### *a.* Pinter's Midwood Statements Do Not Evidence Loans

Nothing in Olympia's records or in any banking documents verify Pinter's position that he loaned money to Olympia. In support of Pinter's argument that he made loans to Olympia, Pinter submitted 72 Midwood Federal Credit Union statements which he claims show the loans he made to Olympia. Pinter Aff. Opp'n. M. Summ. J., Aug. 21, 2008, Ex. A. In fact, none of the statements show funds transferred from Pinter to Olympia. The statements show transfers from Olympia to business or religious entities in which Pinter or his wife had an interest, transfers from Pinter's personal accounts to business or religious entities in which Pinter or his wife had an interest, or transfers into Pinter's personal accounts.

Pages 3-28 and 63-74 of the statements have some handwriting on them purporting to explain "loans" Pinter made to Olympia.[4] Pinter claims that page three shows a transfer from Schmuel Pinter Irrevocable Trust to Olympia in the amount of $100,000. The document shows that the transfer was made to account number 3092, which is an account that belongs to KSH. This is not evidence of a

---

Also, in the opinion on Fannie Mae's motion to pierce the corporate veil against Pinter, to which Olympia was not a party, the court acknowledged that Pinter claimed to have provided the start-up funds for Olympia, but stated that "Pinter made no capital contributions to Olympia in the form of equity, as opposed to loans." *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F.Supp.2d at 311. It is now clear to me that Pinter's infusion of capital to Olympia cannot be deemed a loan which Olympia is obligated to repay. And my contrary conclusion in the prior decision had no impact on the result. This is because I determined that, although undercapitalization was a factor to be considered in piercing the corporate veil, there was insufficient information on the record to determine whether Olympia was, in fact, undercapitalized, and therefore I did not consider undercapitalization in my analysis.

[3] Some of the documents Pinter attaches in support of his argument that he loaned money to Olympia are in a foreign language and no translations were provided. Such documents have not been considered.

[4] Pinter wrote some page numbers by hand, but did not file his documents in numerical order according to his handwritten pagination; document pages 3-12 correspond to handwritten numbers 1-10, document pages 63-73 correspond to handwritten numbers 11-22 and document pages 13-28 correspond to handwritten numbers 23-38. Pinter did not number the remaining pages. The page numbers referred to in this decision are the numbers assigned by ECF, based upon the order in which the documents were filed on ECF.

loan to Olympia.

Pinter claims that page four shows a reduction in his personal account from $220,000 to $0, evidencing a loan to Olympia. The statement clearly shows, however, that the $220,000 was a loan *to* Pinter from Midwood. The reduction in the amount outstanding on the loan is the result of loan payments that were made to Midwood until Pinter paid back the loan. This is not evidence of a loan to Olympia. In fact, this statement is evidence of Olympia paying some of Pinter's loan payments, as two of the loan payments on this statement were made by way of a transfer from Midwood account number 1931, which is an Olympia account.

Pinter claims that the two $100,000 transfers from KSH's account, on page five, went to Olympia. In fact, the two $100,000 transfers were transfers into KSH's account, not transfers out of the account. One transfer came from Pinter's account, and the other came from Faige Pinter's account. This is not evidence of a loan to Olympia.

Pinter claims that two transfers on page six, totaling $70,074.31 were made to Olympia by Royale Apartments. Neither transfer went to Olympia. The first transfer, in the amount of $20,074.31, went to defendant S&F; and the second transfer, in the amount of $50,000, went to New York Bota Sefer/SP.

Pinter notes a transfer, on page seven, in the amount of $78,299.77 from an account titled Schmuel Pinter Irrevocable Trust. This money went to defendant KSH, not Olympia. The transfer shown on page eight was not a transfer out of the account of Braeswood Forest Apartment ("Braeswood"), but rather a transfer into Braeswood's account from Glen Willow Garden Apt. Inc. Page nine is another statement for Braeswood which shows a $10,000 transfer to Royale Apartments ("Royale"), not Olympia. Pinter notes a transfer on page 10 of $50,000 from his personal account,

which he claims went to Olympia. In fact, the transfer went to New York Bota Sefer/S.P. Page 11 is an account statement for Royale Apartments that shows a $10,000 transfer and withdrawals in the amounts of: (1) $29,349; (2) $9,010.65; (3) $15,000; (4) $5,000; and (5) $10,000, all of which Pinter claims were funds he lent to Olympia. The $10,000 transfer was a transfer into Royale's account from Braeswood. The withdrawal for $9,010.65 did go to Olympia to repay a loan Olympia made to Pinter. On April 8, 1998, Midwood wired $142,000 from an Olympia account to Discover Title Company in St. Petersburg, FL for the account of Wollitz Garden Apartments. Although there is no evidence linking Pinter to Wollitz Garden Apartments, Olympia's books show the April 8 transfer in the amount of $142,000 as a transfer to Pinter. On April 10, Pinter repaid $132,989.35 to Olympia leaving a balance of $9,010.65 outstanding on the loan. Pinter paid Olympia the remaining balance of $9,010.65 by Midwood check number 8802 on April 16. None of the remaining withdrawals went to Olympia. The withdrawal of $29,349 was Midwood check number 8786, payable to Z&S Realty. The $15,000 was Midwood check number 8924, payable to Partner's Tile with a memo indicating it was for an entity called Broadway Park. The withdrawal of $5,000 was Midwood check number 8925, payable to First Unum, also with a memo indicating it was for Broadway Park. There is no documentation as to where the final $10,000 withdrawal went; Pinter has not submitted any evidence to show that the money was given to Olympia.

Pinter's next statement, page 12, shows a transfer into Braeswood's account from 1340 Realty Corp. This was not a transfer of Pinter's funds to Olympia.

Pinter has indicated that pages 63-74 are a "sampling of mortgage loans." These pages are all statements for Faige Pinter's account and all relate to a mortgage loan made by Midwood to Faige Pinter. All payments made to Midwood on the mortgage, on pages 63-69, were paid by a transfer

of funds from Midwood account number 1931, an Olympia account, into Faige Pinter's account. The remaining statements, pages 70-74, just show that payments were made to Midwood on the mortgage. None of these statements evidence Pinter loaning money to Olympia.

The aforementioned analysis of the statements submitted by Samuel Pinter in support of his position that he made loans to Olympia show that no loans were, in fact, made by Pinter to Olympia. The court similarly reviewed and analyzed all of the other pages of Exhibit A to Pinter's Affidavit and determined that none of those statements evidence any loans made by Pinter to Olympia.

Finally, Pages 30-62 of exhibit A to Samuel Pinter's affidavit are all statements from various Midwood accounts that do not show any transfers or withdrawals. So, none of the transactions on these statements evidence any loans to Olympia.

### b. Pinter's Alleged $1,000,000 Loan to Olympia

Pinter argues that he lent Olympia $1,000,000 in 1995, which he claims came from the sale of Hidden Lake Village. Olympia purchased Hidden Lake Village, located in Baytown, Texas, in 1991, and sold it to an entity called Olympia-Schapin Realty ("Schapin") in January 1992. Schapin was an entity controlled by Pinter. When Olympia sold the property to Schapin, it gave Schapin a $500,000 purchase money mortgage loan at an annual interest rate of 10%. After Olympia sold Hidden Lake Village to Schapin, it accrued on its books both interest receivable from Schapin for the mortgage and a management fee receivable from Schapin. In October, 1995, Olympia's receivables reflect $1,010,631.44 from Schapin. In October 1995, Schapin sold Hidden Lake Village and received $1,445,736.32 in proceeds. One million dollars of these proceeds were wired to Midwood into Olympia's account and used to pay off some outstanding loans Olympia had with Midwood. Thus, Pinter's proffered records establish that the one million dollar payment was

Pinter's repayment of Schapin's open receivables to Olympia, not a loan to Olympia.

### c. Testimony by Leib Pinter and Abe Donner on the Existence of Loans by Pinter

Defendants argue that trial testimony from Leib Pinter and Abe Donner would prove that Pinter made loans to Olympia and was entitled to interest payments on those loans.

Both Leib Pinter and Abe Donner asserted their rights under the Fifth Amendment to refuse to answer questions at their depositions. Defendants do not point to any deposition statements, affidavits or any other evidence from either man setting forth testimony he would offer at trial. Therefore, defendants have offered no evidence that either would testify that Pinter made loans to Olympia.

### d. Loans by Pinter's Children to Olympia

Exhibit I to Samuel Pinter's affidavit contains documents which Pinter claims are proof of monies which Pinter's children loaned to Olympia. Such loans by Pinter's children, if they are, indeed, actual loans to Olympia, are irrelevant to Pinter's argument that *he* lent money to Olympia.

### 5. Transfers to the Entity Defendants

Pinter was either a principal shareholder, member of the board of directors or managing agent for a principal shareholder for each of the following Entity Defendants: KSH, S&F, 6401 Bingle and Z&S. Neither Pinter nor the Entity Defendants identify Pinter's affiliation with defendant Jasmine Lakes.

Olympia transferred sums of money to each of the Entity Defendants without receiving anything of value in return. The Entity Defendants, with the exception of Jasmine Lakes, which did not submit any papers in opposition to this motion, concede that they, themselves, did not provide

any consideration in exchange for the money transfers to them.[5] They argue, however, that there was fair consideration for the transfers because the transfers were made by Olympia to repay monies which Pinter had loaned to Olympia. The Entity Defendants further contend that Pinter was entitled to assign the repayment monies to any person or entity he chose.

As described above, the undisputed facts show that no loans were made by Pinter to Olympia. In addition, nothing in Olympia's records, or in anything presented by the Entity Defendants, provides proof of the existence of an arrangement whereby purported loans made by Pinter to Olympia were repaid to a person or entity other than Pinter.

KSH, which was incorporated in the early 1970's, is a charitable religious corporation with a principal synagogue located at 1340 East 9th Street, Brooklyn, New York, since 1978. It also supports a synagogue and high school in Lakewood, New Jersey. Pinter is a member of KSH's board of directors. KSH never provided any facilities to Olympia. However, some of the transfers from Olympia to KSH were classified as rental payments on Olympia's books. Pinter maintains, without any evidentiary support, that these payments were improperly classified by the accountants as rental payments, when, in fact, these were interest payments on loans he made to Olympia and told Olympia to pay back to KSH. Olympia has submitted ledgers, copies of cashed checks and copies of invoices evidencing payments totaling $2,044,876.00 which it seeks to recover from KSH.

S&F Ocean Realty is a partnership between Faige Pinter and Shaindy Pinter, Leib's wife. Pinter regards his wife's holdings as his own. *See Federal Nat. Mortg. Ass'n v. Olympia Mortg.*

---

[5] Jasmine Lakes was represented by counsel throughout the briefing of the instant summary judgment motion. The court was informed by letter from defendant Barry Goldstein, dated August 26, 2009, that his attorney, Edward Rubin, Esq., who was also counsel for Jasmine Lakes, had unexpectedly passed away. No new counsel has appeared for Jasmine Lakes.

*Corp.*, 724 S.Fupp.2d at 310 n. 3. Pinter manages the partnership for Faige and Shaindy. Olympia has submitted ledgers, copies of cashed checks and copies of invoices evidencing payments totaling $148,659.59 which Olympia made on S&F Realty's behalf.

Z&S Realty is a partnership between Samuel and Faige Pinter. Pinter manages the partnership. Olympia has submitted ledgers, copies of cashed checks and copies of invoices evidencing payments totaling $163,786.41 which Olympia made on Z&S Realty's behalf.

6401 Bingle Corporation is a domestic limited liability corporation of which Pinter is the principal shareholder and member of the board of directors. Olympia seeks to recover $4,500.00 from 6401 Bingle for which it has submitted ledgers, copies of cashed checks and copies of invoices evidencing the payments.

Jasmine Lakes Properties Corporation was the owner of Jasmine Lakes, a condominium development in Davie, Florida. In March, 2007, Jasmine Lakes was transferred to Jasmine Lakes Acquisition LLC for $10 and other consideration. Olympia seeks to recover $447,951.51 from Jasmine Lakes. Although Jasmine Lakes has not submitted any papers in support of its position on this motion, the court has found that certain transactions relied upon by Olympia are not substantiated. Specifically, although Olympia has shown that it paid a total of $447,952.51 to certain vendors, Olympia has not shown that all of the transfers to vendors were made on behalf of Jasmine Lakes. For example, a vendor would send Olympia a bill, which Olympia would pay; however, with respect to some filings relied upon by Olympia, there is no indication anywhere on the bill or anywhere in Olympia's books that the bill was for services performed for the benefit of Jasmine Lakes.

Olympia's evidence is sufficient to show the following $232,723.61 in transfers on behalf

of Jasmine Lakes:

| Vendor | Amount |
|---|---:|
| Bell South | $8,195.39 |
| Bob Beech Graphic Design | $689.00 |
| Brochure Factory | $1,000.00 |
| Joan Burton | $10,500.00 |
| Delaware Secretary of State | $100.00 |
| Department of State | $550.00 |
| Diversified Publishing | $13,991.20 |
| GGB Engineering, Inc. | $19,757.50 |
| Goldenholz & Associates | $13,560.99 |
| Landscape | $5,622.11 |
| Pillar Development Inc. | $15,441.30 |
| Marcos Pinares | $22,087.54 |
| Rojas Maintenance | $2,511.33 |
| Karl J. Schumer | $5,416.07 |
| Scirocco Financial Group | $12,916.29 |
| Sprint | $897.74 |
| The St. Paul | $17,262.00 |
| Times Investments, Inc. | $19,735.96 |
| Town of Davie | $62,489.19 |
| **Total** | **$232,723.61** |

Olympia's evidence is insufficient to show the following $215,228.90 in transfers because, as explained above, there is no indication in Olympia's files, the checks made out by Olympia, or on the vendor's paperwork that the bills were for services performed for the benefit of Jasmine

Lakes:

| Vendor | Amount |
|---|---|
| Broward County Board, Broward County and Broward County Health Department | $29,451.26 |
| Ary Choueke | $2,500.00 |
| City of Davie | $1,080.00 |
| D. Daniels Inc. | $5,300.00 |
| Delaware Secretary of State | $309.00 |
| EE&G | $1,000.00 |
| Department of State | $550.00 |
| Diversified Publishing | $1,399.00 |
| Doumar, Allsworth, Cross LLP | $12,026.60 |
| GGB Engineering, Inc. | $10,987.24 |
| Goldenholz & Associates | $26,905.00 |
| J.H. Iravani Inc. | $15,850.00 |
| J. Irazani[6] | $1,500.00 |
| Pillar Development Inc. | $1,000.00 |
| Rojas Maintenance | $2,399.28 |
| Matthew Schloss | $1,410.12 |
| Karl J. Schumer | $2,793.05 |
| Scirocco Financial Group | $4,518.00 |
| Sprint | $112.98 |
| Times Investments, Inc. | $80,458.02 |
| Town of Davie | $13,679.35 |

---

[6] The receiver adds the $1,500 in transfers to J. Irazani to the $15,850 in transfers to J.H. Iravani. But, the checks are to different names and the receiver does not explain why she adds the money together. Therefore, the court allocates the transfers separately to J. Irazani and J.H. Iravani.

| Total | $215,228.90 |
|-------|-------------|

## B. Discussion

### 1. Receiver's Standing

Preliminarily, the Entity Defendants argue, citing *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008), that a receiver of a corporation who does not represent a creditor of the corporation lacks standing to bring a fraudulent conveyance claim. The receiver in *Eberhard* represented only the assets of an individual who had engaged in questionable conveyances. The Second Circuit noted that fraudulent conveyance laws have historically existed to protect creditors, not those making the fraudulent conveyances. The Court concluded that allowing an individual who had engaged in a fraudulent conveyance to rescind that fraudulent transaction would allow him to evade the consequences of his actions. Therefore, it held that the receiver in that case lacked standing to bring fraudulent conveyance claims.

*Eberhard* relied on *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), where corporations were used by their management in a Ponzi scheme as conduits to convey away funds rightly belonging to the corporations. The *Scholes* court determined that, absent the wrongdoing of the management, the conveyances would never have occurred. In such a situation, *Scholes* held, it was appropriate to permit the receiver for the "liberated" corporation to seek rescission of the coerced transfers to protect the corporation itself and thus the defrauded corporation's creditors and investors. Since the wrongdoer in such a scenario is not the corporation proper, but rather the management which conveyed away the corporation's assets to the corporation's detriment, the policy concern expressed in *Eberhard* simply does not apply. The present case, in which the receiver of Olympia seeks to recover funds fraudulently conveyed from Olympia to other persons and entities by

Olympia's management, resembles the situation in *Scholes* far more closely than it does the situation in *Eberhard*. I find that Olympia's receiver has standing to pursue fraudulent conveyance claims against these defendants.

### 2. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

"The moving party is entitled to judgment as a matter of law [if] the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. at 323. When deciding a motion for summary judgment, courts must take into account the evidentiary burden of proof applicable at a trial on the merits and measure the evidence submitted against that burden of proof. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. at 254-55. Here, there is a dispute as to the appropriate standard of proof required to prove constructive fraud under § 273. *Compare Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 376 n. 6 (S.D.N.Y. 2003) (concluding that fraud under § 273 must be proved by a preponderance of the evidence) and *Farkas v. D'Oca*, 305 A.D.2d 237 (1st Dept. 2003) (noting that the trial court applied the clear and convincing evidence standard to a claim for constructive fraud under § 273).

### 3. New York Debtor and Creditor Law § 273

New York Debtor and Creditor Law § 273 ("§ 273") states:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

N.Y. Debt. & Cred. Law § 273. Under § 273, "if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent." *Capital Distrib. Servs., Ltd. v. Ducor Express Airlines*, Inc., 440 F.Supp.2d 195, 203 (E.D.N.Y.2006); *Zanani v. Meisels*, 78 A.D.3d 823 (2d Dep't 2010). Therefore, in order to succeed under this Section, Olympia must show (1) that it transferred money to the Entity Defendants; (2) that the money was transferred while Olympia was insolvent or that the transfers rendered Olympia insolvent; and (3) that the transfers were not made in exchange for fair consideration. *See In re Sharp Inter. Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

As explained above, there is a dispute as to the appropriate standard of proof required to prove constructive fraud pursuant to § 273. The court need not decide which standard is correct because Olympia would prevail under either standard.

### a. Money Transfers

The record establishes, without dispute, that KSH received $2,044,876.00 from Olympia; 6401 Bingle received $4,500 from Olympia; S&F received $ 148,659.59 from Olympia; and Z&S received $163,786.41 from Olympia. So, the first element is satisfied as to KSH, 6401 Bingle, S&F and Z&S.

Olympia also seeks to recover $447,952.51 from Jasmine Lakes. However, as explained above, Olympia cannot recover all the transfers it seeks because it cannot prove that all the monies it seeks to recover were transfers made on behalf of Jasmine Lakes. The record establishes that Jasmine Lakes received $232,723.61 in transfers from Olympia. So the first element is satisfied as to Jasmine Lakes in the amount of $232,723.61.

### b. Olympia's Insolvency

The Report concludes that Olympia was insolvent at least from December 31, 1997, which undisputedly is prior to any of the transfers at issue, and possibly for its entire existence.

The defendants argue that the receiver has not proven insolvency, which they impliedly claim is her burden, and therefore they argue that this motion must be denied. The law, however, shifts the burden of proof for insolvency to the transferee when there was no fair consideration in exchange for the conveyance. "[T]the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *U.S. v. Alfano*, 34 F.Supp.2d 827, 845 (E.D.N.Y. 1999). Since, as will be shown, there was no fair consideration for the money transfers, the presumption is that Olympia was insolvent, and the Entity Defendants have not offered any evidence to rebut that presumption.

Defendants also argue that the receiver has not been deposed as an expert on the conclusions set forth in the Report and that, because she has not been deposed, the court cannot rely on the

Report since the defendants are entitled to cross-examine the receiver on the findings in the Report. The Report was an exhibit produced at the receiver's May 23, 2008 deposition. If defendants felt that they did not have ample opportunity to depose the receiver about the Report at that time, they should have made an application to the court requesting to depose her at a later date. Defendants are not entitled to a trial merely on the basis that they chose not to avail themselves of the discovery available to them. Defendants, as described above, did not offer any evidence in their attempt to rebut Olympia's insolvency or in support of their position that the receiver's conclusion on insolvency was incorrect.

Next, defendants argue that the receiver admits in the Report both that the Report is not an audit of Olympia and that the accounting determinations in the Report are not based upon Generally Accepted Auditing Standards[7]. Though defendants are correct on this point, they offer no evidence whatsoever that the audit is in any way deficient or incorrect. In addition, as mentioned above, since there was no consideration in exchange for the transfers in question, defendants, not Olympia, carry the burden to prove that Olympia was not insolvent.

Defendants' final argument is that Olympia's receiver has not offered proof, on this motion, as to the underlying fraud against Fannie Mae. Such evidence is unnecessary for the determination of the claims before the court relating to the Entity Defendants and the damages which Olympia is entitled to recover from them.

### c. Fair Consideration

"Under section 273 of the Debtor and Creditor Law, any transfer made by an insolvent debtor

---

[7] Generally Accepted Auditing Standards are uniform guidelines set by the American Institute of Certified Public Accountants for how audits should be conducted in the United States. *See, generally, The American Institute of Certified Public Accountants, available at* http://www.aicpa.org, last visited June 6, 2011.

for less than 'fair consideration' is fraud as against his creditors without regard to the actual intent of the transferee." *Schmitt v. Morgan*, 98 A.D.2d 934 (3d Dept. 1983). The determination of whether fair consideration is received in exchange for a transfer is a question of fact. *See Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (Am.) Corp. Creditor*, 375 F.Supp.2d 257, 269 n. 5 (S.D.N.Y.2005) *(citing Am. Tissue v. Donaldson*, 351 F.Supp.2d 79, 105-06 (S.D.N.Y.2004)). In order to satisfy the statutory requirement for "fair consideration" under § 273, a conveyance must satisfy an antecedent debt or constitute a present exchange. *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir.1995). The value of the consideration may not be disproportionately small when compared with the value of the conveyance. *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 377 (S.D.N.Y.2003).

As explained above, the record before the court establishes that Samuel Pinter did not loan any money to Olympia which Olympia is obligated to repay. And, the Entity Defendants admit that they did not personally provide any consideration in exchange for the transfers to them. Therefore, there was no fair consideration provided in exchange for any of the transfers.

For the above reasons, Olympia's motion for summary judgment is granted to the extent indicated above. Applying either standard of proof, clear and convincing evidence or the preponderance of the evidence, Olympia has established by undisputed evidence that the transfers were made by Olympia to the Entity Defendants while Olympia was insolvent and without fair consideration. Because there remain no issues of fact, Olympia's motion for partial summary judgment on its § 273 claims is granted.

### 4. Interest

Olympia requests prejudgment interest pursuant to N.Y. C.P.L.R. § 5001(a). "Where ...

damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *See* N.Y. C.P.L.R. § 5001(b); *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83 (2d Cir. 1998) ("New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date,' which can be used to simplify the calculation."). Based on this provision, Olympia asks the court to award interest starting on the date halfway between the first and last fraudulent transfer to each of the Entity Defendants. Applying § 5001(a) in a more nuanced way, the court has in some cases adjusted the reasonable intermediate date based on the timing and amount of money each Entity Defendant received. By way of example, if an Entity Defendant received a larger sum of money earlier in the transfer period, the date to begin interest accrual will be earlier than the halfway point. Likewise, if an Entity Defendant received a larger sum of money later in the transfer period, the date to begin interest accrual will be later than the halfway point. In addition, the court will award interest on certain transfers from the date of the transfer, either because of the large amount of the transfer or because that entity did not receive many transfers and therefore it would not be difficult to award interest from the actual transfer date.

The court awards Olympia interest at the statutory rate of interest on the following amounts in the following manner:

KSH received regular monthly payments and some additional payments from Olympia totaling $1,892,376 from August 3, 1998 through October 1, 2004. Interest is to run on these transfers from September 4, 2001, the date half way between the first and last transfer. In addition, interest on the $152,500 transfer on November 30, 1998 will run from the date of the transfer

because of its size.

Jasmine Lakes received $232,723.61 in transfers between January 18, 2002 and October 19, 2004. The reasonable intermediate date on which to begin calculating interest for Jasmine Lake's payments is set at June 5, 2003, the date half way between the first and last transfer.

S&F Ocean Realty received $122,045 in transfers between December 28, 1998 and April 5, 2001. Interest will be calculated on these transfers starting on February 16, 2000, the date half way between the first and last transfer. Interest on the $26,614.59 transfer on August 25, 2003 will run from the date of the transfer.

6401 Bingle received $3,374 on August 16, 2004 and $1,125 on September 22, 2004. Interest is to run on each payment from the date each transfer occurred.

Z&S Realty received $163,786.41 in transfers between October 23, 1998 and December 1, 2002. Interest on these transfers will accrue from November 11, 2000, the date half way between the first and last transfer.

### 5. Fed. R. Civ. P. 54(b)

Olympia asks the court to enter partial final judgment against the Entity Defendants. This request is denied.

## III. Conclusion

For the reasons set forth above, Olympia's motion for partial summary judgment is granted against the Entity Defendants on constructive fraud pursuant to New York Debtor and Creditor Law § 273. Olympia's motion to pierce the corporate veil as to Samuel Pinter is also granted, and Olympia will be granted judgment against Samuel Pinter in the sum of $44.8 million. Olympia's request for entry of a partial final judgment pursuant to Fed. R. Civ. P. 54(b) is denied.

Olympia is awarded damages against the Entity Defendants in the following amounts, with statutory interest from the specified dates:

(1) KSH: $1,892,376, interest from September 4, 2001 and $152,500, interest from November 30, 1998;

(2) Jasmine Lakes: $232,723.61, interest from June 5, 2003;

(3) S&F: $122,045, interest from February 16, 2000 and $26,614.59, interest from August 25, 2003;

(4) 6401 Bingle: $3,374, interest from August 16, 2004 and $1,125, interest from September 22, 2004; and

(5) Z&S Realty: $163,786.41, interest from November 11, 2000.

SO ORDERED.

_____
NINA GERSHON
United States District Judge

Dated:      Brooklyn, New York
            June 7, 2011