UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

                          Plaintiff,

          - against -

OLYMPIA MORTGAGE CORPORATION,
et al.,

                          Defendants.

-----------------------------------------------------------x

OLYMPIA MORTGAGE CORPORATION,
et al.,

                          Crossclaim Plaintiff,

          - against -

Leib Pinter, et al.,

                          Crossclaim Defendants.

-----------------------------------------------------------x

GERSHON, United States District Judge:

OPINION & ORDER
04-CV-4971 (NG)(MDG)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 17 2011 ★

BROOKLYN OFFICE

Federal National Mortgage Association ("Fannie Mae") initiated this action on November 16, 2004. On October 18, 2005, Olympia Mortgage Corporation ("Olympia") filed an Amended Answer and Crossclaims asserting four crossclaims against defendants Chaim Donner, Nachema Donner, Naftali Donner, Sarah Donner, Perry Lerner, Toby Donner, and Yocheved Donner ("the Donner Relatives") for: (1) violation of New York Business Corporations Law ("N.Y. Bus. Corp. Law") § 720; (2) violation of New York Debtor and Creditor Law ("N.Y. Debt. & Cred. Law") § 276; (3) violation of N.Y. Debt. & Cred. Law § 273; and (4) unjust enrichment. Olympia filed a Notice of Dismissal of Claims, which this court "so ordered" on March 5, 2008, dismissing the N.Y. Bus. Corp. Law § 720 and unjust enrichment claims against the Donner Relatives with prejudice.

Olympia has been put into receivership by this court and has entered into a consent judgment with Fannie Mae concerning its breach of contract claims. On May 11, 2011, by Stipulation and Order, the remaining six claims against Olympia were dismissed without prejudice.

The Donner Relatives are the wife, sons, daughters and daughter-in-law of Abe Donner, the former President and 32% shareholder of Olympia. The Donner Relatives seek summary judgment against Olympia pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Olympia's crossclaims of constructive and actual fraud under N.Y. Debt. & Cred. Law §§ 273 and 276. In its opposition papers, Olympia seeks summary judgment pursuant to Rule 56 on its crossclaim under N.Y. Debt. & Cred. Law § 273.

## BACKGROUND AND FACTS

The following facts are undisputed unless otherwise noted. The background of this case has been set forth in recent opinions, *see, e.g., Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F.Supp.2d 308 (E.D.N.Y. 2010). Facts relevant to the instant motions are set forth below.

Olympia was insolvent at least from December 31, 1997, and possibly for its entire existence. Karen Kincaid Balmer Decl. Ex. 40, May 23, 2008 ("May 2008 Balmer Decl.").

Abe Donner was the President of both Olympia and Midwood Federal Credit Union ("Midwood")[1]. The Donner Relatives consist of Toby Donner, Abe Donner's wife; Naftali and Chaim Donner, Abe Donner's sons; Perry Lerner and Yocheved and Sarah Donner, Abe Donner's daughters; and Nachema Donner, Abe Donner's daughter-in-law and Chaim Donner's wife. Olympia transferred sums of money to and on behalf of the Donner Relatives from 1998 through 2004. These transfers from Olympia took the form of payments evidenced by W-2 Wage and Tax

---

[1] Midwood was seized and shut down by its regulator on November 4, 2004.

-2-

Statement forms ("W-2s"), as well as payments for healthcare insurance and mortgage payments made on their behalf.

The Donner Relatives directly received or benefitted from the following money transfers made by Olympia:

(1) Toby benefitted from a total of $1,619.88 in transfers in 2004.

(2) Nachema directly received or benefitted from a total of $171,743.41 in transfers in the following years: $23,442.61 in 1998; $25,379.21 in 1999; $22,580.36 in 2000; $23,080.76 in 2001; $25,842.08 in 2002; $28,002.02 in 2003; and $23,416.36 in 2004.

(3) Chaim directly received or benefitted from a total of $10,962.01 in transfers in the following years: $1,404.36 in 1998; $2,541.28 in 1999; $1,602.92 in 2000; $1,645.08 in 2001; $1,683.48 in 2002; $1,760.28 in 2003; and $1,324.61 in 2004.

(4) Perry directly received or benefitted from a total of $65,384.89 in transfers in the following years: $15,733.28 in 1998; $10,635.24 in 1999; $8,102.92 in 2000; $8,145.08 in 2001; $8,183.48 in 2002; $8,260.28 in 2003; and $6,324.61 in 2004.

(5) There is a disagreement among the parties as to the amount of money that should be attributed to Yocheved. Yocheved calculates the amount she received to include only the money she directly received from Olympia. Olympia, however, correctly includes mortgage payments it made on Yocheved's behalf in the transfers it seeks to recover. In support of its position, Olympia has submitted an undisputed ledger showing that it made mortgage payments on Yocheved's behalf. Therefore, the undisputed facts establish that Yocheved directly received or benefitted from a total of $136,155.41.

She received the transfers and benefits in the following years: $6,499.51 in 1998; $7,884.11

-3-

in 1999; $7,058.36 in 2000; $7,558.76 in 2001; $8,470.08 in 2002; $9,880.04 in 2003; and $9,476.36 in 2004.

(6) Sarah directly received or benefitted from a total of $82,543.44 in transfers in the following years: $16,406.33 in 1998; $14,789.14 in 1999; $9,549.28 in 2000; $9,203.84 in 2001; $10,153.56 in 2002; $11,640.32 in 2003; and $10,800.97 in 2004.

(7) Naftali received a total of $29,566.11 in transfers in the following years: $8,239.50 in 2002; $10,525.64 in 2003; and $10,800.97 in 2004.

Despite the existence of W-2s for some of the Donner Relatives, they do not claim to have provided any services to Olympia in exchange for the monies or benefits they have received. Rather, they claim that all of the transfers were part of Abe Donner's compensation for the services that *he* provided as President of Olympia.

Between 1998 and 2003, Abe Donner himself received between $99,814.55 and $143,261.12 in compensation each year. Balmer Decl. Ex. A-G., Aug. 29, 2008 ("Aug. 2008 Balmer Decl."). It is undisputed that Abe Donner's W-2s do not include the amounts transferred to the Donner Relatives. The sole evidentiary support for the Donner Relatives' claim that Abe Donner's salary nonetheless included the money transferred to the Donner Relatives, is his affidavit. He states:

"[A]ny transfers [the Donner Relatives] may have received from Olympia [are] part of the compensation I received as President of Olympia .... [T]he amount of compensation I received from Olympia, as president, was well under the average of what the President of a company such as Olympia would receive. This is because the benefits my family [the Donner Relatives] received from Olympia were part and parcel of my compensation as President of Olympia....Thus, it is evident that the transfers that Olympia alleges went to me alone cannot constitute my total salary. Indeed, this is borne out by the amount of the alleged transfers solely to myself, which range from as low as $99,814.55 in 2001, to a maximum of only $143,261.12 in 1998. These salaries are significantly below the salary that a President of a company such as Olympia normally makes. Thus, as illustrated, the transfers to my family were part and parcel of my compensation as President of Olympia."

-4-

Abe Donner Aff.¶¶ 1-11. During his deposition, citing the Fifth Amendment, Abe Donner refused to answer any questions relating to his role or responsibilities at Olympia.

Undisputed evidence establishes that, although he had the title "President," Abe Donner did not have a large role, or spend much time working, at Olympia. Patricia Trinidad, an Olympia employee who most recently held the title of Director of Operations, explained that Abe Donner did not have an office at Olympia and was not involved in day-to-day operations at Olympia. Patricia Trinidad Dep. 115, Aug. 31, 2006 ("Trinidad Dep."). Both Marcus Pinter, Olympia's accountant, and Alan Braun, Olympia's auditor, confirmed that Abe Donner had a very limited role at Olympia and was not involved in the company's daily operations. Marcus Pinter Dep. ("M. Pinter Dep.") 67-68, Aug. 7, 2006 ; Alan Braun Dep. ("Braun Dep.") 81-82, Apr. 6, 2006. Barry Goldstein, Olympia's Managing Director and a part-owner, stated that Abe Donner had "in essence no responsibilities for [Olympia]." Barry Goldstein Dep. ("Goldstein Dep.") 305, Feb. 22, 2006. The Donner Relatives do not contest that Abe Donner's role and responsibilities at Olympia were limited. In their reply papers, the Donner Relatives add an argument that, in addition to Abe Donner's salary, the transfers in question also included shareholder profits disbursed to Abe Donner. They offer no evidence in support of this position.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

-5-

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

"The moving party is entitled to judgment as a matter of law [if] the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. at 323. When deciding a motion for summary judgment, courts must take into account the evidentiary burden of proof applicable at a trial on the merits and measure the evidence submitted against that burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254-55. Actual fraud under § 276 must be proven by clear and convincing evidence. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994), *Marin Midland Bank v. Murkoff*, 120 A.D.2d 122 (2d Dep't 1986). There is a dispute as to the appropriate standard of proof required to prove constructive fraud under § 273. *Compare, e.g., Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 376 n. 6 (S.D.N.Y. 2003) (concluding that fraud under § 273 must be proved by a preponderance of the evidence) and *Farkas v. D'Oca*, 305 A.D.2d 237 (1st Dept. 2003) (noting that the trial court applied the clear and convincing evidence standard to a claim for constructive fraud

under § 273).

"[I]f a motion for summary judgment has been made, a district court may grant summary judgment to any party – including a non-movant," because "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte." *First Financial Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir. 1999). Notice is not necessary where there is no prejudice to the party against whom summary judgment is found. *Biosafe-One Inc. v. Hawks*, 379 Fed.Appx. 4, 8-9 (2d Cir. 2010).

### New York Debtor and Creditor Law § 273

New York Debtor and Creditor Law § 273 ("§ 273") states:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

N.Y. Debt. & Cred. Law § 273. Under § 273, "if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent." *Capital Distrib. Servs., Ltd. v. Ducor Express Airlines*, Inc., 440 F.Supp.2d 195, 203 (E.D.N.Y.2006); *Zanani v. Meisels*, 78 A.D.3d 823 (2d Dep't 2010). Therefore, in order to succeed under this Section, Olympia must show (1) that it transferred money; (2) that the money was transferred while Olympia was insolvent or that the transfers rendered Olympia insolvent; and (3) that the transfers were not made in exchange for fair consideration. *See In re Sharp Inter. Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

As explained above, there is some uncertainty as to the appropriate standard of proof required to prove constructive fraud pursuant to § 273. The court need not decide which standard is correct because Olympia would prevail under either standard.

### *Money Transfers*

The record establishes, without dispute, that the Donner Relatives received the transfers from Olympia or benefitted from transfers Olympia made on their behalf. So, the first element is satisfied.

### *Olympia's Insolvency*

Olympia was insolvent at least from December 31, 1997, which is prior to any of the transfers at issue, and possibly for its entire existence. The Donner Relatives make the bald assertion that the transfers to them, and the transfers from which they benefitted, did not occur while Olympia was insolvent and did not contribute to Olympia's insolvency, but offer no evidence in support of their position.

"Moreover, the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *U.S. v. Alfano*, 34 F.Supp.2d 827, 845 (E.D.N.Y. 1999). Since, as discussed below, there was no fair consideration for the money transfers, the presumption is that Olympia was insolvent, and the Donner Relatives have not offered any evidence to rebut that presumption.

### *Fair Consideration*

"Under section 273 of the Debtor and Creditor Law, any transfer made by an insolvent debtor for less than 'fair consideration' is fraud as against his creditors without regard to the actual intent of the transferee." *Schmitt v. Morgan*, 98 A.D.2d 934 (3d Dept. 1983). In order to satisfy the statutory requirement for "fair consideration" under § 273, a conveyance must satisfy an antecedent debt or constitute a present exchange. *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir.1995). The value of the consideration may not be disproportionately small when compared with the value of the conveyance. *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 377 (S.D.N.Y.2003).

It is undisputed that the Donner Relatives themselves gave no consideration for the transfers to them or benefits they received from transfers made on their behalf. The Donner Relatives argue that the transfers to them and benefits they received from transfers made on their behalf were for fair consideration because the transfers were part of Abe Donner's compensation as President of Olympia. The only affidavit provided was that of Abe Donner in which he states in a most conclusory fashion that the payments the Donner Relatives received were part of his salary. Olympia, however, has submitted copies of Abe Donner's W-2s from 1998 through 2003. The money transferred to the Donner Relatives was not included in Abe Donner's W-2 forms. These W-2s contradict Abe Donner's conclusory affidavit that the transfers were part of his salary; any money that Olympia paid Abe Donner as salary should have been on Abe Donner's own W-2s. Olympia also submitted various Donner Relatives' W-2 forms from 1998 through 2003, showing that Olympia declared the transfers as some of the Donner Relatives' own salary; while these W-2s were improperly issued, as the Donner Relatives acknowledge they never worked for Olympia, they do serve to further contradict Abe Donner's statement that the transferred money was part of *his* salary.[2]

The Donner Relatives do not contest that Abe Donner spent little time at Olympia or that he had very few responsibilities at Olympia. Rather, they argue that his compensation should not be a function of his role or responsibilities but a function of his unidentified contributions to Olympia. In the absence of any but the most conclusory evidence – an affidavit from someone who refused to testify on the subject at his deposition but pled the Fifth Amendment – and in the presence of

---

[2]    In 1998, there are W-2s for Nachema and Sarah Donner; in 1999 there are W-2s for Peri Lerner, Nachema Donner and Sarah Donner; in 2000 there are W-2s for Peri Lerner, Nachema Donner and Sarah Donner; in 2001 there are W-2s for Peri Lerner and Nachema Donner; in 2002 there are W-2s for Peri Lerner and Nachema Donner; and in 2003 there are W-2s for Peri Lerner and Nachema Donner.

undisputed contrary evidence in the form of Abe Donner's own W-2s, no reasonable jury could conclude that the transfers to the Donner Relatives constituted salary payments to Abe Donner.

In their reply papers, the Donner Relatives make a new argument, that the money transferred to them, and transfers from which they benefitted, included Abe Donner's profits for being a 32% shareholder of Olympia. None of the Donner Relatives has provided any affidavit or documentary evidence supporting the argument that the transfers to them were in fact a return on profits owed to Abe Donner. In any event, as a matter of law, they could not be entitled to transfers or benefits from transfers made on their behalf under this theory. Under New York Business Corporations Law, "[a] corporation may declare and pay dividends ... except when [] the corporation is insolvent or would thereby be made insolvent ...." N.Y. Bus. Corp. Law § 510(a). "A corporation holds its assets in trust for the benefit of the corporation's creditors, and cannot lawfully distribute its assets to shareholders to the prejudice of those creditors." *In re Trace Intern. Holdings, Inc.*, 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003). An insolvent corporation cannot make distributions to shareholders, and such distributions are "classic fraudulent conveyances [] prohibited by law." *In re Adelphia Communications Corp.*, 323 B.R. 345, 377 fn.104 (Bkrtcy. S.D.N.Y. 2005) *citing In re Trace Intern. Holdings, Inc.*, 289 B.R. at 561. Given Olympia's poor financial condition, any transfers to, or on behalf of, a corporation's shareholders would have been illegal and therefore recoverable.

For the above reasons, the Donner Relatives' motion for summary judgment is denied. Applying either standard of proof, clear and convincing evidence or the preponderance of the evidence, Olympia has established by undisputed evidence that the transfers were made by Olympia to the Donner Relatives, or on their behalf, while Olympia was insolvent and without fair consideration. Because there remain no issues of fact, Olympia's application for summary judgment

-10-

on its § 273 claims is granted.

## New York Debtor and Creditor Law § 276

New York Debtor and Creditor Law § 276 ("§ 276") states:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Section 276 requires a conveyance and actual intent to hinder, delay or defraud. Here, the record establishes that the transfers occurred. "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor." *In re Sharp Int'l Corp.*, 403 F.3d at 56. Actual fraud must be proved by clear and convincing evidence. *See McCombs*, 30 F.3d at 328, *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122 (2d Dep't 1986). "Because direct proof of a debtor's intent to hinder his creditors is rare, creditors may rely on 'badges of fraud' to establish an inference of fraudulent intent." *Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998). Badges of fraud are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, 30 Misc.3d 1216(A), 2011 NY Slip Op 50100(U), 2011 WL 293716 at *8 (N.Y.Sup. Jan. 31, 2011) (internal quotations and citations omitted). These include "(1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." *Id.*; *see United States v. McCombs*, 30 F.3d at 328.

As with the § 273 claim, the Donner Relatives argue that the transfers and benefits they received were part of Abe Donner's compensation as President of Olympia and profits paid to Abe

-11-

Donner for his 32% share in Olympia. Because the transfers and benefits were part of Abe Donner's compensation and profits for his ownership interest, they argue, there was no intent to defraud Olympia.

As shown above, the defendants cannot establish that the transfers were either part of Abe Donner's compensation or that they were profits for his ownership interest in Olympia. In addition, there are many badges of fraud present. There is a close relationship between Olympia and the Donner Relatives because Abe Donner was the President of Olympia and owned 32% of the company, and Abe is related to each of the Donner Relatives. The money transfers were not made in the usual course of business. A corporation does not usually transfer money to, or for the benefit of, people who provide no consideration. Nor does a corporation properly prepare and file W-2 forms for people who are not employed by the corporation. And, if, as the Donner Relatives argue, these transfers were part of Abe Donner's compensation, the amounts of the transfers each year would have been, but were not, included on Abe Donner's W-2 forms, which Olympia prepared.

As explained above, Olympia, the transferor in this case, had been insolvent at least since December 31, 1997, and all of the transfers in question occurred after that date. Olympia used its money to pay Donner Relatives, among others, rather than pay its creditors, such as Fannie Mae, through an elaborate scheme developed to avoid paying creditors. *See, e.g., Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d 308. Therefore, its actions defrauded its creditors. Under all of these circumstances, the existence of multiple badges of fraud "constitute the requisite clear and convincing evidence of actual intent to defraud." *In re Singh*, 434 B.R. 298, 312 (Bkrtcy.E.D.N.Y. 2010). The court finds that Olympia has satisfied its burden to "establish that the transfer[s] [were] made with an intent to hinder, delay or defraud [] creditors pursuant to §276." *Id.*

For these reasons, the Donner Relatives' motion for summary judgment is denied. There remain no issues of fact that Olympia made the transfers with the intent to defraud its creditors. On the contrary, there is clear and convincing evidence that the transfers were made with the intent to defraud creditors, and no reasonable jury would conclude other than that the transfers were made with such intent. Therefore, summary judgment is granted to Olympia on its crossclaims pursuant to § 276. The Donner Relatives do not suffer any prejudice as a result of the court's grant of summary judgment on the § 276 claims in favor of Olympia because the Donner Relatives had the opportunity to advance all of their arguments in support of their position in their motion papers and at oral argument.

### Recovery of Damages

The Donner Relatives argue that, even if Olympia prevails on its claims, it cannot recover money damages from the Donner Relatives because none of them participated in the fraud. "A fraudulent conveyance claim seeking to recover money damages can only be maintained against a person who participates in the fraudulent transfer as either the transferee of the assets or the beneficiary of the conveyance." *Fundacion Presidente Allende v. Banco De Chile*, 2006 WL 2796793 at *3 (S.D.N.Y.) (*citing Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.1993)(other citations omitted)); *see also In re Shore to Shore Realty Inc.*, No. 8-08-72760, 2011 WL 350526 (Bankr. E.D.N.Y. Feb. 1, 2011); *Cf. Sullivan v. Kodsi*, 373 F.Supp.2d 302 (S.D.N.Y. 2005) (as discussed in *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 2006 WL 2802092 at * 10 (E.D.N.Y. Sept. 28, 2006), distinguishing *Sullivan* on the ground that the transferees in *Sullivan* were not participants because they received the fraudulent transfers passively via a trust managed by two successive trustees).

-13-

The Donner Relatives cite *Stochastic* for the proposition that money damages are recoverable only "against parties who participate in the fraudulent transfer of a debtor's property *and* are transferees of the assets and beneficiaries of the conveyance." 995 F.2d at 1172 (emphasis added). In *Stochastic*, the court was addressing whether a creditor could recover against a person who was the "mastermind of the fraud" but neither a transferee nor a beneficiary; the court held that being a transferee or beneficiary was required. The court in *Stochastic* relied on *Federal Deposit Ins. Corp. v. Porco*, 75 N.Y.2d at 842, which explained that N.Y. Debt. & Cred. Law §§ 278 and 279 do not "create a creditor's remedy for money damages against parties who [participated in the transfer but] were neither transferees of the assets nor beneficiaries of the conveyance." 75 N.Y.2d at 842. Neither *Stochastic* nor *Porco* held that transferees or beneficiaries escape liability for money damages for the amounts transferred just because they were only transferees or beneficiaries and played no other role in the fraudulent transfers. Neither case held that a transferee or beneficiary of a fraudulent transfer who meets all the other requirements under § 273 or § 276 had to have also been a participant in the underlying fraud (here, the "Code 59" fraud that resulted in Olympia's insolvency).[3] The Donner Relatives' argument mischaracterizes the point of *Stochastic*. Courts applying *Stochastic* have repeatedly noted that one need *only* be a transferee or beneficiary to be a participant in a fraudulent transfer; not either a transferee or beneficiary of a fraudulent conveyance *and* a participant in the underlying fraud. *See, e.g., Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F.Supp.2d 536, 548 (S.D.N.Y. 2007). In this case, the Donner Relatives did participate in the fraudulent transfer as the transferees and beneficiaries. They participated in the fraudulent transfers

---

[3] *See Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d at 314, for an explanation of the underlying "Code 59" fraud.

because they received the money or benefitted from transfers made on their behalf, and there was no fair consideration for the transfers. *See In re Lindsay*, No. 06-36352, 2010 WL 1780065 at *8 (Bkrtcy. S.D.N.Y. May 4, 2010)(assets transferred with constructive intent (§ 273) to defraud are recoverable; and assets transferred with actual intent (§ 276) to defraud are recoverable).

Finally, the New York Uniform Fraudulent Conveyance Act, which is set forth in N.Y. Debt. & Cred. Law §§ 270-281, protects the rights of certain transferees who paid "fair consideration" for assets without "knowledge of the fraud at the time of the purchase." N.Y. Debt. & Cred. Law § 278(1); *HBE Leasing v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (noting the statute's "policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme"). This is not one of those instances, as the Donner Relatives did not offer any fair consideration in exchange for the money transfers. Thus, money damages for the entire amount of the fraudulent transfers are recoverable against the Donner Relatives.

## Interest

Olympia requests prejudgment interest pursuant to N.Y. C.P.L.R. § 5001(a). "Where ... damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *See* N.Y. C.P.L.R. § 5001(b); *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83 (2d Cir. 1998) ("New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date,' which can be used to simplify the calculation."). Based on this provision, Olympia asks the court to award interest starting on the date halfway between the first and last fraudulent transfer to each of the Donner Relatives. Applying § 5001(a) in a more nuanced way, the court has in some cases adjusted the

-15-

reasonable intermediate date based on the timing and amount of money each Donner Relative received. By way of example, if a Donner Relative received a larger sum of money earlier in the transfer period, the date to begin interest accrual will be earlier than the halfway point. Likewise, if a Donner Relative received a larger sum of money later in the transfer period, the date to begin interest accrual will be later than the halfway point.

Toby benefitted from $1,619.88 in transfers between May 24, 2004 and October 6, 2004. July 31, 2004, the date halfway between the first and last transfer, is the reasonable intermediate date on which to begin calculating interest on transfers from which Toby benefitted.

Nachema received $23,442.61 in 1998; $25,379.21 in 1999; $22,580.36 in 2000; $23,080.76 in 2001; $25,842.08 in 2002; $28,002.02 in 2003; and $23,416.36 in 2004, for a total of $171,743.42. Transfers and benefits to Nachema occurred from January 1, 1998 through September 30, 2004. Because Nachema received more money towards the end of the time period in question, it is appropriate to set the date of interest calculation after the halfway point. So, the reasonable intermediate date on which to begin calculating interest for Nachema's payments is set at November 15, 2001.

Chaim received $1,404.36 in 1998; $2,541.28 in 1999; $1,602.92 in 2000; $1,645.08 in 2001; $1,683.48 in 2002; $1,760.28 in 2003; and $1,324.61 in 2004, for a total of $10,962.01. Transfers and benefits to Chaim occurred from January 1, 1998 through September 30, 2004. Because Chaim received more money towards the beginning of the time period in question, it is appropriate to set the date of interest calculation prior to the halfway point. So, the reasonable intermediate date on which to begin calculating interest for Chaim's payments is set at November 15, 2000.

-16-

Perry received $15,733.28 in 1998; $10,635.24 in 1999; $8,102.92 in 2000; $8,145.08 in 2001; $8,183.48 in 2002; $8,260.28 in 2003; and $6,324.61 in 2004, for a total of $65,384.89. Transfers and benefits to Perry occurred from January 1, 1998 through September 30, 2004. Because Perry received more money towards the beginning of the time period in question, it is appropriate to set the date of interest calculation prior to the halfway point, namely, at May 15, 2000.

Yocheved received $6,499.51 in 1998; $7,884.11 in 1999; $7,058.36 in 2000; $7,558.76 in 2001; $8,470.08 in 2002; $9,880.04 in 2003; and $9,476.36 in 2004, for a total of $136,755.41. Transfers and benefits to Yocheved occurred from January 15, 1998 through September 27, 2004. Because Yocheved received more money towards the end of the time period in question, it is appropriate to set the date of interest calculation after the halfway point. So, the reasonable intermediate date on which to begin calculating interest for Yocheved's payments is fixed at December 1, 2001.

Sarah received $16,406.33 in 1998; $14,789.14 in 1999; $9,549.28 in 2000; $9,203.84 in 2001; $10,153.56 in 2002; $11,640.32 in 2003; and $10,800.97 in 2004, for a total of $82,543.44. Transfers and benefits to Sarah occurred from January 1, 1998 through September 30, 2004. Because Sarah received more money towards the beginning of the time period in question, the reasonable intermediate date on which to begin calculating interest for Sarah's payments is fixed at November 15, 2000.

Naftali received $8,239.50 in 2002; $10,525.64 in 2003; and $10,800.97 in 2004, for a total of $29,566.11. Transfers to Naftali occurred from February 15, 2002 through September 30, 2004. The reasonable intermediate date on which to begin calculating interest for Naftali's payments is set at September 15, 2003.

-17-

**Federal Rule of Civil Procedure 54(b)**

Olympia asks the court to enter partial final judgment. This request is denied.

## CONCLUSION

For the reasons set forth above, the Donner Relatives' motion for summary judgment is denied. Summary judgment is granted to Olympia on its crossclaims against the Donner Relatives on constructive and actual fraud pursuant to New York Debtor and Creditor Law §§ 273 and 276.

Olympia is awarded damages against the Donner Relatives in the following amounts, with interest from the specified dates:

(1) Toby Donner: $1619.88, interest from July 31, 2004;

(2) Nachema Donner: $171,743.41, interest from November 15, 2001;

(3) Chaim Donner: $10,962.01, interest from November 15, 2000;

(4) Perry Lerner: $65,384.89, interest from May 15, 2000;

(5) Yocheved Donner: $136,755.41, interest from December 1, 2001;

(6) Sarah Donner: $82,543.44, interest from November 15, 2000; and

(7) Naftali Donner: $29,566.11, interest from September 15, 2003.

SO ORDERED.

NINA GERSHON
United States District Judge

Dated:     Brooklyn, New York
           June 15, 2011

-18-