UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

Plaintiff,

- against -

OLYMPIA MORTGAGE CORPORATION, et al.

Defendants.

Index No. 04-CV-4971
(NG) (MDG)

OLYMPIA MORTGAGE CORPORATION,

Cross-Claim Plaintiff,

- against -

LEIB PINTER, et al.

Cross-Claim Defendants.

**OLYMPIA'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AGAINST THE SAM PINTER RELATIVES**

LAW OFFICES OF ERIC J. GRANNIS

One Penn Plaza, 36th Floor
New York, New York 10119
(212) 903-1025

Attorneys for Olympia Mortgage
Corporation

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

    CASES ....................................................................................................... iii

    STATUTES ................................................................................................. iv

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.     OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS NEW
      YORK DEBTOR & CREDITOR LAW § 273 CLAIMS AGAINST THE
      SAM PINTER RELATIVES. ............................................................................ 2

     A.    Olympia Made Transfers to the Sam Pinter Relatives While
         Insolvent. ............................................................................................ 2

     B.    Olympia Did Not Receive Anything in Exchange for the Foregoing
         Transfers. ............................................................................................ 3

     C.    The Sam Pinter Relatives Did Not Provide Services to Olympia. .......... 4

     D.    The Pinter Children Did Not Loan Money to Olympia. ........................ 6

     E.    The Pinter Children Were Not Entitled to the Proceeds From the
         GECC Loan to Olympia. ...................................................................... 6

II.    OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON
      ITS NEW YORK DEBTOR & CREDITOR LAW § 276 CLAIMS
      AGAINST THE SAM PINTER RELATIVES. ................................................. 8

III.   OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      BREACH OF FIDUCIARY DUTY CLAIM AGAINST FAGIE PINTER. .................. 13

     A.    As Secretary of Olympia, Fagie Pinter Had a Fiduciary Duty to
         Olympia. ............................................................................................ 13

     B.    Fagie Pinter Breached Her Fiduciary Duty to Olympia. ...................... 14

     C.    Fagie Pinter's Breach of Fiduciary Duty Caused Damages to
         Olympia. ............................................................................................ 15

         1.    Fagie Pinter Improperly Diverted Olympia Funds to Her
             Children As "Payroll." .............................................................. 15

         2.    Fagie Pinter Improperly Diverted Olympia Funds to Her
             Children as "Interest". .............................................................. 16

         3.    Fagie Pinter Improperly Diverted Olympia Funds to Her
             Children Using the Proceeds of the GECC Loan. ...................... 16

4.      Fagie Pinter Improperly Diverted Olympia Funds to Pay
        Herself Salary and Other Benefits to Which She Was Not
        Entitled.................................................................................. 17

5.      Fagie Pinter Improperly Diverted Olympia Funds to S&F
        Ocean Realty. ......................................................................... 18

6.      Fagie Pinter Improperly Diverted Olympia Funds to Z&S
        Realty. .................................................................................... 19

7.      Fagie Pinter's Breach of Fiduciary Duties as an Officer of
        Olympia and KSH Enabled the Improperly Diverted
        Olympia Funds to KSH............................................................ 19

8.      Fagie Pinter's Breach of Fiduciary Duties Enabled the
        Fannie Mae Fraud. ................................................................. 20

9.      Fagie Pinter Improperly Diverted Olympia Funds to Leib
        Pinter's Relatives. .................................................................. 22

10.     Fagie Pinter Improperly Diverted Olympia Funds to Ave
        Donner's Relatives.................................................................. 23

IV.     INTEREST SHOULD BE AWARDED .................................................... 23

        CONCLUSION.................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ault v. Soutter,* 204 A.D.2d 131, 131 (1st Dep't 1994) .................................................. 13

*Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989) ................................................. 14

*Conway v. Icahn & Co., Inc., 16 F.3d 504, 512* (2d Cir. 1994) ........................................ 24

David Siegel, Practice Commentaries to C.P.L.R. § 5001 at 359.............................................. 24

*Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.,*
    *2006 WL 2802092 at \*8 (E.D.N.Y. 2006)* .................................................. 2, 11

*Feiger v. Iral Jewlery, Ltd.,* 41 N.Y.2d 928, 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977).... 18

*Grumman Aerospace Corp. v. Rice,* 199 A.D.2d 365, 366-67 (2d Dep't 1993) ........................... 8

*Hassett v. Goetzmann,* 10 F.Supp.2d 181, 188 (N.D.N.Y. 1998).................................................. 9

*HBE Leasing Corp. v. Frank,* 48 F.3d 623, 639 (2d Cir. 1995) ........................................ 9

*HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995) ................................... 9

*Herman v. Feinsmith,* 39 A.D.3d 327, 328 (1st Dep't 2007) ........................................ 13

*Howard v. Carr,* 222 A.D.2d 843, 845 (3d Dep't 1995) ........................................ 14

*In re Food Mgt.Group, LLC,* 380 BR 677, 713 (Bankr. S.D.N.Y. 2008)..................................... 18

*In re Monahan Ford Corp. of Flushing,* 340 B.R. 1, 38 (Bkrtcy. E.D.N.Y. 2006) ........................ 9

*In re Saba Enterprises, Inc.,* 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009)..................................... 9

*Kookmin Bank v. B.G. Fashion, Inc.*, 2000 WL 1880315, 4 (S.D.N.Y. 2000)............................ 25

*Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 126 (2d Dep't 1986)..................................... 8

*McKinney's Debtor and Creditor Law § 273* ........................................ 2

*Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir. 1994) ........................... 13

*Pacific Westeel, Inc. v. D & R Installation*, 2003 WL 22359512 at \*3 (S.D.N.Y. 2003) ............ 24

*Pen Pak Corp. v. LaSalle National Bank of Chicago,*

240 A.D.2d 384, 386, 658 N.Y.S.2d 407 (2d Dep't 1997) .................................................. 9

*Scholtz v. Yastrzemski,* 247 A.D. 823, 823-34 (2d Dep't 1936) ...................................... 8

*Sec. Inv. Protection Corp. v. Stratton Oakmont, Inc.,*
234 B.R. 293, 329 (Bankr. S.D.N.Y. 1999) ...................................................... 14

*Sheehy v. New Century Mortg. Corp.,* 690 F. Supp. 2d 51, 62 (E.D.N.Y. 2010) ........................ 13

*Trustees of Hamilton Coll. v. Cunningham,* 70 A.D. 2d 1048, 1049 (4th Dep't 1979).................. 8

*Wall St. Assoc. v. Brodsky,* 257 A.D.2d 526, 529 (1st Dep't 1999) ................................. 9

**STATUTES**

*N.Y. Debtor and Creditor Law § 276* .......................................................... 8

*New York State Business Corporation Law § 510* ...................................... 6

Cross-Claim Plaintiff Olympia Mortgage Corporation ("Olympia") respectfully submits this Memorandum of Law in support of its motion for summary judgment on its New York Debtor and Creditor Law § 273 and § 276 claims against Charles Pinter, Moishe M. Pinter, Basi Nierenberg, David Pinter, Sarah Pinter, and Fagie Pinter ("The Sam Pinter Relatives") and on its Breach of Fiduciary Duty claims against Fagie Pinter.

## PRELIMINARY STATEMENT

The Sam Pinter Relatives are relatives of Sam Pinter, formerly Olympia's Vice-President. *See* Declaration of Karen Kincaid Balmer, dated March 19, 2012 ("Balmer Decl.") at Ex. A. Fagie Pinter is the wife of Sam Pinter, held the title of Corporate Secretary ("Secretary") at Olympia, and was a majority shareholder of Olympia. *Id.* Charles Pinter, Moishe M. Pinter, Basi Nierenberg, David Pinter, and Sarah Pinter (the "Pinter Children") are the children of Sam and Fagie Pinter. All of the Sam Pinter Relatives received monies from Olympia in the time period of September 1999 thru October 2004 totaling $776,044.01. *See* Balmer Decl. Exs. B, C, and D. These monies were transferred to the Sam Pinter Relatives ostensibly in the form of alleged payroll payments, health insurance, mortgage payments, alleged interest payments and a portion of the proceeds of the GECC loan proceeds which rightfully belonged to Olympia. None of the Sam Pinter Relatives provided any services to Olympia or loaned Olympia any money for the transfers they received. Sam Pinter has admitted that none of the moneys paid to his children were for work they performed.  He contends this money was paid as part of his own compensation, as Vice-President of Olympia. *See* Declaration of Eric J. Grannis, dated March 19, 2012 ("Grannis Decl.") Ex. A at 19-22; Ex. D at 118-119. However, Sam Pinter himself did not provide services to Olympia and admits that he had "zero day-to-day operation input" in

1

Olympia. Grannis Decl. Ex. D at 79. Sam Pinter also stated that the monies Fagie Pinter received from Olympia were part of her compensation as Secretary of Olympia, even though she never provided any services to Olympia. *See* Grannis Decl. Ex. C at 110. Fagie Pinter admits that she never performed any tasks or work for Olympia. *See* Grannis Decl. Ex. G at 279, 285; Ex. F at 62-63.  In addition, all of these payments were made during a period when Olympia was insolvent. *See* Declaration of Karen Balmer, dated May 23, 2008 [Dkt. No. 511] at *¶ 8 and Ex. 40.*

## ARGUMENT

I.     **OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS NEW YORK DEBTOR & CREDITOR LAW § 273 CLAIMS AGAINST THE SAM PINTER RELATIVES.**

New York Debtor & Creditor Law § 273 states that "Every conveyance made, and every obligation incurred, by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." *McKinney's Debtor and Creditor Law § 273; accord Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp., 2006 WL 2802092 at \*8 (E.D.N.Y. 2006).* Under Section 273, the transfers made to the Sam Pinter Relatives were fraudulent for the reasons set forth below.

**A.     Olympia Made Transfers to the Sam Pinter Relatives While Insolvent.**

During the time frame of September 1999 thru October 2004, Olympia transferred the following amounts to the Sam Pinter Relatives:

- Fagie Pinter: $93,839.11

- Charles Pinter: $264,691.30

- Moishe M. Pinter: $65,200.00

- Basi Nierenberg: $302,620.07

- David Pinter: $26,569.99

- Sarah Pinter: $23,123.54

*See* Balmer Decl. Exs. B, C, and D.

All of these transfers were made while Olympia was insolvent. The Receiver has determined that Olympia was insolvent since at least December 31, 1997. *See Declaration of Karen Balmer, dated May 23, 2008 [Dkt. No. 511] at ¶ 8 and Ex. 40.* Olympia was insolvent during this period by amounts ranging up to $41 million. *Id.*

**B.      Olympia Did Not Receive Anything in Exchange for the Foregoing Transfers.**

The Receiver, after conducting an extensive investigation and review of Olympia's books, has located no evidence that the Sam Pinter Relatives provided any fair value in exchange for the transfers that Olympia made to them. *See* Balmer Decl. ¶ 9.

The Sam Pinter Relatives took monies out of Olympia in several ways: as supposed "payroll" payments, health insurance, mortgage payments, payments classified as "interest," and payments from the proceeds of the GECC loan. Below is a chart which illustrates the various ways and amounts in which each Sam Pinter Relative took money out of Olympia from September 1999 thru October 2004.

| Defendant | "Payroll" | Health Ins. | Mortgage | "Interest" | GECC Proceeds | Total |
|-----------|-----------|-------------|----------|------------|---------------|-------|
| Fagie Pinter | $39,300.00 | $54,539.11 | $0.00 | $0.00 | $0.00 | $93,839.11 |
| Charles Pinter | $192,000.00 | $52,691.30 | $0.00 | $0.00 | $20,000.00 | $264,691.30 |
| Moishe M. Pinter | $37,200.00 | $0.00 | $0.00 | $8,000.00 | $20,000.00 | $65,200.00 |
| Basi Nierenberg | $177,091.83 | $52,691.30 | $41,487.69 | $11,349.25 | $20,000.00 | $302,620.07 |
| David Pinter | $0.00 | $0.00 | $0.00 | $6,569.99 | $20,000.00 | $26,569.99 |

| Sarah Pinter | $0.00 | $0.00 | $0.00 | $3,123.54 | $20,000.00 | $23,123.54 |

*See* Balmer Decl. Exs. B, C, and D.

**C.** **The Sam Pinter Relatives Did Not Provide Services to Olympia.**

Fagie Pinter and her children Charles Pinter, Moishe M. Pinter, and Basi Nierenberg all received monies allegedly as payroll from Olympia. Some of these individuals additionally received health insurance benefits and mortgage payments made on their behalf by Olympia. None of these individuals provided any services to Olympia as fair consideration for these transfers.

It is undisputed that Fagie Pinter never provided any services to Olympia. Fagie Pinter admits that she never performed any tasks or work for Olympia. *See* Grannis Decl. Ex. G at 279, 285; Ex. F at 62-63. Sam Pinter admits that Fagie Pinter didn't perform work as Secretary. *See* Grannis Decl. Ex. C at 110.

In fact, Fagie Pinter admitted that Sam Pinter had her write down notes to remind her as to her position and salary at Olympia before one of her depositions. When asked why she had written these notes, Fagie Pinter replied "I have no clue as to what is [sic] the happenings in the business, my husband had to refresh my memory of what I am or what I am not in this business. It's still vague to me." *See* Grannis Decl. Ex. G at 141-142. When asked if she was aware, at the time she was receiving salary from Olympia, that she was receiving that salary, she stated "I was a passive investor that's something that you get as being an investor in a property or any investment usually." *Id.* at 144.

Various Olympia employees also concurred that Fagie Pinter did not provide services to Olympia in her role as Secretary. Patty Trinidad, Olympia's Director of Operations, who worked at Olympia for nine years, stated that she never saw Fagie Pinter do any work with

4

respect to Olympia. *See* Grannis Decl. Ex. K at 115-116. Barry Goldstein, Olympia's Managing Director, stated that he was unaware of any responsibilities that Fagie Pinter had for Olympia. *See* Grannis Decl. Ex. H at 250. In fact, as Managing Director of Olympia, Barry Goldstein never had a conversation with Fagie Pinter "in the business context." *See* Grannis Decl. Ex. I at 393.

        Charles Pinter, Moishe M. Pinter, and Basi Nierenberg did not provide any services to Olympia in exchange for the transfers they received. None of Olympia's employees interviewed or deposed were aware of any services that the children of Sam and Fagie Pinter provided to Olympia. Olympia's Director of Operations, Patty Trinidad was unaware of the Pinter Children performing any work for Olympia. *See* Grannis Decl. Ex. K at 216-217. Barry Goldstein, Olympia's Managing Director admitted that, at Sam Pinter's direction as part of his compensation, the Pinter children received money from Olympia while providing no services. *See* Grannis Decl. Ex. J at 325-327.

        Sam Pinter's testimony on whether any of his relatives performed work for Olympia has varied. In his first three depositions, he admitted that they did no work. *See* Grannis Decl. Ex. A at 19-22; Ex. B at 80-81; Ex. C at 269-270. He subsequently claimed that two of his children did do some work. *See* Grannis Decl. Ex. D at 118-119. However, Sam Pinter has consistently conceded that the wages that his relatives received were not for any work they performed but rather were paid as compensation allegedly owed to him. *See* Grannis Decl. Ex. D at 118 ("[T]hey did work a little bit. But that little bit shouldn't reflect on the moneys that they received."); Ex. A at 19-22 (agreeing that "the money that was paid to [him] as an investor was paid in the form of salary and medical benefits to [his] family.").Sam Pinter admitted that at the

time his children were receiving money characterized as wages from Olympia, his belief was that they were not working for Olympia. *See* Grannis Decl. Ex. D at 118-119.

**D.     The Pinter Children Did Not Loan Money to Olympia.**

Moishe M. Pinter, Basi Nierenberg, David Pinter and Sarah Pinter all received monies from Olympia classified as "interest." From September 1999 thru October 2004, these four children of Sam and Fagie Pinter received $29,042.78 from Olympia as "interest." There is no evidence that any of these individuals loaned money to Olympia to warrant these "interest" payments. Neither Sam Pinter nor the Sam Pinter Relatives have provided any proof that the Pinter Children loaned money to Olympia.  Nor did Sam Pinter or the Sam Pinter Relatives provide any proof that they made any capital contributions to Olympia. *See* Balmer Decl. ¶ 9.

Sam Pinter does not state in any of his depositions that his children loaned money to Olympia. Rather, he claimed that his children made capital contributions to Olympia. *See* Grannis Decl. Ex. D at 50-54. Sam stated that his children received 12% interest on these alleged capital contributions to Olympia. *Id.* Capital contributions are equity of a corporation and as such do not receive payments of interest.  Rather, payments made to shareholders for equity or capital contributions would be made as dividend payments.  However, dividend payments are not payable when a company is insolvent. *New York State Business Corporation Law § 510*. It also bears observation that none of the Sam Pinter Relatives have asserted claims for repayment of these alleged loans or capital contributions.

**E.     The Pinter Children Were Not Entitled to the Proceeds From the GECC Loan to Olympia.**

The Pinter Children all received money that was allegedly in repayment of a loan made by Pincus Pinter, their paternal grandfather, to Olympia. The Receiver has not found any evidence to substantiate this purported loan.

6

On December 31, 2002, Olympia issued check number 10926 from its operating account to Congregation Tiferes Yaakov (a/k/a Tiferes Yaakov Moshe, a/k/a Yeshiva Tifereth Yaakov Moshe) ("TYM"), a religious charity, in the amount of $205,000. *See* Balmer Decl. Ex. 6 at 15-16. This payment was funded in its entirety from the proceeds of the mortgage loan on the 1716 Coney Island Avenue property from GECC received by Olympia on or about that date. This check was deposited at Midwood Federal Credit Union ("Midwood"), a related entity, to account 1639, titled Yaakow Yeshiva Tifereth. *Id.*

On January 15, 2003, on the instructions of Leib Pinter, Midwood issued five $20,000 checks against this account; one check for each of the Pinter Children. *See* Balmer Decl. Ex. 6. It has previously been alleged  that the $205,000 distributed from Olympia to TYM represented repayment of a loan from Pincus Pinter  made through TYM to Olympia, and that the payments totaling $100,000 to the Pinter Children by TYM were in accordance with instructions left by Pincus Pinter prior to his death. *See* Memorandum of Law of Crossclaim Defendants, dated May 21, 2008 [Dkt. No. 511] at 5-6.

Moreover, there are no documents proving an actual transfer of funds to Olympia such as a note, cancelled checks, or wire transfer advices.  There is no proof that a loan to Olympia – if in fact made – came from Pincus Pinter. *See* Declaration of Karen Kincaid Balmer, dated August 29, 2008 [Dkt. No. 494-7] at 5-6.

The claim that there was an unpaid loan from TYM is not borne out by a closer examination of Olympia's books. Having reviewed the books of Olympia, the Receiver has found no evidence that there was any unpaid loan from TYM, or from Pincus Pinter, that would justify any of these payments made to the Pinter Children. *See id. at ¶¶ 5-12 and Exs. A-G.*

But for the GECC loan proceeds to Olympia, on the date of the transfer to TYM, Olympia's bank account was overdrawn. *See* Balmer Decl. Ex. C.

This Court has previously determined that the Leib Pinter Children were not entitled to the GECC loan proceeds, which they received in the same set of circumstances as the Pinter Children. Opinion and Order, dated August 5, 2011 [Dkt. 654] at 8.

## II.   OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS NEW YORK DEBTOR & CREDITOR LAW § 276 CLAIMS AGAINST THE SAM PINTER RELATIVES.

New York Debtor & Creditor Law § 276 states that "every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." *N.Y. Debtor and Creditor Law § 276.* A showing of actual intent is sufficient to prevail on a § 276 claim. *Scholtz v. Yastrzemski,* 247 A.D. 823, 823-34 (2d Dep't 1936).  Though the determination of actual intent is "ordinarily a question of fact which cannot be resolved on a motion for summary judgment," *Grumman Aerospace Corp. v. Rice,* 199 A.D.2d 365, 366-67 (2d Dep't 1993), the Court has granted summary judgment to Plaintiffs in cases where "there is no question of fact preventing summary judgment on the pleadings." *Trustees of Hamilton Coll. v. Cunningham,* 70 A.D. 2d 1048, 1049 (4th Dep't 1979).

The standard for proving actual intent for the purposes of a § 276 claim is "clear and convincing evidence." *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 126 (2d Dep't 1986). Under New York Debtor & Creditor Law § 276, "the intent examined is the intent of the transferor, not the transferee." *In re Monahan Ford Corp. of Flushing,* 340 B.R. 1, 38 (Bkrtcy. E.D.N.Y. 2006); *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995) ("to prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor").

Thus, the question is whether Olympia acted with fraudulent intent, and there is more than sufficient evidence to establish that. "Actual intent is rarely, if ever, established by direct evidence." *Hassett v. Goetzmann,* 10 F.Supp.2d 181, 188 (N.D.N.Y. 1998). "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers 'that their presence gives rise to an inference of intent.'" *Pen Pak Corp. v. LaSalle National Bank of Chicago,* 240 A.D.2d 384, 386, 658 N.Y.S.2d 407 (2d Dep't 1997). Among such circumstances are: a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." *Wall St. Assoc. v. Brodsky,* 257 A.D.2d 526, 529 (1st Dep't 1999); *See also In re Saba Enterprises, Inc.,* 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) ("Actual fraudulent intent…may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."); *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 639 (2d Cir. 1995).

The instant case is one of those rare ones in which there is direct and conclusive evidence that the transfers were made to defraud creditors. By at least 1997 Olympia's scheme to defraud Fannie Mae was running full steam. *See* Declaration of Karen Kincaid Balmer, dated August 29, 2008 [Dkt No. 561] at ¶ 3.  Thus, Olympia was concealing the fact that, although certain loans had been paid off through refinancing, Olympia had failed to remit the payoff proceeds to Fannie Mae. *Id.*  Olympia concealed that the borrowers had paid off the loans. It concealed this by various means including by making phony monthly payments on loans

9

(pretending that it had received these payments from borrowers), providing reports from Olympia's computer system to Fannie Mae showing such payments, and by making false entries in the computer system to indicate that the loans were still outstanding. *Id.* The purpose of all of this was to prevent Fannie Mae from realizing that it was owed money, which would have resulted in Fannie Mae taking aggressive measures to collect what it was owed and refusing to purchase further loans from Olympia. *Id.*

Olympia's fraudulent scheme enabled Olympia to make payments enriching relatives of Olympia's principals including the Sam Pinter Relatives. If Olympia hadn't tricked Fannie Mae into complacency by misleading it, then Olympia could not have retained the funds that it owed to Fannie Mae, and therefore it would not have had funds to pay to the relatives of Olympia's principals. It was Olympia's fraudulent retention of funds that were due to Fannie Mae that permitted Olympia to make payments to the Sam Pinter Relatives and other relatives of the principals. *Id. at ¶ 4.*

Thus, this is a unique case in which the fact that payments were made to defraud creditors is objectively demonstrable and it is therefore unnecessary to examine badges of fraud. However, if the Court deems it necessary to engage in such an analysis, these badges of fraud certainly exist. First, there is certainly a close relationship between the parties. The defendants herein are the children and spouse of Sam Pinter, who was Olympia's Vice President and was found by this Court to be responsible and liable for Olympia's liability to Fannie Mae. *See Opinion and Order, dated June 8, 2011 [Dkt. 628] at 10.*

Where money is transferred to a relative, there is a greater suspicion that the transaction is not at arm's length but rather merely reflects a desire to enrich the relative. The same suspicion is certainly warranted here. Sam Pinter had control over Olympia and used that

10

control to cause transfers to be made to his relatives. It is reasonable to infer that Sam Pinter did

so in order to enrich his relatives and this relationship is therefore a badge of fraud. Indeed, this

shifts the burden to the Sam Pinter Relatives to prove that the transfers were not fraudulent.

*Federal Nat. Mortg. Ass'n. v. Olympia Mortg. Corp.,* 2006 WL 2802092 at *8 (E.D.N.Y.

2006)("[I]n cases of intra-family transfers, where facts concerning the nature of the consideration

are within the exclusive control of the transferee, the burden shifts to the transferee to prove the

adequacy of consideration.")

Second, there was inadequate consideration for the transfers as discussed

previously. *See supra at § I. B.*

Third, Olympia was insolvent at the time of the transfers and there can be little

doubt that Olympia's management knew this. By his own admission, Leib Pinter knew about and

was orchestrating the fraud on Fannie Mae. *See Declaration of Karen Kincaid Balmer, dated*

*August 29, 2008 [Dkt No. 561] at ¶ 2.*

Additionally, Olympia's payment of certain of these transfers to Basi Nierenberg

in the form of payments on mortgages loans raises suspicion. These mortgage payments were

included as salary to Basi Nierenberg. *See* Balmer Decl. Ex. E. Making payments that were

purportedly salary in forms other than salary is "concealment of the facts and false pretenses,"

which is another badge of fraud. Furthermore, Sam Pinter has stated many times that the money

that his children received was compensation for him. *See* Grannis Decl. Ex. A at 19-22; Ex. D at

118-119, 81; Ex. B at 80-81; Ex. C at 110-111, 269-270. Yet Olympia obviously did not pay this

money to Sam Pinter. If Sam Pinter's contention that this was his compensation is truthful, this is

another example of concealment regarding the transfers at issue, as the nature of the payments

was disguised. This was tax fraud since Olympia was falsely reporting that the money paid to the

11

Sam Pinter Relatives was earned income. Tax fraud, as well as paying one person for another's work, can hardly be considered to be in the ordinary course of business.

Furthermore, Olympia did not provide mortgage payments for the majority of its employees, nor did it allow most employees to obtain family health insurance. *See* Balmer Decl. ¶ 5. Olympia only gave these benefits to the principals' relatives and a couple of select favored employees. *Id.* Olympia made mortgage payments for Basi Nierenberg and provided family health insurance for Faige Pinter, Charles Pinter, and Basi Nierenberg even though these individuals provided no services to Olympia. *See* Balmer Decl. ¶ 5 and Ex. B. Thus, these payments were not made "in the ordinary course of business," which is also a badge of fraud.

Moreover, Olympia transferred monies to Moishe M. Pinter, Basi Nierenberg, David Pinter, and Sarah Pinter categorized as "interest" payments. After an extensive investigation by the Receiver, there is no evidence that any of these individuals lent money to Olympia to warrant these payments. *See infra* at § I. B. 2. Interest payments made to individuals who have not lent any money or performed any services for the company certainly are not made in the ordinary course of business.

Finally, the Pinter Children each received $20,000, for a total of $100,000, from the proceeds of the mortgage loan on the 1716 Coney Island Avenue property from GECC received by Olympia on or about December 31, 2002. *See* Balmer Decl. Ex. C. It has been alleged that these monies were in repayment of a loan made by Pincus Pinter, the Pinter Children's paternal grandfather, through TYM to Olympia and the monies were transferred to the Pinter Children in accordance with instructions left by Pincus Pinter prior to his death. *See infra* at § I. B. 3. If this in fact was true, tax and estate laws would have required that upon Pincus Pinter's demise such property would pass into his estate, subject to distribution and taxation in

12

accordance with the laws of probate or the laws governing intestacy, as applicable. Therefore, the method of this transfer, is not in accordance with the ordinary course of business.

The foregoing facts clearly establish that the transfers to the Sam Pinter Relatives were made with the intent to defraud creditors.

## III.   OLYMPIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF FIDUCIARY DUTY CLAIM AGAINST FAGIE PINTER.

In New York, the elements of a breach of fiduciary duty claim are that "(1) that a fiduciary duty existed between plaintiff and defendants, (2) that defendant breached that duty, and (3) damages as a result of the breach." *Sheehy v. New Century Mortg. Corp.,* 690 F. Supp. 2d 51, 62 (E.D.N.Y. 2010).

New York provides for substantial judicial leeway in awarding damages resulting from a director's breach of fiduciary duty. *Herman v. Feinsmith*, 39 A.D.3d 327, 328 (1st Dep't 2007). "[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir. 1994). A director "is liable for all damages flowing from his breach of fiduciary duty as a director." *Ault v. Soutter,* 204 A.D.2d 131, 131 (1st Dep't 1994).

### A.   As Secretary of Olympia, Fagie Pinter Had a Fiduciary Duty to Olympia.

Fagie Pinter held the title of Secretary of Olympia. *See* Balmer Decl. Ex. A. As such, she owed a fiduciary duty to Olympia. *Sec. Inv. Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 329 (Bankr. S.D.N.Y. 1999) ("Under New York law, officers and directors owe a fiduciary duty to the corporation which they serve.") (internal citations omitted). As a fiduciary of Olympia, Fagie Pinter had a duty to protect the interests of Olympia. The obligation of fiduciary duty is one "barring not only blatant self-dealing, but also requiring avoidance of

13

situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989). Officers are not "permitted to profit personally at the expense of the corporation." *Howard v. Carr,* 222 A.D.2d 843, 845 (3d Dep't 1995).

### B.        Fagie Pinter Breached Her Fiduciary Duty to Olympia.

Fagie Pinter breached her fiduciary duty to Olympia by performing virtually no duties in her capacity of Secretary of Olympia. In fact, it is undisputed that Fagie Pinter provided no services to Olympia. *See infra* at § *I. B. 1.*

Fagie Pinter relinquished all of her powers and responsibilities with respect to any business or financial situation to her husband, Sam Pinter. Fagie Pinter stated that she relied on her husband to run her business interests for her and that she had "nothing to do with the day-to-day operation of anything." Grannis Decl. Ex. F at 28, 38. Fagie Pinter also admitted that she was never involved in the corporate decisions or meetings regarding any aspect of Olympia's corporate activity and that the business decisions of Olympia were made by others, not herself. *Id.* at 85. Sam Pinter corroborated this when he stated that "no one went to Fagie without me. Nobody, at any time. She would not do that for anybody. I was her representative at every given time." Grannis Decl. Ex. C at 306. This is the same Sam Pinter that stated that as Vice President of Olympia he had "zero day-to-day operation input." Grannis Decl. Ex. D at 79. Fagie Pinter acted in collusion with him and therefore bears the full responsibility for each fraud perpetrated by Olympia. In essence, Fagie Pinter gave over her responsibilities and duties as Secretary of Olympia to her husband, Sam Pinter, who admitted that he had no interaction with the day-to-day operations of Olympia.

The only work that Fagie Pinter could claim that she did for Olympia was to sign some documents as Secretary of Olympia. However, in signing these documents, Fagie Pinter was in essence a "rubber stamp" and breached her fiduciary duty to Olympia. Fagie Pinter admitted "As I said previously, I had nothing to do with running the business. So my husband made the decisions. And if he asked me to sign something that was relevant to the situation, I signed it." Grannis Decl. Ex. F at 52. When asked if she would sign the document without reading it, she replied "I trusted in my husband, he was my financial advisor." *Id.* Sam Pinter stated that Fagie Pinter only signed documents for Olympia if it was a state requirement that the Secretary of the company sign. *See* Grannis Decl. Ex. C at 305. Fagie Pinter was quite clear about what she considered her role in Olympia to be: "I was a passive investor. I was not part of this business…I had nothing to do with Olympia Mortgage…I am just a cosigner with my husband as being his wife. End of story." Grannis Decl. Ex. G at 138.

For all the reasons stated above, Fagie Pinter breached her fiduciary duty to Olympia.

**C.      Fagie Pinter's Breach of Fiduciary Duty Caused Damages to Olympia.**

As set forth below, Fagie Pinter repeatedly breached her fiduciary duties to Olympia and Olympia was damaged in the following ways:

**1.      Fagie Pinter Improperly Diverted Olympia Funds to Her Children As "Payroll."**

From 1999 through 2004, $553,162.12 was transferred to Fagie Pinter's children, Charles Pinter, Moishe M. Pinter, and Basi Nierenberg, through Olympia's payroll as "payroll" payments, health insurance, and mortgage payments. *See* Balmer Decl. Ex. B. These individuals did no work for Olympia. *See infra* at § *I. B. 1.* Sam Pinter has repeatedly claimed that the monies received by his children were part of his compensation and that he was aware that his

children did not provide any services to Olympia as consideration. *See* Grannis Decl. Ex. A at 19-22; Ex. D at 118-119; Ex. B at 80-81; Ex. C at 110-111, 269-270.

During one of Fagie Pinter's depositions, there was a discussion on some notes that she had written and brought with her to the deposition. She was asked to read part of those notes aloud in which it stated "[m]y children did not work for Olympia, they were investors and they got a paycheck for their schooling." Grannis Decl. Ex. G at 143-144.

Given her position as Secretary and major shareholder of Olympia, it is inconceivable that Fagie Pinter would not be aware of payments to her own children.  Even if she weren't aware of the payments to her children, knowledge of them should be imputed to her as an officer of Olympia.

### 2.   Fagie Pinter Improperly Diverted Olympia Funds to Her Children as "Interest".

From 1999 through 2004, $29,042.78 was transferred to Fagie Pinter's children, Moishe M. Pinter, Basi Nierenberg, David Pinter, and Sarah Pinter, as "interest" payments from Olympia. *See* Balmer Decl. Exs. B and D. None of these individuals loaned any money to Olympia to warrant these "interest" payments. *See infra* at § I. B. 2. As all of these individuals are children of Fagie Pinter, it is difficult to believe that she would not be aware of whether or not her children loaned money to Olympia and whether they were receiving interest payments from Olympia. This is especially true of Sarah Pinter, as she was underage during the time period in question.  Even if she weren't aware of the payments to her children, knowledge of them should be imputed to her as an officer of Olympia.

### 3.   Fagie Pinter Improperly Diverted Olympia Funds to Her Children Using the Proceeds of the GECC Loan.

The Pinter Children all received $20,000 payments, for a total of $100,000 from TYM. *See infra* at § *I. B. 3.* The money that TYM transferred to the Pinter Children was part of a $205,000 transfer to TYM from Olympia. *Id.* TYM was a religious corporation and had no business dealings with Olympia and the Receiver found no evidence that TYM loaned Olympia money, or any other justification as to why Olympia would transfer money to TYM. *Id.*

All of these individuals are children of Fagie Pinter and it is difficult to believe that she would not be aware of the amount and means of transfer of monies to her children that allegedly came from her father-in-law. This is especially true of Sarah Pinter, as she was underage during the time this transfer occurred.  Even if Fagie Pinter weren't aware of the payments to her children, knowledge of them should be imputed to her as an officer of Olympia.

### 4.    Fagie Pinter Improperly Diverted Olympia Funds to Pay Herself Salary and Other Benefits to Which She Was Not Entitled.

Fagie Pinter drew a salary and received health insurance from Olympia from 1998 through 2004. *See* Balmer Decl. Ex. B. Between September 26, 1999, the start of the clawback period, and October of 2004, when Olympia closed down, Fagie Pinter took out monies for herself totaling $93,839.11. *Id*. at Exs. B and D.

Fagie Pinter is liable for repayment of these amounts on two separate grounds. First, Fagie Pinter did virtually no work for Olympia. *See infra* at § *I. B. 1.* The only involvement that Fagie Pinter had with Olympia was to sign a few documents as Olympia's secretary. *See infra* at § III. B. These acts alone cannot constitute legally cognizable "work" that would justify Fagie Pinter's payments of salary. Accordingly, Fagie Pinter breached her fiduciary duties to Olympia by causing Olympia to pay her a salary for doing no legally cognizable work.

Second, Fagie Pinter breached her duties in numerous other respects as set forth herein. "Under New York law, the so-called faithless servant doctrine requires disgorgement of

all compensation received after the date of disloyalty began." *In re Food Mgt.Group, LLC*, 380 BR 677, 713 (Bankr. S.D.N.Y. 2008). "One who owes a duty of fidelity…and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Feiger v. Iral Jewlery, Ltd.,* 41 N.Y.2d 928, 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977). Accordingly, under the faithless servant doctrine, Fagie Pinter forfeited all right to compensation by breaching her fiduciary duties to Olympia. This disloyalty began no later than 1998 as payroll records show that Fagie Pinter and some of her children have been drawing salaries since this time. *See* Balmer Decl. Ex. B. Fagie Pinter has received $93,839.11 in payments from Olympia since September of 1999. Accordingly, Fagie Pinter is liable for repayment of this amount.

### 5.     Fagie Pinter Improperly Diverted Olympia Funds to S&F Ocean Realty.

S&F Ocean Realty ("S&F") is a 50/50 partnership between Fagie Pinter and Shaindy Pinter, Leib Pinter's wife. *See* Grannis Decl. Ex. D at 302. Sam Pinter stated that S&F did not have any deals at all with Olympia. *See* Grannis Decl. Ex. E at 488. Olympia made payments on S&F's behalf totaling $148,659.59, despite having no business dealings with S&F. *See* Declaration Of Karen Kincaid Balmer, dated May 23, 2008 [Dkt. No. 511] ¶ 5 and Ex. 37. In fact, this court has already found that these monies were transferred to S&F while Olympia was insolvent and without fair consideration and therefore granted Olympia summary judgment as to its New York Debtor & Creditor Law § 273 against S&F. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] at 22.

Given Fagie Pinter's position as Secretary and major shareholder of Olympia, it is inconceivable that she would not be aware of payments to a company in which she has a 50%

interest. Even if she weren't aware of the payments to S&F, knowledge of them should be imputed to her as an officer of Olympia.

### 6. Fagie Pinter Improperly Diverted Olympia Funds to Z&S Realty.

Z&S Realty ("Z&S") is owned 50/50 between Fagie Pinter and her husband, Sam Pinter. *See* Grannis Decl. Ex. D at 305.   Z&S did not have any business dealings with Olympia. In fact, Sam Pinter refused to produce documents relating to Z&S because he claimed it had zero relevancy to Olympia. *See* Grannis Decl. Ex. E at 524.  Despite Z&S having no business dealings with Olympia, Olympia made payments on Z&S's behalf totaling $163,786.41. *See* Declaration Of Karen Kincaid Balmer, dated May 23, 2008 [Dkt. No. 511]  ¶ 5 and Ex. 37.  In fact, this court has already found that these monies were transferred to Z&S while Olympia was insolvent and without fair consideration and therefore granted Olympia summary judgment as to its New York Debtor & Creditor Law § 273 against Z&S. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] at 22.

Given Fagie Pinter's position as Secretary and major shareholder of Olympia, it is inconceivable that she would not be aware of payments to a company in which she has a 50% interest. Even if she weren't aware of the payments to Z&S, knowledge of them should be imputed to her as an officer of Olympia.

### 7. Fagie Pinter's Breach of Fiduciary Duties as an Officer of Olympia and KSH Enabled the Improperly Diverted Olympia Funds to KSH.

Kahal Shomrei Hadath ("KSH") was formed in 1971 as a New York non-profit organization that purports to be a religious organization. *See* Grannis Decl. Ex. D at 106, 108. Despite the fact that non-profit religious organizations cannot have shareholders, Sam and Fagie

Pinter are listed on KSH's operating agreement as 50/50 "shareholders" of KSH. *See* Balmer

Decl. at Ex. F. Fagie Pinter is also the Secretary and Treasurer of KSH. *Id.*

   KSH had no business dealings with Olympia. *See* Grannis Decl. Ex. E at 362-363.

Despite KSH having no business dealings with Olympia, Olympia made transfers to KSH

totaling $2,044,876.00. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] 20-21. In fact,

this court has already found that these monies were transferred to KSH while Olympia was

insolvent and without fair consideration and therefore granted Olympia summary judgment as to

its New York Debtor & Creditor Law § 273 against KSH. *Id.* at 22.

  Given Fagie Pinter's position as Secretary and major shareholder of Olympia, as well as

Secretary and Treasurer of KSH, it is inconceivable that she would not be aware of these

payments. Even if she was not aware of the payments to KSH, knowledge of them should be

imputed to her as an officer of Olympia and KSH.

> **8.**  **Fagie Pinter's Breach of Fiduciary Duties Enabled the Fannie Mae Fraud.**

   Olympia's scheme to defraud Fannie Mae, which resulted in losses to Fannie Mae

of $44.8 million, has been well documented. This scheme was running full steam since at least

1997. *See* Declaration of Karen Kincaid Balmer, dated August 29, 2008 [Dkt No. 561] at ¶ 3.

Based upon the result of the Receiver's investigation, Olympia entered into a consent judgment

with Fannie Mae in the amount of $44.8 million. *See* Consent Judgment Against Olympia

Mortgage Corporation on Counts One and Two of the Amended Complaint, dated August 31,

2007 [Dkt No. 399].

   Fagie Pinter's breach of fiduciary duty, in her position of Secretary of Olympia,

contributed to Olympia's ability to continue the scheme to defraud Fannie Mae. Her breach of

fiduciary duty was so great that it reached the level of gross negligence.[1] Fagie Pinter voluntarily relinquished all her powers and responsibilities as Secretary to her husband, Sam Pinter.  *See §III. B.* Sam Pinter, by his own admission, had zero day-to-day input with Olympia, and in turn allowed Olympia to be run and operated by Leib Pinter and Barry Goldstein. *See* Grannis Decl. Ex. D at 98-99.  Both Leib Pinter and Barry Goldstein were convicted felons before the incorporation of Olympia.  Leib Pinter is Fagie Pinter's brother-in-law.  It is undisputed that both Sam and Fagie Pinter were aware of Leib Pinter's felony status prior to authorizing him to control Olympia. *See* Grannis Decl. Ex. D at 34-35, 67; Ex. F at 28.  Leib Pinter and Barry Goldstein were precluded from being officers or directors of Olympia because of those convictions.

Leib Pinter has pled guilty to orchestrating the Fannie Mae fraud. *See* Criminal Cause for Pleading, 1:08-cr-00297-SLT, dated September 11, 2008 [Dkt No. 34].  Barry Goldstein pleaded guilty to defrauding Credit Suisse First Boston, by selling it loans whose credit histories had been fraudulently altered. *See* Criminal Calendar for a Guilty Plea, 1:08-cr-00297-SLT, dated January 8, 2009 [Dkt No. 44].

Had Fagie Pinter acted with any kind of diligence or care in her position as Secretary, it is inconceivable that the fraudulent scheme against Fannie Mae would have been able to continue for seven years.

Fagie Pinter did nothing to understand Olympia's business, nor did she do anything to ensure compliance with federal or state laws.  Olympia violated a number of federal and state laws.  Not least among them was providing false statements on a frequent basis to

---

[1] Black's Law Dictionary defines gross negligence as: "(1) a lack of slight diligence or care. (2) A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages." See Black's Law Dictionary, Seventh Edition at 1057.

Fannie Mae, a quasi-governmental agency, regarding what loans had been paid by borrowers on a monthly and payoff basis.  Olympia participated in this practice frequently and consistently over at least seven years. Each of these false statements disguised the fact that Olympia was stealing monies from Fannie Mae.

Given Fagie Pinter's position as Secretary of Olympia and that her breach of those fiduciary duties helped ensure that the fraud against Fannie Mae was able to continue for years, she should be found liable for Olympia's liability to Fannie Mae.

9. **Fagie Pinter Improperly Diverted Olympia Funds to Leib Pinter's Relatives.**

The Court has previously determined that Olympia funds were improperly diverted to Chaim Taub, Moshe Pinter, Yossie Pinter, Zvi Pinter, and Tova Taub (collectively the "Leib Pinter Children"). *See* Opinion and Order, dated August 5, 2011 [Dkt. 654] at 29. The sum transfers to each of the Leib Pinter Children were determined by the Court as follows:

- Chaim Taub in the amount of $299,113.54

- Moshe Pinter in the amount of $298,552.32

- Yossie Pinter in the amount of $143,232.06

- Zvi Pinter in the amount of $276,748.19

- Tova Taub in the amount of $15,000.00

*Id*.

Given Fagie Pinter's position as Secretary and major shareholder of Olympia it is inconceivable that she would not have been aware of these payments.  Even if she was not aware of the payments to the Leib Pinter Children, knowledge of them should be imputed to her as an officer of Olympia.

22

10. **Fagie Pinter Improperly Diverted Olympia Funds to Ave Donner's Relatives.**

The Court has previously determined that Olympia funds were improperly diverted to Toby Donner, Naftali Donner, Chaim Donner, Perry Lerner, Yocheved Donner, Sarah Donner, and Nachema Donner (collectively the "Donner Relatives"). *See* Opinion and Order, dated June 17, 2011 [Dkt. 629] at 18. The sum transfers to each of the Donner Relatives were determined by the Court as follows:

- Toby Donner in the amount of $1,619.88

- Nachema Donner in the amount of $171,743.42

- Chaim Donner in the amount of $10,962.01

- Perry Lerner in the amount of $65,384.89

- Yocheved Donner in the amount of $136,755.41

- Sarah Donner in the amount of $82,543.44

- Naftali Donner in the amount of $29,566.11

*Id*.

Given Fagie Pinter's position as Secretary and major shareholder of Olympia it is inconceivable that she would not have been aware of these payments.  Even if she was not aware of the payments to the Donner Relatives, knowledge of them should be imputed to her as an officer of Olympia.

## IV.    INTEREST SHOULD BE AWARDED

Rule 5001(a) of the CPLR provides that "interest shall be recovered upon a sum awarded because of . . . an act or omission depriving or otherwise interfering with title to, or

possession or enjoyment of, property." Accordingly, Olympia is entitled to an award of interest on its fraudulent transfer claims.

With respect to the date from which interest runs, Rule 5001(b) of the CPLR provides as follows:

Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

Accordingly, "[w]here damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co., Inc., 16 F.3d 504, 512* (2d Cir. 1994) "When precision isn't practicable, [§ 5001(b) ] allows the fact-trier to select 'a single reasonable intermediate date' from which the interest may be computed on all of the items together." David Siegel, Practice Commentaries to C.P.L.R. § 5001 at 359; *accord Pacific Westeel, Inc. v. D & R Installation*, 2003 WL 22359512 at *3 (S.D.N.Y. 2003). In particular, where "calculating interest based on each individual item would be impractical, the Court should fix a 'reasonable intermediate date' in order to simplify the calculations." *Pacific Westeel,* 2003 WL 22359512 at *3. "In determining this date, the Court has substantial discretion." *Id.*

In the instant case, the fraudulent transfers were numerous with hundreds of particular transactions. Because it would be impractical to make interest calculations on hundreds of individual transfers, the Court should exercise its discretion to fix a "reasonable intermediate date." In *Kookmin Bank v. B.G. Fashion, Inc.*, 2000 WL 1880315, 4 (S.D.N.Y.

2000), damages arose from 54 bills of exchange that matured on different dates over the course of fifteen months. The Court determined that "a reasonable intermediate date is mid-way between the first and last maturity dates." *Id.* This Court should take the same approach here, choosing the date mid-way between the first and last fraudulent transfers to each defendant.

The following are the midway points for these defendants:

- Fagie Pinter:          3/29/02

- Charles Pinter:        3/15/02

- Moishe M. Pinter:      3/29/02

- Basi Nierenberg:       3/29/02

- David Pinter:          3/31/03

- Sarah Pinter:          3/31/03

This Court previously held that interest should run on the transfers to Z&S from November 11, 2000. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] at 11. The same date remains appropriate.

This Court previously held that interest should run on the transfers to S&F totaling $122,045 from February 16, 2000 and on the transfers to S&F totaling $26,614.59 from August 25, 2003. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] at 11. The same dates remain appropriate.

This Court issued a consent judgment on the transfers to Fannie Mae on August 31, 2007. *See* Consent Judgment Against Olympia Mortgage Corporation on Counts One and Two of the Amended Complaint, dated August 31, 2007 [Dkt No. 399] at 6.

This Court previously held that interest should run on the transfers to KSH totaling $1,892,376 from September 4, 2001 and on the transfers to KSH totaling $152,500 from

November 30,1998. *See* Opinion and Order, dated June 8, 2011 [Dkt. 628] at 11. The same dates remain appropriate.

This Court previously held that interest should run on the transfers to the Donner Relatives as follows:

- Toby Donner:      7/31/2004

- Nachema Donner:      11/15/2001

- Chaim Donner:      11/15/2000

- Perry Lerner:      5/15/2000

- Yocheved Donner:      12/1/2001

- Sarah Donner:      11/15/2000

- Naftali Donner:      9/15/2003

*See* Opinion and Order, dated June 17, 2011 [Dkt. 629].

This Court previously held that interest should run on the transfers to the Leib Pinter Children as follows:

- Chaim Taub:      5/1/2002

- Moshe Pinter:      11/1/2000

- Yossie Pinter:      11/1/2001

- Zvi Pinter:      11/1/2000

- Tova Taub:      1/16/2003

*See* Opinion and Order, dated August 5, 2011 [Dkt. 654].

## <u>CONCLUSION</u>

For the reasons stated above, Olympia Mortgage Corporation respectfully requests that the Court enter judgment as follows:

- Charles Pinter: $264,691.30 plus interest thereon at 9% from 3/15/2002.

- Moishe M. Pinter: $65,200.00 plus interest thereon at 9% from 3/29/2002.

- Basi Nierenberg: $302,620.07 plus interest thereon at 9% from 3/29/2002.

- David Pinter: $26,569.99 plus interest thereon at 9% from 3/31/2003.

- Sarah Pinter: $23,123.54 plus interest thereon at 9% from 3/31/2003.

- Fagie Pinter in the amounts diverted to the transferees listed below, with 9% interest from the appropriate dates:

| Transferee | Amount | Date Interest Begins |
|---|---:|---:|
| Fagie Pinter | $93,839.11 | 3/29/2002 |
| Charles Pinter | $264,691.30 | 3/15/2002 |
| Moishe M Pinter | $65,200.00 | 3/29/2002 |
| Basi Nierenberg | $302,620.07 | 3/29/2002 |
| David Pinter | $26,569.99 | 3/31/2003 |
| Sarah Pinter | $23,123.54 | 3/31/2003 |
| S&F Ocean Realty | $122,045.00 | 2/16/2000 |
| S&F Ocean Realty | $26,614.59 | 8/25/2003 |
| Z&S Realty | $163,786.41 | 11/11/2000 |
| Toby Donner | $1,619.88 | 7/31/2004 |
| Nachema Donner | $171,743.42 | 11/15/2001 |
| Chaim Donner | $10,962.01 | 11/15/2000 |
| Perry Lerner | $65,384.89 | 5/15/2000 |
| Yocheved Donner | $136,755.41 | 12/1/2001 |
| Sarah Donner | $82,543.44 | 11/15/2000 |
| Naftali Donner | $29,566.11 | 9/15/2003 |
| Chaim Taub | $299,113.54 | 5/1/2002 |
| Moshe Pinter | $298,552.32 | 11/1/2000 |
| Yossie Pinter | $143,232.06 | 11/1/2001 |
| Zvi Pinter | $276,748.19 | 11/1/2000 |
| Tova Taub | $15,000.00 | 1/16/2003 |
| KSH | $1,892,376.00 | 9/4/2001 |
| KSH | $152,500.00 | 11/30/98 |
| Fannie Mae | $44,800,000.00 | 8/31/2007 |
| **TOTAL:** | **$49,464,587.28** | |

Dated:  New York, New York

27

March 19, 2012

LAW OFFICES OF ERIC J. GRANNIS

By: _____

Eric J. Grannis            (EJG 8403)
One Penn Plaza, 36th Floor
New York, New York 10119
(212) 903-1025

Attorneys for Olympia Mortgage
Corporation

28