UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

                 Plaintiff,

    - against -

OLYMPIA MORTGAGE CORPORATION,
et al.,

                 Defendants.
-------------------------------------------------------x
OLYMPIA MORTGAGE CORPORATION,
et al.,

            Crossclaim Plaintiff,

    - against -

Leib Pinter, et al.,

            Crossclaim Defendants.
-------------------------------------------------------x

OPINION & ORDER
04-CV-4971 (NG)(MDG)



GERSHON, United States District Judge:

    Federal National Mortgage Association ("Fannie Mae") initiated this action on November 16, 2004. On October 18, 2005, Olympia Mortgage Corporation ("Olympia") filed an Amended Answer and Crossclaims asserting four crossclaims against defendants Charles Pinter, Moishe M. Pinter, Basi Nierenberg, David Pinter and Sarah Pinter ("the Sam Pinter Children") for: (1) violation of New York Business Corporations Law ("N.Y. Bus. Corp. Law") § 720; (2) violation of New York Debtor and Creditor Law ("N.Y. Debt. & Cred. Law") § 276; (3) violation of N.Y. Debt. & Cred. Law § 273; and (4) unjust enrichment. Olympia filed a Notice of Dismissal of Claims, which was "so ordered" on October 18, 2011, dismissing the N.Y. Bus. Corp. Law § 720 and unjust enrichment

claims. Olympia also filed an Amended Answer and Crossclaims against Fagie Pinter asserting (1) breach of fiduciary duty; (2) two claims of violation of N.Y. Bus. Corp. Law § 720; (3)N.Y. Debt. & Cred. Law § 276; (4) violation of N.Y. Debt. & Cred. Law § 273; (5) conversion; (6) accounting; (7) unjust enrichment; and (8) a claim to pierce the corporate veil.

Olympia has been put into receivership by this court and has entered into a consent judgment with Fannie Mae concerning its breach of contract claims. On May 11, 2011, by Stipulation and Order, the remaining six claims against Olympia were dismissed without prejudice.

Olympia now seeks summary judgment against the Sam Pinter Relatives pursuant to Rule 56 of the Federal Rules of Civil Procedure on its crossclaims of constructive and actual fraud under New York Debtor and Creditor Law §§ 273 and 276. Olympia also seeks to hold Fagie Pinter responsible for all of Olympia's liabilities for breaching her fiduciary duty to Olympia. For the reasons set forth below, Olympia's motion is granted in part and denied in part; and summary judgment is granted to Fagie Pinter on Olympia's breach of fiduciary duty claim.

## BACKGROUND AND FACTS

The following facts are undisputed unless otherwise noted. The background of this case has been set forth in past opinions, *see, e.g., Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F.Supp.2d 308 (E.D.N.Y. 2010). Facts relevant to the instant motion are set forth below.

Olympia, a close corporation, was insolvent at least from December 31, 1997, and possibly for its entire existence. Karen Kincaid Balmer Decl., Ex. 40, May 23, 2008.

Samuel Pinter ("Sam") was Olympia's Vice President, and his wife, Fagie, was Olympia's

corporate Secretary.  Sam and Fagie, together, were Olympia's largest shareholders.[1]

On July 7, 2010, this court granted Fannie Mae's motion to pierce the corporate veil as to Sam Pinter finding that "[t]hroughout Olympia's existence, defendant [Sam Pinter] raided the assets of the company for his own purposes, indifferent to whether his steady drain of funds from its coffers would impair its ability to meet its substantial contractual obligations to Fannie Mae (and other parties)." *Federal Nat. Mortg. Ass'n.*, 724 F.Supp.2d at 320.  The court also granted Olympia's subsequent motion to pierce its own corporate veil and hold Sam personally liable for its liabilities on the same ground and for the same reasons as it granted Fannie Mae's motion.  *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 04-CV-4971, 2011 WL 2414685 (E.D.N.Y. Jun. 8, 2011).

The Sam Pinter Relatives consist of his wife, Fagie Pinter; Charles Pinter, Moishe M. Pinter and David Pinter, their sons; and Basi Niernberg and Sarah Pinter, their daughters.  Olympia transferred sums of money to and on behalf of the Sam Pinter Relatives from September 1999 through October 2004.  These transfers from Olympia were payments evidenced by Olympia's accounting records, W-2 Wage and Tax Statement forms ("W-2s"), or "interest payments," evidenced by 1099 Interest Income forms ("1099's").

There are five categories of transfers to the Sam Pinter Relatives: payroll, health insurance benefits, mortgage payments made on their behalf, interest payments and proceeds from a loan which Sam's father, Pincus Pinter, allegedly made to Olympia (the "GECC loan").  It is undisputed that the Sam Pinter Relatives directly received or benefitted from the following money transfers made by Olympia between September 1999 and October 2004:

---

[1]  The shareholders of Olympia, as of September 6, 2003, were: Abe Donner (32%), Fagie Pinter (32%), Sam Pinter (9%), Barry Goldstein (9%), Miriam Goldstein (8.5%), and Shaindy Pinter (8.5%).  The shareholders and percentage of ownership changed numerous times during Olympia's existence.

Fagie Pinter received or benefitted from $93,839.11 in transfers: $39,300.00 as payroll and $54,539.11 in health insurance benefits;

Charles Pinter received or benefitted from $264,691.30 in transfers: $192,000.00 as payroll, $52,691.30 in health insurance benefits and $20,000.00 in proceeds from the GECC loan;

Moishe M. Pinter received or benefitted from $65,200.00 in transfers: $37,200.00 in payroll, $8,000.00 in interest payments and $20,000.00 in proceeds from the GECC loan;

Basi Nierenberg received or benefitted from $302,620.07 in transfers: $177,091.83 in payroll, $52,691.30 in health insurance benefits, $41,487.69 in mortgage payments made on her behalf, $11,349.25 in interest payments and $20,000.00 in proceeds from the GECC loan;

David Pinter received or benefitted from $26,569.99 in transfers: $6,569.99 in interest payments and $20,000.00 in proceeds from the GECC loan; and

Sarah Pinter received or benefitted from $23,123.54 in transfers: $3,123.54 in interest payments and $20,000.00 in proceeds from the GECC loan.

## I. Money Purportedly Owed to Sam Pinter by Olympia

Each of the Sam Pinter Children claims that part of the money received and reported on their individual W-2s was money Olympia owed Sam Pinter as a result of his relationship with Olympia and which Sam Pinter subsequently assigned to each of his children. In Sam's affidavit in support of his children and wife, he states that "any money that went to my children from Olympia was by my direction and was money that was due to me." Aff. Sam Pinter, May 22, 2012 ("Sam Pinter Aff."), ¶ 8. He explains that he was entitled to money by virtue of his relationship with Olympia and as interest and principal payments of money he lent Olympia over the course of its existence.

It is undisputed that Sam's Children, with the exception of Charles, did not work for

-4-

Olympia. All the children, including Charles, argue that the some of transfers to them or made on their behalf were for fair consideration because the transfers were, in part, monies to which Sam Pinter was entitled as a result of his involvement in and investments in Olympia. Sam "received a 'salary' of approximately $150,000 a year (plus life insurance) from Olympia, though he claims to have performed no substantial services for Olympia." *Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d at 312. This court has already determined that "[n]othing in Olympia's records or in any banking documents verify [Sam] Pinter's position that he loaned money to Olympia." *Federal Nat. Mortg. Ass'n*, 2011 WL 2414685 at *2-*5. Because Sam did not loan any money to Olympia, neither Sam nor his wife nor his children are entitled to any monies, in the form of interest payments or principal repayments, resulting therefrom.[2] There is no documentary evidence that Sam assigned any monies owed to him, whether that money was salary, interest on loans or return on capital contributions, to his wife or children. *See id.*, at *5 ("[N]othing in Olympia's records . . . provides proof of the existence of an arrangement whereby purported loans made by [Sam] Pinter to Olympia were repaid to a person or entity other than [Sam] Pinter.").

In sum, the argument that monies owed to Sam Pinter form the consideration for transfers to his relatives is without evidentiary support.

## II. Fagie Pinter

### A. Fagie's Corporate Relationships

Fagie, as mentioned above, was Olympia's corporate Secretary from its inception until its demise. Fagie, together with Sam, was Olympia's largest shareholder. Her personal shares in

---

[2] As for Sam's capital infusion of $250,000.00 to Olympia, Sam, at most, expected a yearly return of 12 ½% on the money, but not a repayment of the principal. *Federal Nat. Mortg. Ass'n*, 2011 WL 2414685 at *2.

Olympia varied from as much as 50% in 1996 to as little as 32% in 2001-2003.  Declaration of Karen Balmer, Mar. 19, 2012 ("Balmer Decl."), Ex. A.   It is undisputed that she provided no services to Olympia and never worked at Olympia.  It is also undisputed that she never participated in any of Olympia's business dealings and relied on Sam to make all business decisions for her.  She never questioned him, and she signed documents for Olympia only when Sam asked for her signature in her capacity as corporate Secretary.  Fagie considered herself to be a passive investor in Olympia.

Fagie also owned an interest in, or was an officer of, various other entities controlled by Sam Pinter.  *See Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d at 310.  She owns 50 percent, each, of S&F Ocean Realty and Z&S Realty.  Fagie is also the corporate Secretary and Treasurer of Kahal Shomrei Hadath, a non-profit organization.

## B.  Knowledge of the Fraud

Olympia does not claim that Fagie was actually aware of the massive fraud perpetrated at Olympia over several years by Leib Pinter, Fagie's brother-in-law, and Barry Goldstein[3] nor does it claim that she had any day-to-day control over Olympia or influence over its affairs.  Indeed, Olympia has never claimed that Sam Pinter was aware of the fraud.

Olympia argues that Fagie was aware of Leib's criminal past, in that he had previously pled guilty to charges of bribing a Congressman.  Because of his past crime, Olympia asserts, Fagie should never have allowed Leib to control Olympia.  While Fagie denies knowledge of this crime during Olympia's existence, any issue of fact on this point is immaterial, as will be shown.

## C.  Transfers to Fagie

---

[3]  Both Leib Pinter and Barry Goldstein have pled guilty to fraud charges in connection with the Olympia scheme.

Fagie claims that she was entitled to health insurance coverage as a result of her status as an investor and also because "it was agreed that all the wives and children of the principal investors [] would receive health insurance through the company." Fagie Pinter's Aff. Opp'n, ¶ 6. She also claims that any other money she received, evidenced by W–2 Wage and Tax Statement forms, was because she was an investor in Olympia. *Id.*, ¶ 7. To the extent she relies on her husband's purported loans and capital contribution as her investments in Olympia, as discussed above, those transactions do not entitle Fagie to any monetary benefit.

## III. Transfers to the Sam Pinter Children

Although each child received $20,000 in GECC proceeds, they did not all benefit from transfers in all categories. Each child claims that some of the transfers were monies assigned to him or her by Sam to which Sam was entitled based upon his status as an investor, officer and shareholder of Olympia. As explained above, Sam's relationship to Olympia was not valid consideration for any transfers to the Sam Pinter Children. It is undisputed that David, Sarah, Basi and Moishe never worked at Olympia.

### A. The GECC Loan

Each of the Sam Pinter Children received $20,000, classified by Olympia as proceeds from the GECC loan. As explained in a previous decision, undisputed records submitted by Olympia prove that none of Sam's children is entitled to any repayment of loan monies from the GECC loan. *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 04-CV-4971, 2011 WL 9933496 at *4, *9 (E.D.N.Y. Aug. 5, 2011).

### B. Charles Pinter

Charles Pinter is the only child who claims to have performed work in exchange for the

monies he received from Olympia, and even then admits that this work was only in exchange for a portion of the monies he received from Olympia.

There is no dispute that Charles did work for Olympia on the elevator shaft at 1716 Coney Island Avenue in Brooklyn, New York. He did so through his company, Shraig & Shraig Trucking. Charles submitted two invoices to Olympia for "Work that was Done at 1716 Coney Island Ave (Elevator)," both dated January 15, 2002. The invoices were almost identical; they specified the same 15 tasks performed for Olympia, and charged Olympia the same amount, $5,000.00, for the work. One invoice's heading, however, stated it was for work done by Shraig & Shraig Trucking, while the other invoice stated it was for work done by Charles Pinter. For this work, Shraig & Shraig Trucking was paid in full: $1000.00 on October 25, 2001; $2000.00 on January 15, 2002; and another $2000.00 on March 13, 2002.

Charles offers no evidence to support the performance of any additional work he performed for Olympia.

### C. Alleged Loans to Olympia from the Sam Pinter Children

#### 1. Basi Nierenberg

As stated above, Basi received $11,349.25 in interest payments. Basi claims that she lent $27,500 to Olympia in June of 1992, and that the "payroll" she received was partially in repayment of the loan, and interest payments she received were interest on the loan. As evidence of this loan, she has submitted a promissory note between "Binyomin and Basia Nierenberg" and Olympia that only Binyomin signed as lender. Olympia had two signatories on the promissory note, Leib Pinter and a second signature which is illegible. The term of the loan was from June 3, 1992 through September 2, 1992, and the interest rate on the loan was 12%.

-8-

Basi's purported loan for $27,500 first appeared on Olympia's books by a post-closing journal entry following the December 31, 1992, closing (in other words, the entry occurred between the year-end balance on December 31, 1992, and the opening balance on January 1, 1993). This entry did not reflect a cash transaction, but rather reduced the balance of a purported loan payable to Sam Pinter. Declaration of Karen Balmer, Aug. 29, 2008 ("2008 Balmer Decl."), Doc. # 495-3, Ex. N. The loan to Basi was increased by $2,500, which was recorded on Olympia's books by a post-closing journal entry following the December 31, 1994, closing.[4] *Id.*, Ex. L. The added balance was not a cash receipt but also accomplished by reducing loans payable to Sam Pinter and Barry Goldstein. *Id.* The undisputed evidence thus establishes that there was no cash transfer of $27,500 by Basi Nierenberg to Olympia. Put simply, Basi did not loan any money to Olympia. Therefore, the alleged loan provides no consideration either for payroll or interest payments to her.

### 2. Moishe M. Pinter

Moishe received $8,000.00 in interest payments from Olympia. Moishe claims that he lent money to Olympia and that the payroll payments were partially in repayment of those loans and that the interest payments reflect interest accrued on the money he lent to Olympia.

Moishe claims that he lent Olympia a total of $47,100.79: $8,793.54 in 1992 and $38,307.25 in 1998. Moishe's purported loan for $8,793.54 first appeared on Olympia's books on December 31, 1992. 2008 Balmer Decl. ¶ 2. This entry did not reflect a cash transaction, but rather reduced the balance of a purported loan payable to Sam Pinter. 2008 Balmer Decl. Ex. N. As evidence of

---

[4] Basi neither mentions the $2,500.00 increase in her affidavit, nor does her counsel mention this increase in his papers. Olympia's papers state that her purported loan was increased by $2,400.00. However, upon examination of both the computer-printed ledger and the hand-written ledger, it is clear that the increase was for $2,500, which brought the total purported outstanding loan from Basi from $27,500.00 to $30,000.00.

this loan, Sam Pinter has submitted a promissory note which appears to be identical to the promissory note submitted by Leib's son of the same name (but without the middle initial), Moishe Pinter; this loan was addressed, and rejected as a loan, in an earlier opinion, *see Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 04-CV-4971, 2011 WL 9933496 at *4, *9.

Olympia argues that the court also previously rejected a purported loan in the amount of $30,706.46 also claimed by Leib's son Moishe. *Id.* But, Moishe M. Pinter is not claiming to have made a loan to Olympia for $30,706.46. Rather, Sam submitted a second purported promissory note, dated June 30, 1998, signed by Moishe Pinter, for a loan to Olympia in the amount of $38,307.25.[5] Olympia does not address the existence of this promissory note in the amount of $38,307.25, other than to express that there is no loan for this amount recorded on Olympia's books. Aside from the promissory note, however, there are no records of Olympia's receipt of the second loan nor any cancelled checks or any other evidence that Moishe actually lent that money to Olympia.

Since there are two defendants in this case named Moishe Pinter who have already used what appears to be the same document to substantiate an alleged loan for $8,793.54, the court is not in a position to determine whether the purported promissory note for $38,307.25 actually belongs to Moishe M. Pinter, the defendant in this motion, or Leib's son Moishe Pinter. The same issue arises with respect to the two 1999 ledger pages submitted by Sam, which show loans to "Moishe Pinter." Sam Pinter Aff., Ex. C.

Reviewing the evidence proffered by Moishe Pinter and Olympia, there remains a factual dispute as to whether Moishe loaned Olympia $38,307.25 on June 30, 1998, and is entitled to keep

---

[5] The promissory note mentions Moishe Pinter in the first sentence, "[i]t is agreed that Moshe Pinter of 1199 East 8th Street . . . ," but names Charles Pinter in the last sentence, "[i]n the even Charles Pinter is desirous to receive his loan within 90 days . . . ." I note that Charles Pinter does not claim to have lent any money to Olympia.

some part of the $8,000.00 in interest payments which Olympia seeks on this motion.

### 3. Sarah Pinter

Sarah claims that she loaned $8,077.53 to Olympia on December 7, 2000, and was entitled to the interest payments in the amount of $3,123.54 which Olympia seeks to recover. Neither Olympia nor Sarah has submitted evidence which conclusively establishes whether Sarah actually loaned Olympia $8,077.53. Therefore, there remains a factual dispute as to whether she is entitled to keep the $3,123.54 she received in interest payments.

### 4. David Pinter

David claims that he is entitled to keep the $6,568.99 in interest payments given to him as a result of $16,781.55 in loans which he made to Olympia on December 7, 2000. As with Sarah, neither Olympia nor David has conclusively proven whether or not David actually loaned $16,781.55 to Olympia. Therefore, there remains a factual issue as to whether David is entitled to keep the $6,568.99 in interest payments he received from Olympia.

### DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552

(1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 586–8, 106 S.Ct. 1348 (emphasis removed).

"The moving party is entitled to judgment as a matter of law [if] the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. at 323. When deciding a motion for summary judgment, courts must take into account the evidentiary burden of proof applicable at a trial on the merits and measure the evidence submitted against that burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254–55. Actual fraud under § 276 must be proven by clear and convincing evidence. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994), *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122 (2d Dep't 1986). There is a dispute as to the appropriate standard of proof required to prove constructive fraud under § 273. *See, e.g. Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp*, 792 F.Supp.2d 645, 650 (E.D.N.Y. 2011) *comparing Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 376 n. 6 (S.D.N.Y. 2003) (concluding that fraud under § 273 must be proved by a preponderance of the evidence) and *Farkas v. D'Oca*, 305 A.D.2d 237 (1st Dept. 2003) (noting that the trial court applied the clear and convincing evidence standard to a claim for constructive fraud under § 273).

"[I]f a motion for summary judgment has been made, a district court may grant summary judgment to any party—including a non-movant," because "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte." *First Financial Ins. Co. v. Allstate*

-12-

*Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir. 1999). Notice is not necessary where there is no prejudice to the party against whom summary judgment is found. *Biosafe–One Inc. v. Hawks*, 379 Fed.Appx. 4, 8–9 (2d Cir. 2010).

## I. Standing

Defendants argue that the receiver does not have standing to pursue claims against them. The same argument was addressed and rejected in a previous decision in this case, *Federal Nat. Mortg. Ass'n*, 2011 WL 2414685 at * 7. The receiver has standing to pursue these claims on Olympia's behalf.

## II. New York Debtor and Creditor Law § 273

New York Debtor and Creditor Law § 273 ("§ 273") states:

> "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

N.Y. Debt. & Cred. Law § 273. Under § 273, "if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent." *Capital Distrib. Servs., Ltd. v. Ducor Express Airlines, Inc.*, 440 F.Supp.2d 195, 203 (E.D.N.Y. 2006); *Zanani v. Meisels*, 78 A.D.3d 823 (2d Dep't 2010). Therefore, in order to succeed under this Section, Olympia must show (1) that it transferred money; (2) that the money was transferred while Olympia was insolvent or that the transfers rendered Olympia insolvent; and (3) that the transfers were not made in exchange for fair consideration. *See In re Sharp Inter. Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

As explained above, there is some uncertainty as to the appropriate standard of proof required to prove constructive fraud pursuant to § 273. I will apply the more stringent standard.

-13-

### A. Money Transfers

The record establishes, without dispute, that the Sam Pinter Relatives received, or benefitted from, the transfers asserted in this motion by Olympia. So, the first element is satisfied.

### B. Olympia's Insolvency

Olympia was insolvent at least from December 31, 1997, which is prior to any of the transfers at issue, and possibly for its entire existence. The Sam Pinter Relatives make the bald assertion that the transfers to them, and the transfers from which they benefitted, did not occur while Olympia was insolvent and did not contribute to Olympia's insolvency, but offer no evidence in support of their position.

"Moreover, the element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *U.S. v. Alfano*, 34 F.Supp.2d 827, 845 (E.D.N.Y. 1999). As discussed below, with the exception of the interest payments to Moishe, Sarah and David, where summary judgment is denied, there was no fair consideration for the money transfers. The presumption then is that Olympia was insolvent for those transactions for which there was no fair consideration, and the Sam Pinter Relatives have not offered any evidence to rebut that presumption.

### C. Fair Consideration

"Under section 273 of the Debtor and Creditor Law, any transfer made by an insolvent debtor for less than 'fair consideration' is fraud as against his creditors without regard to the actual intent of the transferee." *Schmitt v. Morgan*, 98 A.D.2d 934 (3d Dept. 1983). In order to satisfy the statutory requirement for "fair consideration" under § 273, a conveyance must satisfy an antecedent debt or constitute a present exchange. *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir.

-14-

1995). The value of the consideration may not be disproportionately small when compared with the value of the conveyance. *Lippe v. Bairnco Corp.*, 249 F.Supp.2d at 377.

Fagie, Charles and Basi provided no consideration for any of the transfers at issue. Sarah, David and Moishe provided no consideration for any of their transfers, with the exception of the interest payments made to them, as to which there remain issues of fact.

### 1. Sam did not Provide Consideration for Any of the Transfers

The Sam Pinter Relatives argue that the transfers to them and benefits they received from transfers made on their behalf were for fair consideration because some of the transfers were monies to which Sam was entitled by virtue of his relationship with Olympia. In support of this argument, Sam has provided an affidavit explaining his relationship to Olympia. As explained above, Sam did not loan money to Olympia. In addition, there is no evidence that Sam assigned any monies to which he may have been entitled to any of the Sam Pinter Relatives.

The money transferred to the Sam Pinter Relatives was not included on Sam's W–2 forms, but rather on his relatives' W-2s. These W–2s contradict Sam's conclusory affidavit that the transfers were monies owed to him; any money that Olympia paid to Sam Pinter should have been on forms issued to him, not to the Sam Pinter Relatives. Olympia submitted the Sam Pinter Relatives' W–2 forms, showing that Olympia declared the transfers as some of the Sam Pinter Relatives' own salary; while these W–2s were improperly issued, as the Sam Pinter Relatives did not work for Olympia[6], they do serve to further contradict Sam's statement that the transferred money was owed to him. As such, no reasonable jury could conclude that the transfers to the Sam Pinter

---

[6] Charles, who, as explained earlier, did some work for Olympia, was paid for that work through his company, not in his individual capacity.

-15-

Relatives constituted monies owed to Sam Pinter.

In addition, as a matter of law, the Sam Pinter Relatives could not be entitled to transfers or benefits from transfers made on their behalf on the basis of profits or shareholder distributions owed to Fagie or to Sam. Under the New York Business Corporations Law, "[a] corporation may declare and pay dividends . . . except when [ ] the corporation is insolvent or would thereby be made insolvent . . . ." N.Y. Bus. Corp. Law § 510(a). "A corporation holds its assets in trust for the benefit of the corporation's creditors, and cannot lawfully distribute its assets to shareholders to the prejudice of those creditors." *In re Trace Intern. Holdings, Inc.*, 289 B.R. 548, 560 (Bktrcy.S.D.N.Y. 2003). An insolvent corporation cannot make distributions to shareholders, and such distributions are "classic fraudulent conveyances [ ] prohibited by law." *In re Adelphia Communications Corp.*, 323 B.R. 345, 377 fn. 104 (Bkrtcy.S.D.N.Y. 2005), *citing In re Trace Intern. Holdings, Inc.*, 289 B.R. at 561. Given Olympia's poor financial condition, any transfers to, or on behalf of, its shareholders would have been illegal and therefore are recoverable.

In sum, Sam Pinter did not provide any consideration for any transfers to any of the Sam Pinter Relatives. Olympia is granted summary judgment on all of the payroll transfers, mortgage payments and health insurance benefits which the Sam Pinter Children claim they received in consideration of Sam's relationship with Olympia.

### 2. The GECC Loan was not Consideration

As explained above, I addressed the GECC loan, in detail, in a previous opinion, and determined that undisputed records submitted by Olympia prove that none of Sam's children is entitled to any repayment of loan monies from the GECC loan. *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 04-CV-4971, Doc. # 654, Aug. 5, 2011, pp. 7-8, 17. As such, Olympia is

-16-

granted summary judgment against each of the Sam Pinter Children in the amount of $20,000.00.

### 3. Fagie Gave No Consideration for her Transfers

Fagie received $39,300.00 in transfers identified as payroll and $54,539.11 identified as health insurance benefits. It is undisputed that Fagie never worked for Olympia. She argues that she was entitled to the transfers and benefits she received because she was an officer of, and shareholder in Olympia. To begin with, she has not shown that she invested any money in Olympia. Moreover, if she had received money from Olympia because she was an investor, she would not have received W-2 forms for the $39,300.00 in payroll transfers; W-2s report only income and wages, not returns on investments. Finally, neither an officer of a corporation nor a shareholder in a corporation is entitled to health care benefits without giving the corporation consideration for the benefits, and Fagie gave none.

In sum, Olympia has proved that Fagie gave no consideration for the transfers and benefits she received from Olympia, and Olympia is entitled to summary judgment against her in the amount of $93,839.11.

### 4. Charles's Company was Paid for His Work

Charles did work for Olympia, but the undisputed evidence shows that his company, Shraig & Shraig Trucking, was paid, in full, for the work. Charles has offered no explanation as to why, since his company was paid in full for the work, he was not fully compensated by those payments. The W-2s submitted by Olympia shows that he was paid large amounts, totaling $192,000.00, over a period of five years. Charles has submitted no evidence to show that he was an employee of Olympia. He also offered no evidence as to how being paid over a period of five year correlates to the time period he worked on the elevator shaft. *See.* Tr. Oral Argument, July 30, 2012, pp. 27-28

-17-

("Mr. Grannis: [T]he other problem is that, you know, he was paid for years these additional monies. An[d] so, its not like there's any - - - these additional payroll amounts are not in any way correlated in terms of time with the elevator money. So, it just makes no sense. . . . Mr. Russo: I'm not denying the allegations of the timing [.]). In sum, Charles was not employed by Olympia for any work other than the work on the elevator shaft for which Charles's company was paid in full.

Charles also received $52,691.30 in health insurance benefits from Olympia which he claims he was entitled to by virtue of his employment at Olympia. However, since I have determined that he was not employed by Olympia, Charles was not entitled to any health insurance benefits from Olympia.

Olympia has proven that Charles gave no consideration for the payroll transfers to him or for the health insurance benefits he received. As such, Olympia is granted summary judgment on those transfers, in the amount of $244,691.30.

### 5. Basi

Since it is undisputed that Basi never worked for Olympia, there was no consideration for the payroll transfers to her. Basi seeks to keep $11,349.25 in interest payments she received which she claims Olympia paid to her because she loaned Olympia money. However, as explained above, the evidence shows that Basi did not loan Olympia any money. In addition, Olympia submitted W-2s showing that Basi received $177,091.83 as payroll; no part of this sum could have been repayment of loan principal. As such, she was not entitled to any interest she received from Olympia. Olympia is granted summary judgment on the interest and payroll payments it made to her.

### 6. Moishe

It is undisputed that Moishe never worked for Olympia. As such, there was no consideration

for the payroll transfers he received.

Olympia has proven that Moishe did not loan the corporation $8,793.54 in 1992. Moishe claims, however that the $8,000.00 in interest payments resulted from a loan he made to Olympia in 1998. He also claims that $37,200.00 in payroll payments to him were partially repayment of his loan principal. Although Moishe has not specified how much principal he was repaid, principal repayments would not be made or recorded as payroll. Because Olympia has submitted W-2s showing that Moishe received $37,200.00 as payroll, this sum could not have been repayment of loan principal.

Olympia, however, has not proven to this court that Moishe did not loan Olympia $38,307.25 in 1998. Moishe has submitted a signed promissory note supporting his contention that he lent Olympia the money. As explained above, there are factual problems with the circumstances of this alleged loan which lead me to find that issues of fact exist as to whether Moishe actually loaned Olympia $38,307.25 and whether the "interest" payments he received were, in fact, interest payments on that loan.

### 7. David and Sarah

It is Olympia's burden to prove that there was no consideration for the interest amounts paid to David and Sarah. The evidence on both sides is thin, but, given this burden, I cannot grant summary judgment to Olympia. Rather, I find an issue of fact exists as to whether loans were made by Sarah and David, and whether the payments identified as "interest" were interest payments on those loans.

### D. Summary as to § 273 Claims

For the above reasons, Olympia's motion for summary judgment as to Fagie, Charles and

-19-

Basi, is granted in its entirety. Olympia's motion is granted against Sarah and David only to the extent they received transfers from the GECC loan, and against Moishe to the extent he received payroll and GECC proceeds. With those exceptions, Olympia has established by undisputed clear and convincing evidence that the transfers were made by Olympia to the Sam Pinter Relatives, or on their behalf, while Olympia was insolvent and without fair consideration. The motion is denied against Sarah in the amount of $3,123.54, David in the amount of $6,569.99 and Moishe in the amount of $8,000.00.

### III. New York Debtor and Creditor Law § 276

New York Debtor and Creditor Law § 276 (" § 276") states:

> "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Section 276 requires a conveyance and actual intent to hinder, delay or defraud. Here, the record establishes that the transfers occurred. "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor." *In re Sharp Int'l Corp.*, 403 F.3d at 56. Actual fraud must be proved by clear and convincing evidence. *See McCombs*, 30 F.3d at 328, *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122 (2d Dep't 1986). "Because direct proof of a debtor's intent to hinder his creditors is rare, creditors may rely on 'badges of fraud' to establish an inference of fraudulent intent." *Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998). Badges of fraud are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, 30 Misc.3d 1216(A), 2011 N.Y. Slip Op. 50100(U), 2011 WL 293716 at *8 (N.Y.Sup. Jan. 31, 2011) (internal quotations and citations omitted). These include "(1) a close relationship between the parties to the transaction, (2)

-20-

a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." *Id.*; *see United States v. McCombs*, 30 F.3d at 328.

As with the § 273 claim, the Sam Pinter Relatives argue that the transfers and benefits they received were part of monies owed to Sam and Fagie based on their relationship with Olympia and because of that, they argue there was no intent to defraud Olympia.

As shown above, Olympia has established that the transfers to or on behalf of the Sam Pinter Relatives were neither part of Sam's or Fagie's "profits" on their investment nor outstanding GECC loan proceeds owed to them. Olympia has also established that Charles, Fagie and Basi did not loan money to Olympia. It is undisputed that none of the Sam Pinter Relatives worked for Olympia, with the exception of Charles, whose company was paid in full for any work he performed, and who was not, himself, employed by Olympia. There are many badges of fraud present. There is a close relationship between Olympia and the Sam Pinter Relatives. Sam Pinter was the Vice President of Olympia and owned 9% of its shares, and Fagie Pinter was the corporate Secretary and owned 32% of the company. Sam and Fagie are the parents of the Sam Pinter Children. The money transfers were not made in the usual course of business. A corporation does not usually transfer money to, or for the benefit of, people who provide no consideration. Nor does a corporation properly prepare and file W–2 forms for people who are not employed by the corporation. And, if, as the Sam Pinter Relatives argue, these transfers were monies owed to Sam or Fagie, the amounts of the transfers each year would have been, but were not, issued by Olympia on appropriate forms to Sam and Fagie, not as W-2s for people who did no work for Olympia.

-21-

As explained above, Olympia, the transferor in this case, had been insolvent at least since December 31, 1997, and all of the transfers in question occurred after that date. Olympia used its money to pay the Sam Pinter Relatives, among others, rather than pay its creditors, such as Fannie Mae, through an elaborate scheme developed to avoid paying creditors. *See, e.g., Federal Nat. Mortg. Ass'n*, 724 F.Supp.2d 308. Therefore, its actions defrauded its creditors. Under all of these circumstances, the existence of multiple badges of fraud "constitute the requisite clear and convincing evidence of actual intent to defraud." *In re Singh*, 434 B.R. 298, 312 (Bkrtcy.E.D.N.Y. 2010). The court finds that Olympia has satisfied its burden to "establish that the transfer[s] [were] made with an intent to hinder, delay or defraud [ ] creditors pursuant to § 276." *Id.*

For these reasons, Olympia's motion for summary judgment on its § 276 claims is granted except as to Sarah in the amount of $3,123.54, David in the amount of $6,569.99 and Moishe in the amount of $8,000.00 as to whom issues of fact remain as to whether they made loans to Olympia and are entitled to keep the interest they received therefrom. As to the rest of the transfers to the Sam Pinter Relatives, there remain no issues of fact that Olympia made the transfers with the intent to defraud its creditors. On the contrary, there is clear and convincing evidence that the transfers were made with the intent to defraud creditors, and no reasonable jury would conclude other than that the transfers were made with such intent. Therefore, summary judgment is granted in part to Olympia on its crossclaims pursuant to § 276.

## IV. Breach of Fiduciary Duty by Fagie Pinter

"The elements of a cause of action to recover damages for a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Institute, Inc.*, 74 A.D.3d 776, 777 (2d

Dep't 2010). "A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority." *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 438 (S.D.N.Y. 2010), *quoting Bank of Am. Corp., v. Lemgruber*, 385 F.Supp.2d 200, 224 (S.D.N.Y. 2005). The existence of a fiduciary relationship, however, is based upon a fact-specific inquiry. *Krys v. Butt*, No. 11-1695-CV, 2012 WL 2331485 (2d Cir. Jun. 20, 2012), *citing EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005). *See also Anwar*, 728 F.Supp.2d at 415.

It is undisputed that Fagie was an officer in name only; she had no control over Olympia. She had no specialized knowledge and no one at the company relied on her for any advice regarding corporate affairs. In fact, she completely relied on her husband to take care of her interests in Olympia. She was involved only when Sam placed corporate papers before her which needed the corporate Secretary's signature. There is no dispute that she was unaware of the massive fraud being perpetrated at Olympia. Olympia argues that her breach was based, in part, on the fact that she did nothing to control Leib Pinter, who, prior to Olympia's inception, had pled guilty to bribing a Congressman. But, because Fagie had no control over the affairs at Olympia, there is no way she would have been able to exercise any control over Leib.

Under these circumstances, no reasonable jury would find that Fagie, despite the fact that she was a corporate officer, exercised any control over Olympia, a close corporation, or dominated its affairs in any way. Therefore, there is no factual basis upon which to find that Fagie had a fiduciary duty to Olympia. *Tulumello v. W.J. Taylor Intern. Const. Co., Inc.*, 84 A.D.2d 903 (4th Dept. 1981) ("Considering that Taylor Co. was a close corporation completely run by Taylor and that Tulumello was only a nominal officer thereof, we find no basis to subject him to the strict fiduciary duty of a responsible officer.").

-23-

Even assuming, *arguendo*, that Fagie had a fiduciary duty to Olympia that she somehow breached, Olympia has not shown that her actions or lack of action factually and proximately caused Olympia's damages. *RSL Communications PLC v. Bildirici*, 649 F.Supp.2d 184, 208 (S.D.N.Y. 2009) (causation for a breach of fiduciary duty is proven by direct and proximate causation) (compiling cases), *aff'd*, 412 Fed.Appx. 337 (2d Cir. 2011), *cert. denied*, 132 S.Ct. 97 (2011). On the contrary, it is undisputed that Fagie exercised no influence as to any affairs at Olympia, and Olympia has not shown any basis for concluding that she could have exercised any influence. In sum, Olympia has not offered any evidence to show that, had Fagie performed her duties as corporate Secretary, the fraud perpetrated at Olympia would not have happened.

Olympia also argues that Fagie acted in collusion with Sam Pinter and therefore bears the full responsibility for each fraud perpetrated by Olympia. Olympia, however, offers no evidence in support of such an argument. There is no proof of any collusion, as Olympia admits that Fagie was not involved in company decisions and left business dealings to her husband.

In sum, Fagie did not breach her fiduciary duty to Olympia.

## V. Interest

Olympia requests prejudgment interest pursuant to N.Y. C.P.L.R. § 5001(a). "Where ... damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *See* N.Y. C.P.L.R. § 5001(b); *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83 (2d Cir.1998) ("New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date,' which can be used to simplify the calculation.").

-24-

Interest will flow from the following intermediate dates: interest will run on $93,839.11 in transfers to Fagie starting from March 29, 2002; interest will run on $264,691.30 in transfers to Charles starting from March 15, 2002; interest will run on $302,620.07 in transfers to Basi starting from March 29, 2002; interest on the $20,000.00 GECC loan proceeds to Sarah and David will run from January 16, 2003, the date they received the proceeds; and interest will run on $57,200.00 in transfers to Moishe starting from March 29, 2002.

## CONCLUSION

For the reasons set forth above, summary judgment is granted in part and denied in part. Summary judgment is granted to Olympia on its crossclaims under New York Debtor and Creditor Law §§ 273 and 276 on all transfers as to Fagie, Charles and Basi. Summary judgment is granted in part on its §§ 273 and 276 crossclaims against Sarah, David and Moishe, on those transfers not supported by consideration. There remain issues of fact as to whether Sarah, David and Moishe loaned money to Olympia, and summary judgment is denied to Olympia on monies relating to those loans.

Summary judgment is also denied to Olympia but granted to Fagie Pinter on Olympia's crossclaim of breach of fiduciary duty against Fagie Pinter.

Olympia is entitled to recover damages against the following defendants on its crossclaims pursuant to New York Debtor and Creditor Law §§ 273 and 276 in the following amounts, with interest from the specified dates:

(1) Fagie Pinter: $93,839.11, interest from March 29, 2002;

(2) Charles Pinter: $264,691.30, interest from March 15, 2002;

(3) Basi Nierenberg: $302,620.07, interest from March 29, 2002;

-25-

(4) Sarah Pinter: $20,000.00, interest from January 16, 2003;

(5) David Pinter: $20,000.00, interest from January 16, 2003; and

(6) Moishe M. Pinter: $57,200.00, interest from March 29, 2002.

SO ORDERED.

s/Nina Gershon

NINA GERSHON
United States District Judge

Dated:        Brooklyn, New York
              January 29, 2013

-26-